1   CARLSMITH BALL LLP

2   DAVID LEDGER (CNMI BAR NO. F0195)
    ELYZE J. MCDONALD (CNMI BAR NO. F0355)
3   Carlsmith Ball LLP Building
    Capitol Hill
4   Post Office Box 5241
    Saipan, MP 96950-5241
5   Tel No. 670.322.3455

6   Attorneys for Defendant
    Aviation Services (CNMI), Ltd. dba Freedom Air
7

8
                    UNITED STATES DISTRICT COURT
9
                             FOR THE
10
                    NORTHERN MARIANA ISLANDS
11

12
    MOSES T. FEJERAN and           |    CIVIL ACTION NO. 05-0033
13  QIANYAN S. FEJERAN,            |
14                                 |
                 Plaintiffs,       |    **DEFENDANT'S OPPOSITION TO**
15                                 |    **PLAINTIFFS MOTION TO AMEND**
         vs.                       |    **COMPLAINT AND TO ALLOW**
16                                 |    **DEPOSITION OF DEFENDANT;**
    AVIATION SERVICES (CNMI), LTD. |    **DECLARATION OF RICHARD**
17  dba FREEDOM AIR,               |    **BROWN; DECLARATION OF DAVID**
                                   |    **LEDGER; EXHIBIT A; CERTIFICATE**
18               Defendant.        |    **OF SERVICE**

19

20  I.    **INTRODUCTION**

21          This case is now less than two months from its rescheduled trial date and it is all too

22  apparent that Plaintiff has squandered limitless opportunities to take the discovery needed for

23  trial preparation. While Plaintiff disingenuously claims "surprise" and suppression of facts and

24  defenses on the part of Defendant, the plain and painful truth of the matter is that Plaintiff simply

25  didn't do his homework.  It is far too late to assert an entirely new (and futile) claim obviously

26  designed to end-run Defendant's defenses and theories, which certainly would require a

27  significant amount of discovery.  It is naïve for Plaintiff to suggest no additional discovery would

28

be required. But then again when he had the chance Plaintiff did little discovery to learn about Defendant's theories and defenses. If Plaintiff was caught off guard by recent expert witness testimony it is of his own doing, not Defendant's. Had Plaintiff simply deposed Freedom Air Director of Safety Richard Brown he would have discovered Mr. Brown to be a wealth of information.[1]

The new and futile claim sought to be asserted, CNMI's Consumer Protection Act (CPA) involves the issue of whether or not Defendant Freedom Air knew or should have known that it introduced an unsafe service into commerce. This is *not* an issue which has been the subject of this case at any time. Because further discovery, and thus, further delay, would be necessary, leave to amend the complaint should be denied. Further, as discussed below, amendments which are futile should likewise not be permitted, notwithstanding the liberal standard for amendments. The proffered amendment would be futile because local law can not be utilized to provide rules of decision in this action which involves international air transportation by an air carrier authorized to provide such service, all of which is subject to Warsaw Convention and the manner in which United States federal courts have construed and applied the Convention. United States Supreme Court authority leaves no doubt that local law is pre-empted.

As this Memorandum discusses, untimely assertion of the CPA claim is not due to anything other than Plaintiffs' lack of diligence. Plaintiffs could have tried to assert the CPA claim earlier, but waited to do so until two months prior to trial, and at that solely in reaction to theories and defenses which diligence would have uncovered. Furthermore, Plaintiff's legal team are seasoned CNMI practitioners and can hardly claim just learning about the Commonwealth's CPA. Plaintiff's untimely motion is extremely dilatory and prejudicial.

---

[1] The Court may recall having been introduced to Mr. Brown at the settlement conference. It is significant to note that despite verifying Freedom's interrogatory answers and being identified in disclosures, certainly an indication of having something to say, Plaintiff never sought to depose Mr. Brown.

Moreover, the Ninth Circuit allows the Pretrial Order, which has not yet been compiled, to set the stage for the issues to be tried. It would therefore be improper for the Court to preclude Defendant at this juncture to utilize its defense that its aircraft is airworthy, in compliance with FAA regulations and manufacturer specifications, and that an air carrier such as Freedom Air is prohibited from self-modifying an FAA-certified commercial transport aircraft. Again, minimal diligence and a single deposition of Freedom Air Director of Safety Richard Brown would have been an eye-opener on these issues. Because Plaintiffs have failed without justification or excuse to take Defendant's (presumably Mr. Brown) deposition before discovery closed, there is no good cause to permit the deposition now.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

On October 11, 2005, Plaintiffs filed their Complaint in the Superior Court of the Commonwealth of the Northern Mariana Islands, alleging negligence and loss of consortium. On October 31, 2005, Defendant removed to the District Court for the Northern Mariana Islands, on the grounds of federal jurisdiction, specifically, the Warsaw Convention. Oct. 31, 2005 Notice of Removal at 1-2.[2] Plaintiffs have never disputed the applicability of the Warsaw Convention.

Plaintiffs' failure to conduct adequate and prompt discovery is the root of their present dilemma. When Defendant filed its Answer, it asserted that Plaintiff failed to state a claim upon which relief may be granted. *See* Answer filed October 31, 2005. However, Plaintiff never conducted discovery on this issue, as they never asked Defendants to explain its position and they never deposed any of Defendant's representatives when they had the chance. Had they done even a single deposition of a knowledgeable Freedom Air representative, Plaintiffs would have learned, among other information, that Freedom Air holds an airworthiness certificate

---

[2] Defendant also stated that in the alternative, diversity jurisdiction was present.

1    issued by the FAA, that its aircraft is operated in compliance with the manufacturer's

2    specifications, and is approved by the FAA.

3         Plaintiffs also forced a delay as they refused to produce their own expert report until

4    March 22, 2007, and then only upon Court order compelling it. As the Court is aware, Plaintiffs

5    promised to produce their expert report in September 2006, but then refused to do so. That delay

6    meant that Defendant's expert, Richard Gill, could not compile his own report until May 21,

7    2007. *See* Notice of Order, filed Mar. 16, 2007.

8

9         In May 2007 Defendant promptly produced Mr. Gill's report which made the following

10   observations, *putting Plaintiff on notice of Freedom Air's defense:*

11              ·         Inadequate or defective maintenance was not a contributing factor to Mr.

12   Fejeran's alleged stairway fall accident.

13

14              ·         "There is no evidence to support any allegation that the subject stairway

15   was *not deployed in a manner consistent with the manufacturer's specifications.*"

16              ·         "There is no evidence to support any allegation that the subject stairway

17   was *not utilized in a manner consistent with the manufacturer's intention for the routine*

18   *disembarkation from the aircraft.* In fact, no such allegation has been made by Mr. Fejeran, nor

19   his expert Dr. Perez."

20

21              ·         "The design of the subject stairway *is typical for built-in or fixed*

22   *stairways in commuter aircraft.* There is no evidence to support any allegation that *the general*

23   *design characteristics* of the subject stairway somehow contributed to Mr. Fejeran's alleged

24   stairway fall accident. The general design configuration *is common to that of most commuter*

25   *aircraft with built-in fixed stairways.*"

26   Ex. A at 2-3 (emphasis added). Mr. Gill concluded that "the subject stairway that Mr. Fejeran

27   encountered at the time of his alleged fall was neither unusual nor unexpected. Rather, *the*

28

1    *design, condition, operational protocol, and so forth were all consistent with the normal*

2    *operation of any comparable such aircraft.*" Ex. A at 4 (emphasis added).

3    Plaintiffs had this report in their hands in May 2007 and were therefore on notice that the

4
     aircraft's disembarkation stair is designed and/or built by the manufacturer of the aircraft and in
5
     the case of commercial transport aircraft in compliance with federal regulations applicable to
6
7    such aircraft. Therefore, their claims that they only heard of this defense in the deposition of Mr.

8    Gill simply shows that, in addition to not taking any discovery from Freedom Air on the issue,

9    they failed to read or understand Mr. Gill's report.[3]

10   Furthermore, now Plaintiffs seek leave to file an amended complaint to add an additional

11   cause of action: a claim under the Commonwealth Consumer Protection Act (CPA). Plaintiffs
12
     state that this claim involves no new facts;[4] if that is true, this claim could have been brought
13
14   earlier. It is therefore disingenuous for Plaintiffs to claim that the expert report and deposition of

15   Richard Gill are what prompted Plaintiffs to think of a new cause of action.

16   **III.    LEGAL DISCUSSION**

17           A.    LEAVE TO AMEND SHOULD BE DENIED BASED ON REASONS OF
                   UNFAIR PREJUDICE AND UNDUE AND UNJUSTIFIABLE DELAY.
18

19   Federal Rule of Civil Procedure 15 governs the amendment of pleadings. Rule 15 states

20   that leave to amend shall be granted freely "when justice so requires." Fed. R. Civ. P. 15(a);

21   *see also CK-Alexanders Laing & Cruickshank v. Goldfield*, 739 F. Supp. 158, 167 (S.D.N.Y.

22   1990) (Rule 15(a) "requires that leave to amend shall be 'freely given,' but there is a difference

23   between freedom and license. That difference is spelled out in the Rule's next phrase, which
24
     mandates that leave be freely given only 'when justice so requires.'"). However, even though
25

26   [3] Plaintiff's lack of diligence to take discovery from Freedom Air's Richard Brown was highlighted during Mr. Gill's deposition. When Mr. Gill recited certain information regarding Freedom Air's inability to modify the aircraft stair he was asked how he knew that. Mr. Gill explained that the information had been provided by Freedom Air. It
27   seems reasonable to assume that had Plaintiff taken a deposition from Freedom Air that an inevitable question would have been what information had Freedom Air provided to its expert ?
28   [4] Defendant disputes this. *See* discussion at § III.A., *infra*.

amendments shall be freely given, limitations on amendment still exist, such as when the amendment is due to undue delay or gives rise to undue prejudice, or, as in this instance, when it is futile. *See, e.g., Jacobson v. Rose*, 592 F.2d 515, 519 (9th Cir. 1978) ("delay in seeking an amendment is a common reason for refusing leave"); *Foman v. Davis*, 371 U.S. 178, 182 (1962). For example, as in this case, "when the motion to amend is filed late in the litigation, justice requires the Court to determine whether there is prejudice to defendants." *Hollinger-Haye v. Harrison Western/Franki-Denys*, 130 F.R.D. 1, 1 (D.D.C. 1990).

Also, amendments should not be permitted if, as in this instance, they radically shift the nature of the case. *See Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074 (9th Cir. 1990) (denying amendment to add RICO claims because "new claims set forth in the amended complaint would have greatly altered the nature of the litigation and would have required defendants to have undertaken, at a late hour, an entirely new course of defense"); *Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998) (prejudice will result from proposed amendment involving new factual and legal issues requiring additional discovery). In *Vitale v. Aetna Cas. & Sur. Co.*, 814 F.2d 1242, 1252 (8th Cir. 1987), the Court denied leave to amend where, as here, the plaintiff sought leave two months prior to trial, and the new claim required additional discovery on new factual allegations.

Lastly, Plaintiff must provide a justifiable reason for the delay in seeking amendment. 739 F. Supp at 166-67. When considerable time has elapsed between the filing of the complaint and the motion to amend, the movant has the burden of showing some valid reason for his neglect and delay. *Acosta-Mestre*, 156 F.3d 49 52 (1st Cir. 1998) (internal citation omitted); *Whitaker v. City of Houston, Tex.*, 963 F.2d 831, 836 (5th Cir. 1992) (plaintiff must show delay due to oversight, inadvertence, or excusable neglect).

1.    <u>Defendant Will Suffer Prejudice if the Amendment is Allowed.</u>

Defendant will suffer prejudice if the amendment is allowed.  Although Plaintiffs claim that no new discovery is required, the CPA claim, as Plaintiffs assert, has been raised in order to show that Defendant, in spite of using airworthy aircraft, used or performed a service which it *knew* or *should have known* was unsafe or may have caused an unsafe condition in normal use.  The CPA claim is not based on exactly the same facts and legal elements as the negligence claim; there is one obviously new crucial legal element: **Defendant's knowledge of an unsafe condition and introduction of that unsafe condition into commerce.**  First, Plaintiff would have to disclose to Defendant any and all information Plaintiff has bearing on the so-called knowledge defendant had or should have had.  Second, Defendant must show it did not have any such knowledge and should or could not have known that the aircraft was "unsafe".  Defendant must conduct discovery to determine what facts Plaintiffs possess that show that Defendant had knowledge or should have had knowledge of an unsafe condition.  Defendant notes that the proposed amended complaint does not allege any facts revealing how Defendant knew or should have known of an unsafe condition.  At this late stage, Plaintiffs posture Defendant to be surprised at Trial.

Moreover, Defendant requires time to explore other defenses, such as whether the CPA applies to cases in which a merchant provides a service that conforms to industry standard or is approved, as in this instance, by government regulation.[5]

---

[5] Last, but certainly not least, Plaintiffs' contention here that no additional investigation or discovery would be needed has to have been made after forgetting what transpired in  March 2007 during Plaintiff's deposition of Freedom Air Ground Agent Felicidad Boddy.  During her deposition Ms. Boddy alluded to what may have been a disembarkation incident.  She could not, however, recall any details, nor was she present at the time of the incident she spoke of.  Ms. Boddy also testified that a written report might exist. Though at the time of the deposition deposing counsel said a discovery request would be served, no such request was ever served. Thus, at the moment of Ms. Boddy's deposition opposing counsel knew additional discovery would be required, yet  now they say none is needed.

As this discussion shows, Defendant's need for time to respond to this new allegation is contrary to Plaintiff's understandable claim that no new discovery is needed. The development of Defendant's defense to the CPA claim is no small task in the *two months before the trial date*. Had Plaintiffs asserted this claim back in October 2005, Defendant could have incorporated any necessary facts, legal defenses, and expert testimony to these claims. However, those two years are now lost. Now, should the amendment be permitted, Defendant stands at a large disadvantage in that it must shift its focus in the next two months from trial preparation to developing a defense to a new claim.

Needless to say, this late claim has not been developed thoroughly by either party or their experts. It would be unfair to Defendant to allow this claim to be tried without it having had adequate time to prepare. Yet, adequately addressing this new claim requires no less than five months, if not more, for exchanging discovery and developing defenses. Moreover, additional expert opinions may be needed. Because of the inevitable delay due to the amendment and the prejudice to Defendant, it would not be an abuse of discretion to deny the motion for leave to amend the complaint. *Zivkovic v. Southern Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002).

This case is coming up on two years. The time to proceed to trial on claims that have been timely asserted is now.

> 2. No Good Cause Has Been Cited.

Plaintiffs fail to demonstrate good cause for not seeking amendment earlier. The gist of Plaintiffs' argument in this regard is that because they have "just discovered"[6] that Defendant has a strong defense to the negligence claim, they must now be allowed an opportunity to assert a new claim that they believe has a chance of getting past the strong defense. Basically, they create a new theory out of old facts.

---

[6] Even if this were true, do Plaintiffs have anyone to blame but themselves? As previously mentioned, though Richard Brown, or a 30(b)(6), deponent was ready and willing to be deposed, Plaintiffs simply chose not to.

1    Creating a new legal theory out of old facts is hardly good cause. The time to assert the

2    CPA claim was two years ago. Plaintiffs themselves are the cause of the delay in asserting the

3    CPA claim, not just because the claim was available two years ago, but also because Plaintiffs

4    failed to conduct proper discovery or to read Mr. Gill's report. Had they served discovery

5    requests regarding Defendant's defenses or even deposed Defendant, they would have become

6    aware of the aircraft's airworthiness much sooner. In this respect, Defendant also opposes

7    

8    Plaintiffs' extremely dilatory request to depose Defendants after the discovery cutoff has passed.

9        B.    THE CPA CLAIM IS FUTILE BECAUSE THE WARSAW CONVENTION
10               PROVIDES THE EXCLUSIVE REMEDY

11    The primary and unchallenged basis for the removal of this action is the Warsaw

12    Convention, which governs injuries occurring on board, or embarking or disembarking on

13    international air travel. This action unquestionably concerns an international flight in

14    international airspace, see Decl. of Richard Brown, ¶¶ 3, 6-9, thus the Warsaw Convention

15    applies.

16    

17    The Supreme Court has decisively held that if the Warsaw Convention does not allow

18    recovery, then no recovery at all is permitted. *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525

19    U.S. 155, 161 (1999). "Recourse to local law, we are persuaded, would undermine the uniform

20    regulation of international air carrier liability that the Warsaw Convention was designed to

21    foster." *Id.*; *see also id.* at 169 ("The cardinal purpose of the Warsaw Convention, we have

22    observed, is to achieve uniformity of rules governing claims arising from international air

23    transportation.") (internal citation omitted).

24    

25    The Ninth Circuit has followed *Tseng* in holding that the Warsaw Convention provides

26    the exclusive remedy for claims within its scope. In *Carey v. United Airlines*, 255 F.3d 1044 (9th

27    Cir. 2001), the court affirmed summary judgment in favor of the airline on Carey's state law

28    claims for emotional and mental distress arising from willful misconduct by a flight attendant.

The Court saw "no basis for concluding that the Warsaw Convention does not apply to claims arising out of intentional misconduct. Because the Warsaw Convention does apply to such claims, Carey has a remedy. Under *Tseng*, it is his only one." *Id.* at 1051. *See also Dazo v. Globe Airport Security Servs.*, 295 F.3d 934, 940 (9th Cir. 2002) ("The Warsaw Convention provides the exclusive remedy for claims arising out of a carrier's intentional misconduct."); *Husmann v. Trans World Airlines, Inc.*, 169 F.3d 1151. 1152 (8th Cir. 1999) (state law claims for injury arising from tripping over luggage while boarding were completely preempted by the Warsaw Convention).

**Claims under consumer protection acts are also preempted by the Warsaw Convention.** In *Mbaba v. Societe Air France*, 457 F.3d 496, 500 (5th Cir. 2006), the court held that the Warsaw Convention preempted a claim under the Texas Deceptive Trade Practices Act. "To hold otherwise would undermine the Convention's goals of uniformity." *Id. See also Bernardi v. Apple Vacations*, 236 F. Supp. 2d 465 (E.D. Pa. 2002) (dismissing claims under Pennsylvania's Unfair Trade Practices and Consumer Protection Law). Furthermore, as the *Tseng* court stated, "[r]ecourse to local law, we are persuaded, would undermine the uniform regulation of *international air carrier liability* that the Warsaw Convention was designed to foster." Freedom Air is an international air carrier (*see* Decl. of Richard Brown, ¶ 7) and as such is entitled to adjudication of its rights and liabilities in accordance with Warsaw not the same local law which would apply to a bus or taxi.

In accordance with the Warsaw Convention, and the policies of uniformity and certainty, the CPA claim is undoubtedly preempted. It involves a claim for which the Warsaw Convention provides a remedy, and thus, the exclusive remedy. As the amendment would be futile, leave to amend the Complaint should be denied.

C.    THERE IS NO BASIS FOR COURT TO PRECLUDE DEFENDANT'S DEFENSE TO LIABILITY.

Plaintiffs recognize that the Ninth Circuit has liberalized the requirement that defendants must raise affirmative defenses in their initial pleadings. Mot. at 9 (citing *Magana v. CNMI*, 107 F.3d 1436, 1446 (9th Cir. 1997)).    One method the Ninth Circuit has used to liberalize the requirement is by allowing an affirmative defense to be asserted through a pretrial order, which controls the subsequent course of action in the litigation. *See Northwest Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 924 (9th Cir. 1988). Here, the Court has not yet issued its pretrial order, and may incorporate any defenses that Plaintiffs claim have been newly raised, but are in actuality only newly discovered due to Plaintiff's lack of diligence.

Also, "[s]trict adherence to Federal Rule of Civil Procedure 8(c) is not required so long as no prejudice results." *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993). As discussed above, if there has been any prejudice to Plaintiffs, it has been of their own making by their failure to conduct prompt or adequate discovery. Defendant's defense theories have always been available to be explored by Plaintiffs through depositions of Defendant and through its expert report. Plaintiff on numerous occasion mentioned taking depositions from Freedom Air, including a 30(b)(6) deposition, yet never followed through. It is hardly surprising that Plaintiff now concerns himself over viable theories which were always there simply for the asking.

There is no justification for striking a defense due to Plaintiffs' lack of diligence. Plaintiffs had ample time to conduct discovery and to take Defendant's deposition, which it failed to do. Defendant is the party that would experience prejudice if it is not permitted to defend itself in this action with the defense that its aircraft is airworthy and in compliance with federal regulations and manufacturer specifications. This defense has not only been discoverable to Plaintiffs, and part of Defendant's defense that Plaintiffs have failed to state a claim upon which relief may be granted, it is really just common sense. Do Plaintiffs really expect the court

1    to believe a commercial airline flying passengers for hire is not subject to FAA regulation with

2    regard to its aircraft and operations and that such regulation should not have been the subject of

3    discovery?

4

**IV.    CONCLUSION**

5

6    For the foregoing reasons, the Court should deny Plaintiffs' Motion for Leave to amend

7    their complaint to include a consumer protection claim that could have been brought at the

8    inception of this case, deny Plaintiffs' request to strike Defendant's defense, and deny any

9    opportunity for Plaintiffs to engage in further discovery.

10    DATED: July 26, 2007.

11    CARLSMITH BALL LLP

12

13    DAVID LEDGER
      ELYZE J. MCDONALD
14    Attorneys for Defendant
      Aviation Services (CNMI), Ltd.
15    dba Freedom Air

16

17

18

19

20

21

22

23

24

25

26

27

28

1    CARLSMITH BALL LLP

2    DAVID LEDGER (CNMI BAR NO. F0195)
     Carlsmith Ball LLP Building
3    Capitol Hill
     Post Office Box 5241
4    Saipan, MP 96950-5241
     Tel No. 670.322.3455
5
     Attorneys for Defendant
6    Aviation Services (CNMI), Ltd. dba Freedom Air

7

8
                     UNITED STATES DISTRICT COURT
9
                              FOR THE
10
                    NORTHERN MARIANA ISLANDS
11

12

13   MOSES T. FEJERAN and              CIVIL ACTION NO. 05-0033
     QIANYAN S. FEJERAN,
14
                  Plaintiffs,
15
              vs.                      **DECLARATION OF RICHARD
16                                     BROWN**

17   AVIATION SERVICES (CNMI), LTD.
     dba FREEDOM AIR,
18
                  Defendant.
19

20        I, RICHARD BROWN, declare under penalty of perjury that the following statements are

21   true and correct:

22        1.    I have personal knowledge of the facts stated in this declaration except as

23   otherwise indicated.

24        2.    I would testify competently to these facts if called by the Court to do so.

25        3.    At present, I am employed by Freedom Air as Director of Safety. In January

26   2005 when Mr. Fejeran was a passenger on Freedom Air and was involved in a disembarkation

27   irregularity on a flight from Saipan to Rota my position was Director of Operations. That flight
28

4833-7267-9681.1.059303-00001

was one leg of an international flight Freedom Air operated between Guam and the Northern Mariana Islands. The ticket Mr. Fejeran traveled on was the same ticket issued to all passengers on that flight.

4.    Previous to my employment with Freedom Air, I was employed for thirty seven (37) years in the aviation industry as a commercial airline transport pilot and held a transport pilot license issued by the FAA. I retired from commercial transport flying upon reaching mandatory retirement age of 60.

5.    My present position at Freedom Air requires me to ensure that Freedom Air is in compliance with FAA and U.S. Dept. of Transportation ("DoT") rules and regulations applicable to international air travel. My present position at Freedom Air also requires me to be familiar with how the Warsaw Convention applies to international air travel such as the flight Mr. Fejeran was on, and in particular how the Convention applies to passengers traveling on such flights with regard to liability for claims against Freedom Air.

6.    Freedom Air operates and did operate in January 2005 a flight with the following itinerary: Guam-Rota-Saipan-Rota-Guam. Freedom Air operates the entire flight and each separate leg of this flight as an international flight in full compliance with FAA and DoT rules and regulations for international air travel. Though the Saipan-Rota leg could be mislabeled by an uninformed person as a so-called domestic flight because it takes off and lands in the CNMI, since the flight traverses approximately forty (40) miles of international airspace FAA and DoT rules and regulations for international air travel apply and the flight is officially classified as international air travel.

7.    In addition, Freedom Air operates Guam-Rota-Saipan-Rota-Guam, including the Saipan-Rota leg, as a Flag Carrier authorized by FAR Part 121 to conduct international air transportation (see 14 CFR Part 119.3).

8.      Previous to my employment with Freedom Air I was employed by Pacific Island Aviation in the position of Director of Operations for nearly three years.  PIA also flew Guam-Rota-Saipan-Rota-Guam.  At one time the FAA wanted PIA to operate the Saipan-Rota leg as a domestic flight and Guam-Saipan and Rota-Guam as international flights.  This was not possible as different flight rules applied, for example, as concerns fuel loads and payloads.  After being reminded that the Saipan-Rota leg operated in international airspace, the FAA concluded that even that leg was to be deemed an international flight.

9.      The Transportation Security Administration likewise classifies the Saipan-Rota leg of the Guam-Rota-Saipan-Rota-Guam flight as international air travel. All commercial aircraft operating internationally are required to carry on board a transponder which identifies the aircraft to aviation authorities.   Freedom Air's Guam-Rota-Saipan-Rota-Guam flight is required to carry such a transponder, and have it turned on for all legs of the flight because FAA classifies the flight, including Saipan-Rota, as international air travel.

I declare under penalty of perjury that the foregoing is true, correct and complete.

DATED: Hagåtña, Guam, July 25th, 2007.

RICHARD BROWN

# DECLARATION OF DAVID LEDGER

I, DAVID LEDGER, declare under penalty of perjury that the following statements are true and correct:

1.    I have personal knowledge of the facts stated in this declaration except as otherwise indicated.

2.    I would testify competently to these facts if called by the Court to do so.

3.    I am licensed to practice law in the Commonwealth of the Northern Mariana Islands and am admitted to this Court.

4.    I am the attorney for Aviation Services (CNMI), Ltd. dba Freedom Air.

5.    Attached hereto as **Exhibit A** is a true and correct copy of Richard Gill's Expert Report.

I declare under penalty of perjury that the foregoing is true, correct and complete.

EXECUTED: July 26, 2007.

DAVID LEDGER

# EXHIBIT A



May 21, 2007

David Ledger
c/o Carlsmith Ball LLP
Bank of Hawaii Building, Suite 401
134 West Soledad Avenue
Hagåtña, Guam  96932

### **Fejeran vs. Aviation Services (CNMI), Ltd.**

Dear Mr. Ledger:

I have reviewed the file material provided by your office pertaining to the above referenced matter. In addition, my Associate Engineer, Ms. Joellen Gill, inspected the subject aircraft and its associated ladder wherein she took a variety of measurements and photographs, as well as digital videos. The purpose of this letter is to summarize my opinions, as well as provide a brief discussion of their underlying foundation.

I base my findings and opinions: on my training, experience, and expertise in the field of Human Factors Engineering; the photographs, videos, observations, and measurements made at the time of Ms. Gill's site inspection; and the various file material pertaining to this case that your office provided. The material I reviewed that was specific to the facts of this case included:

1. Dr. Perez's Report;
2. Defendant's Second Supplemental Responses to Plaintiff's First Discovery Requests;
3. Defendant's Third Supplemental Rule 26 Disclosures;
4. Miscellaneous Shorts SD3-60 Maintenance Protocols;
5. Miscellaneous Communications with your office.

This report is based on the information that is available to date. It is my understanding that discovery is continuing in this matter, thus I reserve the right to further expand and/or amend my opinions and their bases if additional information relevant to my area of expertise becomes available.

Attached as an exhibit to this report is a copy of my CV that highlights my training, experience, and expertise as it pertains to safety and risk management, along with a list of my publications. Also attached is a listing of my sworn testimony for the past 5 years. Please note that my fees for work on this matter, including trial, is $300/hour plus expenses; deposition fees are $350/hour, unless paid in advance, with a minimum charge of $1,000. Commercial travel time is billed at half-rate.

I have a Ph.D. in Mechanical Engineering – Human Factors Option; I have 30 years of experience in Human Factors with my emphasis being in safety and risk management. I have done theoretical work in the area of safety, as well as provided consulting services to private industry and businesses in the field of safety and risk management. As noted in my CV, I am board certified in Human Factors and I am a certified Tribometrist.

## OPINIONS

1. Inadequate or defective maintenance was not a contributing factor to Mr. Fejeran's alleged stairway fall accident.

   There is no evidence to support any allegation that the subject stairway and its associated appurtenances were not maintained consistent with the requirements as set forth by the aircraft manufacturer (i.e. Shorts). It is noted that Mr. Fejeran has alleged that the handrail somehow "wobbled" as he was descending the stairway. However, it is noted that Mr. Fejeran's expert Dr. Perez measured a total deflection of only ½ inch (i.e. only a ¼ inch deviation on either side of the center line of the handrail). First and foremost, such an alleged deviation does not violate Shorts maintenance specifications. In addition, such a deviation is inconsequential and not likely to induce a loss of balance. Lastly, with all due respect to Mr. Fejeran, it is questionable how such a deviation could occur when other passenger(s) that were disembarking the plane were likely holding onto the handrail at the same time this alleged deflection occurred.

2. Improper deployment of the subject stairway was not a contributing factor to Mr. Fejeran's alleged stairway fall accident.

   There is no evidence to support any allegation that the subject stairway was not deployed in a manner consistent with the manufacturer's specifications. In fact, no such allegation has been made by Mr. Fejeran, nor his expert Dr. Perez.

3. The manner in which Aviation Services was utilizing the subject stairway was not a contributing factor to Mr. Fejeran's alleged stairway fall accident.

   There is no evidence to support any allegation that the subject stairway was not utilized in a manner consistent with the manufacturer's intention for the routine disembarkation from the aircraft. In fact, no such allegation has been made by Mr. Fejeran, nor his expert Dr. Perez.

4. The design of the subject stairway is typical for built-in or fixed stairways in commuter aircraft.

   There is no evidence to support any allegation that the general design characteristics of the subject stairway somehow contributed to Mr. Fejeran's alleged stairway fall accident. The general design configuration is common to that of most commuter aircraft with built- in fixed stairways.

2

It is noted that Dr. Perez is critical of the variation in the elevation between the last actual stair tread and the tarmac, opining that this increased variation was "a substantial factor" in Mr. Fejeran's alleged fall. However, the variation between the last tread and the tarmac is not proximate to Mr. Fejeran's alleged fall in that in his answers to interrogatories Mr. Fejeran claims that he was about halfway down the stairway when the handrail allegedly wobbled thereby causing him to lose his balance and fall. In other words, according to Mr. Fejeran, his loss of balance allegedly occurred before this variation and it was induced by the handrail.

5. In his report Dr. Perez claims that the 1985 Uniform Building Code (UBC) "requires" or "mandates" certain design parameters for stairways; however, Dr. Perez's claims are misleading and/or factually erroneous.

For example, Dr. Perez claims that the 1985 UBC "requires" riser heights to be no more than 7 inches. However, for many years both pre 1985, as well as post 1985, the UBC had permitted riser heights up to 8 inches (i.e. see section 3306.(c)1). Dr. Perez also claims that the 1985 UBC "requires" tread depths "to be greater than 11 inches". To be more precise, the 1985 UBC, as well as those for many years before and after, specifically permit tread depths of 11 inches under all circumstances (i.e. see Section 3306.(c)); in fact, in some circumstances the UBC has routinely, over the years, permitted tread depths as shallow as 9 inches (i.e. see Section 3306.(c)1).

Dr. Perez also falsely claims that the 1985 UBC "mandates" handrails on both sides of a stairway **and** a 12 horizontal extension of such handrails. However, the 1985 UBC, as well as the UBC for numerous years before and after 1985, permits either no handrail or a handrail on a single side under a variety of conditions. It should be noted that given the setting for the subject stairway (i.e. embarkation/disembarkation of a commercial aircraft) there is no reason to expect "two-way" traffic on the subject stairway; as such, a handrail on one side only is not unreasonable or unsafe. Of course, it is noted that there is a handrail on both sides on the upper portion of the stairway. It is also noted that the 1985 UBC requires horizontal extensions to be only 6 inches, not 12 inches as alleged by Dr. Perez; in addition, such extensions are not universally required (i.e. see Section 3306.(j)). Lastly, the lack of any such horizontal extension is not proximate to the alleged falling accident in that Mr. Fejeran claims that he was only **partway** down the stairway and he was **holding the handrail** when he allegedly lost his balance and fell.

6. Mr. Fejeran's alleged stairway fall accident was a result of his own interaction with the design of the subject stairway and not due to any atypical design/condition of the subject stairway, nor due to any unexpected or unusual condition or event.

Mr. Fejeran's alleged falling accident occurred as he was descending the stairway on the subject aircraft. As discussed above: (1) the overall condition of the

subject stairway was in compliance with the manufacturer's maintenance
specifications; (2) the deployment of the subject stairway was in compliance with
the manufacturer's specifications; (3) the subject stairway was deployed in a
manner consistent with the manufacturer's recommendations; and (4) there was
nothing atypical associated with the design/configuration of the subject stairway.

In short, the subject stairway that Mr. Fejeran encountered at the time of his
alleged fall was neither unusual nor unexpected. Rather, the design, condition,
operational protocol, and so forth were all consistent with the normal operation of
any comparable such aircraft. Any abnormality in Mr. Fejeran's interaction with
the subject stairway was due to his own personal interaction with the subject
stairway and not due to any abnormality in the design, condition, or method of use
of the subject stairway.

Please let me know if you have any questions or if I can be of any further assistance. I
look forward to continuing to work with you in this matter.

Sincerely,

Richard Gill, Ph.D., CHFP, CXLT
President and Chief Scientist

Richard Thomas Gill
2104 West Riverside
Spokane, WA 99201
Phone/Fax: (509) 624-3714
Email: RickGill.ACS@Verizon.Net

**LICENSE:**

Certified Human Factors Professional, 1994-present
  By the Board of Certification in Professional Ergonomics
  License Number 0526, 1994

Certified XL Tribometrist, 2002-present
  By the International Safety Academy
  License Number A2002-0272

**EDUCATION:**

University of Illinois
  Ph.D. in Mechanical Engineering, 1982
  Area of Specialization: Human Factors

Wright State University, 1978
  M.S. in Systems Engineering
  Area of Specialization: Human Factors

Massachusetts Institute of Technology
  1 year Graduate Study in Electrical Engineering, 1973

Wright State University
  B.S. in Systems Engineering, 1972

**ACADEMIC EXPERIENCE:**

*Professor of Mechanical Engineering at the University of Idaho (1995-2002):* Teaching responsibilities include human factors, math modeling, mechanics, and statistics. Additional responsibilities include appointment as an adjunct professor in the Department of Psychology and Director of Idaho Space Grant Consortium.

*Associate Professor of Mechanical Engineering at the University of Idaho (1990-1995):* Teaching responsibilities include human factors, math modeling, mechanics, and statistics. Additional responsibilities include appointment as an adjunct professor in the Department of Psychology and Director of Idaho Space Grant Consortium.

## ACADEMIC EXPERIENCE: (Continued)

*Assistant Dean for the College of Engineering at the University of Idaho (1989-1990):* Administrative responsibilities included the overall administration of the Engineering Science curriculum, coordinating statewide off-campus programs, managing engineering cooperative education programs, and recruiting new students. Position also included teaching and research responsibilities.

*Assistant Professor of Mechanical Engineering at the University of Idaho (1987-1988):* This tenure track appointment was 65% Mechanical Engineering and 35% Engineering Sciences. Teaching responsibilities included math modeling, mechanics, statistics, and course development in human factors. Additional responsibilities included a position as an adjunct professor in the Department of Psychology to assist in the development of an interdisciplinary research laboratory and graduate program in human factors.

*Assistant Professor of Engineering Science at the University of Idaho (1984-1987):* This tenure track appointment was 50% in the Engineering Science Department and 50% in the Mathematics and Applied Statistics Department. Teaching responsibilities included courses in engineering mechanics, applied probability and statistics, and developing a course in human factors in engineering design. Additional responsibilities included helping staff the Statistical Consulting Center.

*Assistant Professor of Engineering at Wright State University (1980-1984):* Served as Program Director for the Human Factors Engineering Program. Teaching responsibilities included engineering statics, engineering dynamics, human factors engineering, senior seminar, and systems approach to human factors. Also held a joint appointment with the WSU School of Professional Psychology where the primary responsibility was to assist in the development of a Doctor of Psychology degree in Human Factors.

*Tutor for the State of Ohio (1978):* Worked as a personal tutor for individual college students being rehabilitated from mental illnesses.

*Student Tutor (1969-1972):* Worked as a tutor for Wright University, Dean of Students Office. Tutored courses in Mathematics and Physics.

## PROFESSIONAL EXPERIENCE:

*Engineering Consultant for Applied Cognitive Sciences (1983-Present):* I have worked as an expert witness, for both the plaintiff and defense, on over 1000 legal cases nationwide. I have been qualified as an expert in human factors, accident reconstruction, mechanical engineering, safety engineering, and risk management. Work has also included contracts from U.S. government agencies (USAF Aeromedical Research Laboratory and Idaho National Engineering Laboratory) as well as private industry (Arvin Industries, The Vendo Corporation, Key Tronic Corporation, Port Townsend Paper, Hewlett Packard, Manco Industries, Fun-Kart Association, Anchor Industries, and so forth).

2

**PROFESSIONAL EXPERIENCE: (Continued)**

*Research Scientist for the USAF Office of Scientific Research (1983):* This was an appointment at the USAF Aeromedical Research Laboratory. The work focused on assessing the relationship between acceleration-stress and pilot workload. In addition, I also worked on a project concerning the effects of high-onset rates of acceleration on pilot performance.

*Graduate Research Assistant at the University of Illinois (1978-1981):* Responsibilities included the conception and formulation of various research projects in the fields of Engineering Psychology and Mechanical Engineering.

*Human Factors Engineer for the United States Air Force Human Resources Laboratory (1976-1978):* Worked concurrently in two major fields: (1) visual simulation and (2) motion and force simulation. This included conducting in-house research as well as serving as program manager for externally conducted research.

*Electronics Engineer for the United States Air Force Foreign Technology Division (1974-1976):* Position required a Top Secret security clearance. The work involved the selection and analysis of intelligence data to predict foreign military trends and capabilities.

*Process Control Engineer for Industrial Nucleonics Corporation (1973-1974):* Worked on the development of an infra-red moisture gauge to allow real-time computer control for tobacco dryers. Responsibilities included the development of a calibration technique and system installation at an operational site.

*Computer Operator for Synergy, Inc. (1970-1972):* Operated a CDC 6600 Computer at Wright Patterson Air Force Base while attending undergraduate school.

**HONORS AND AWARDS:**

University of Idaho College of Engineering Outstanding Academic Advisor, 1998.

University of Idaho College of Engineering Outstanding Senior Faculty, 1996.

University of Idaho Alumni Award for Excellence, 1994.

American Society for Engineering Education Centennial Certificate Awardee, 1993.

Best Paper Award from American Society for Engineering Education Regional Conference, 1991.

ASUI Outstanding Faculty Award, 1991.

University of Idaho Alumni Award for Excellence, 1988.

3

**HONORS AND AWARDS: (Continued)**

Recipient of the New Engineering Educator Excellence Award from American Society for Engineering Education, 1987.

Recipient of the Dow Outstanding Young Faculty Award from the American Society for Engineering Education, 1986.

Selected as an S.C.E.E.E. fellow for the Air Force Office of Scientific Research Summer Faculty Research Program, 1983.

Graduated first in class at the University of Illinois (GPA 5.0 out of 5.0), 1981.

Member of Tau Beta Pi National Engineering Honor Society, 1979.

Recipient of the "Science and Engineering Career Motivation Award" which is given annually by the Dayton Board of Education, 1978.

Graduated first in class at Wright State University (GPA 4.0 out of 4.0), 1978.

Awarded National Science Foundation Traineeship to Massachusetts Institute of Technology, 1972.

Graduated first in class at Wright State University, summa cum laude (GPA 3.9 out of 4.0), 1972.

W.S.U. Foundation Scholarship, 1972.

W.S.U. Foundation Scholarship, 1971.

Golding Award (Outstanding Junior Engineer) at Wright State University, 1971.


**PUBLICATIONS:**

Gill, R., and Gordon, S.  Cognitive Task Analysis.  In C. Zsambok and G.  Kline (Eds.), Naturalistic Decision Making, pp. 131-140, Lawrence Erlbaum Associates, 1997.

Gill, R.  Towards Protection from Cumulative Trauma Disorder Litigation.  Advances in Industrial Ergonomics and Safety VII, Taylor and Francis, Ltd., 1996.

Gill, R., Gordon, S., McGehee, D., and Dean, S. Integrating Cursor Control into the computer Keyboard. In Human Factors Perspectives on Human-Computer Interaction: Selections from Human Factors and Ergonomics Society Annual Meeting Proceedings, 1983-1994, Human Factors Society, 1995.

Gill, R., Gordon, S., and Babbitt, B.  Embedding Intelligent Tutoring into Real Time Simulation.  Proceedings of the Eighth Symposium on Aviation Psychology, 1995.

**PUBLICATIONS: (Continued)**

Babbitt, B., Bell, H., Crane, P., Sorensen, H., Gordon, S., and Gill, R. Intelligent Tutoring System: F-16 Flight Simulation. <u>Proceedings of the 1994 American Institute of Aeronautics and Astronautics (AIAA) Computing in Aerospace Conference</u>, 1994.

Gill, R. A Comprehensive Evaluation of Warning Label Design. In K. Laughery, M. Wogalter, and S. Young (Eds.), <u>Human Factors Perspectives on Warnings</u>, pp. 50-52, Human Factors and Ergonomics Society, 1994.

Gill, R., and Gordon, S. Conceptual Graph Analysis: A Tool for Curriculum Development, Instructional Design, and Trainee Evaluation. <u>Proceedings of the 1993 Interservice/Industry Training Systems and Education Conference</u>, pp. 861-870.

Gordon, S. E., Schmierer, K. A., and Gill, R. T. Conceptual Graph Analysis: Knowledge Acquisition for Instructional System Design. <u>Human Factors</u>, 35, pp. 459-482, 1993.

Gordon, S. E., and Gill, R.T. Knowledge Acquisition with Question Probes and Conceptual Graph Structures. In T. Lauer, E. Peacock, and A. Graesser (Eds.), <u>Questions and Information Systems</u>, pp. 29-46. Hillsdale, N J: Lawrence Erlbaum Associates, 1992.

Gill, R, Gordon, S., McGehee, D., and Dean, S. Integrating Cursor Control into the Computer Keyboard. <u>Proceedings of the Human Factors Society's 35th Annual Meeting</u>, Vol. 1, pp. 256-260, 1991.

Gill, R., Dingus, T. Human Factors and Engineering Design High School Summer Workshop. <u>Proceedings of the Human Factors Society's 34 Annual Meeting</u>, Vol. 1, pp. 522-524, 1990.

Dingus, T., Gordon, S., and Gill, R. A New Program for the Remote Training of Human Factors Professionals. <u>Proceedings of the Human Factors Society's 34 Annual Meeting</u>, Vol. 1, pp. 534-536, 1990.

Gill, R., and Stauffer, L. Developing Appropriate Evaluation Criteria for Assessing the Value Added by Mechanical Engineering Education Programs. <u>Proceedings of the 1989 American Society for Engineering Education Annual Conference</u>, Vol. 3, pp. 1263-1265, 1989.

Gordon, S., and Gill, R. Question Probes: A Structured Method for Eliciting Declarative Knowledge. <u>AI Applications in Natural Resource Management</u>, Vol. 3, pp. 13-20, 1989.

Gill, R. Mail-order Errors: The Role of Human Factors. <u>Dickinson's PSAO,</u> Vol. 3, No. 12, pp. 6-7, Dec. 1988.

Christensen, J., Topmiller, D. and Gill, R. Human Factors Definitions Revisited. <u>Human Factors Bulletin</u>, pp. 7-8, Oct. 1988.

**PUBLICATIONS: (Continued)**

Dingus, T., Hyde, R., Hyde, T., Frame, M. and Gill, R. The Speed and Accuracy of a Spatial Communication Task as a Function of Operator Location. Proceedings of the 21 st Annual Meeting of the Human Factors Association of Canada.

Gill, R., Gordon, S., Moore, J. and Barbera, C. The Role of Knowledge Structures in Problem Solving. Proceedings of the 1988 American Society for Engineering Education Annual Conference, Vol. 2, pp. 583-90, 1988.

Junker, A., Levison, B. and Gill, R. A Systems Engineering Based Methodology for Analyzing Human Electrocortical Responses. AFAMRL Technical Report AAMRL-TR-87-030, May 1987.

Gill, R., Barbera, C. and Precht, T. A Comparative Evaluation of Warning Label Designs. Proceedings of the Human Factors Society's 31 st Annual Meeting, Vol. 1, pp. 476-78, 1987.

Gordon, S., Gill, R., and Dingus, T. Designing for the User: The Role of Human Factors in Expert System Development. Artificial Intelligence Applications in Natural Resource Management, Vol. 1, No. 1, pp. 35-46, 1987.

Gill, R. The Need for Human Factors in the Design of Expert Systems. Proceedings of the 1987 Frontiers in Education Conference, 1987.

Gill, R., and Dingus, T. A Structural Approach to Teaching Relative Motion. Proceedings of the 1987 American Society for Engineering Education Annual Conference, Vol. 4, pp. 1806-08, 1987.

Barbera, C. and Gill, R. Human Factors in Warning Label Design. Proceedings of Interface 1987.

Gill, R., Kenner, K. and Junker, A. Steady State EEG as A Measure of Peripheral Light Loss. Proceedings of the Human Factors Society's 30th Annual Meeting, Vol. 2, pp. 1249-52, 1986.

Kenner, K, Junker, A. and Gill, R. Visual Evoked Response in the Periphery, The Beginnings of an Objective Measure of G-Induced PLL. Proceedings of the National Aerospace and Electronics Conference, Vol. 3, pp. 909-12, May 1986.

Gill, R., and Albery, W. The Effects of Acceleration Stress on Human Workload and Manual Control. Proceedings of the 21st Annual NASA Conference on Manual Control, 1985.

Albery, W., Ward, S. and Gill, R. Effects of Acceleration Stress on Human Workload. AFAMRL Technical Report AAMRL-TR-85-039, 1985.

**PUBLICATIONS: (Continued)**

Gill, R., and Gordon, S. The Effectiveness of Group Projects in Teaching Engineering Mechanics. <u>Proceedings of the 1984 American Society for Engineering Education</u>, 5(5), pp. 27-33, 1984.

Gill, R., Obleski, M. Gordon, S. and Albery, W. The Effects of Acceleration on Cognitive Processing. <u>Proceedings of Mid-Central Ergonomics/Human Factors Conference</u>, April 1984.

Gill, R. Pilot Workload and G-Stress: A Potential Interaction? USAF Summer Faculty Research Program - Final Reports. Published by Southeastern Center for Electrical Engineering Education, December 1983.

Pierce, B., Obleski, M. and Gill, R. Human Factors in Aerospace: A Student Chapter Project. <u>Human Factors Bulletin</u>, April 1983.

Gill, R., and Wickens, C. Operator Workload as a Function of the System State. <u>Proceedings of the 18th Annual NASA Conference on Manual Control</u>, 1982.

Gill, R., Wickens, C., Reid, R. and Donchin, E. Pseudo-Quickening: A New Display Technique for Manual Control of Higher Order Systems. <u>Proceedings of the Human Factors Society's 26th Annual Meeting</u>, 1982.

Gill, R., Wickens, C., Donchin, E. and Reid, R. The Internal Model as a Means of Analyzing Human Performance. <u>Proceedings of the 1982 I.EE.E. International Conference on Systems, Man and Cybernetics</u>, 1982.

Hull, J., Gill, R. and Roscoe, S. Locus of Stimulus to Visual Accommodation: Where in the World, or Where in the Eye? <u>Human Factors</u>, 24, pp. 311-19, 1982.

Wickens, D., Gill, R., Kramer, A., Ross, W. and Donchin, E. The Cognitive Demands of Second Order Manual Control: Applications of the Event-Related Brain Potential. <u>Proceedings of the 17th Annual NASA Conference on Manual Control</u>, NASA TM, 1981.

Ritchie, M., Gill, R. and Jankowski, R. The Education and Placement of Human Factors Engineers. <u>Proceedings of the North Central Section, American Society for Engineering Education</u>, Dayton, OH, pp. 82-87, April 1981.

Albery, W., and Gill, R. Development and Validation of Drive Concepts for an Advanced G-Cueing System. <u>Proceedings of the 1978 American Institute of Aeronautics and Astronautics</u>, 1978.

## PRESENTATIONS:

Gill, J. and Gill, R.  Human Factors in Litigation. Invited presentation by the Washington State Trial Lawyer's Association, October 2006.

Gill, R. Electronic Billboards: Safety and Social Issues.  Invited presentation to the Snohomish City Council Meeting, May 2005.

Gill, R. Human Factors in Accident Reconstruction.  Invited address to the 20th Annual Special Problems in Traffic Crash Reconstruction at IPTM, Jacksonville, Florida, April, 2002.

Gill, R.  Human Factors Expert Witness. American Board of Trial Advocates Meeting, Waikiki, Hawaii, November 2000.

Gill, R.  Industrial Funding Support for K-12 Programs.  Panel discussant for the Annual Meeting of Space Grant Directors, April 1997.

Gill, R.  Human Factors in Forensic Investigations.  Invited address at Society of Forensic Engineers and Scientists Meeting, August 1996.

Barnes, T., Hodge, J., and Gill, R.  Design and Fabrication of an Integrated Cystic Fibrosis Treatment System.  Presented at the 1996 Idaho Academy of Science Meeting.

Gill, R.  Technology and Its Impact on Society.  Invited address at the Fourteenth Annual International Exchange Conference, Lewis-Clark State College, October 1994.

Gill, R., and Lewis, V. Towards Improved College Teaching: A Preliminary Report. Presented at the American Society for Engineering Education Pacific Northwest Section Annual Regional Meeting, April 1992.

Elger, D., and Gill, Modeling the Problem Solving Process Used by an Expert. Presented at the American Society for Engineering Education Pacific Northwest Section Annual Regional Meeting, April 1992.

Gill, R. High School Summer Workshops: An Effective Recruitment Technique. Presented at the American Society for Engineering Education Pacific Northwest Section Annual Regional Meeting, April 1991.

Elger, D., and Gill, R. A Goal for Engineering Education: The Ideal Engineer. Presented at the American Society for Engineering Education Pacific Northwest Section Annual Regional Meeting, April 1991.

Carson, B., and Gill, R. The Human Factors Element in Engineering Design. Presented at the 1989 Idaho Academy of Science.

## PRESENTATIONS: (Continued)

Simon, A., Imthurn, J., Polillo, S. and Gill, R. The Role of Human Factors in Engineering Design: A Case Study of an Industrial Paper Winder. Presented at the 1987 Idaho Academy of Science.

Gill, R. The Role of Human Factors in Operator Workstation Design. Invited Presentation at the 1986 PCAPPA.

Gill, R., and Mau, C. The Feasibility of Using EEG to Measure Peripheral Light Loss. Presented at the Annual Western Psychological Association Meeting, 1986.

Gill, R., Ward, S. and Albery, W. The Comparison of Subjective and Objective Workload Measures for Humans Under Acceleration Stress. Presented at the 1984 National Aerospace and Electronics Conference, May 1984.

Gordon, S., & Gill, R. A New Technique for Assessing Cognitive Processing Capabilities. Presented at the Annual Meeting of the Ohio Academy of Science, April 1984.

Richard, M., Rice, S. and Gill, R. The Improvement of a Ballistics Test Range Control Panel Via Human Factors Engineering. Presented at the Annual Meeting of the Ohio Academy of Science, April 1984.

Peters, R., Gill, D., Pasquini, L. and Gill, R. Human Factors Critique and Redesign of a Jet Engine Control Panel. Presented at the Annual Meeting of the Ohio Academy of Science, April 1984.

Gill, R. Improved Quickened Displays. Presented at the Annual Meeting of the Ohio Academy of Science, April 1983.

Julien, J., Click, A., Sanders, S., Scandura, L. and Gill, R. Human Factors Critique and Design of a Hydraulic Systems Test Stand. Presented at the Annual Meeting of the Ohio Academy of Science, April 1983.

Ingle, D., Dabney, G., Scherty, K. Beckett, T. and Gill, R. A Human Factors Critique of an Industrial Sewer Cleaner. Presented at the Annual Meeting of the Ohio Academy of Science, April 1983.

Gill, R. The Role of Human Factors at Three Mile Island. Invited presentation by the Southern Ohio Chapter of the Human Factors Society, October 1982.

Gill, R. Human Factors in Education. Invited presentation by the Dayton Chapter of the I.E.E.E., October 1980.

Gill, R., Ross, T. and Albery, W. An Advanced Acceleration Simulation Device for the Flight Simulators. Presented at the Dayton-Cincinnati AIAA  Mini-Symposium, 1978.

9

## PROFESSIONAL ACTIVITIES:

Member of Human Factors and Ergonomics Society
Member of American Society for Testing and Materials
Member of American Academy of Forensic Sciences

## GRANTS AND CONTRACTS:

Evaluation and Development of Warning Information for Portable Fire Shelters, Anchor Industries, Co-investigator, 2006.

Safety Analysis of Electronic Billboards, City of Snohomish, Principle Investigator, 2005.

Evaluation of Warning Label Designs, American Fun Kart Association, Principle Investigator 2002.

Idaho Space Grant Consortium, NASA, $260,000, Assistant Director, 2001.

Idaho Space Grant Consortium, NASA, $260,000, Assistant Director, 2000.

Transforming Engineering Consulting into Engineering Case Studies, University of Idaho, $35,000, Sabbatical, 1999-2000.

Idaho Space Grant Consortium, NASA, $256,500, Director, 1999.

NASA Experimental Program to Stimulate Competitive Research, $225,000, State-wide Director, 1999.

Idaho Space Grant Consortium, NASA, $256,000, Director, 1998.

Idaho Space Grant Consortium, NASA, $255,000, Director, 1998.

Idaho Total Engineering Challenge, Lockheed Martin Aerospace Corporation, $5,000, Principal investigator, 1997.

Idaho Space Grant Consortium, NASA, $255,000, Director, 1997.

Idaho Space Grant Consortium, NASA, $230,000, Director, 1996.

Summer Institute for Engineering Educators on Curriculum Design and Implementation for Interactive Teaching/Learning, University of Idaho Office of Teaching Enhancement, $2,500, Co-principal investigator, 1995.

Idaho Space Grant Consortium, NASA, $230,000, Director, 1995.

Evaluation of an F-16 Intelligent Tutoring System, Northrop Corporation, $37,600, Co-principal investigator, 1994.

## GRANTS AND CONTRACTS: (Continued)

JETS Workshop, US Department of Energy, $1,400, Co-principal investigator, 1993.

Workstation and Hand Tool Design for Disk Drive Assembly, Hewlett Packard, $5,000, Co-principal investigator, 1993.

Analysis of a Disk Drive Arm Assembly Line Process, Hewlett Packard, $2,000, Co-principal investigator, 1992.

Multimedia for Enhanced Undergraduate Education, University of Idaho Office of Academic Affairs and IBM, $81,000, Co-principal investigator, 1991.

JETS Summer Workshop, US Department of Energy, $9,000, Co-investigator, 1991.

Analysis of a Paper Winder Safety Gate, Port Townsend Paper, $2,500, Co-principal investigator, 1991.

Keymouse Configuration and Design, Key Tronic Corporation, $6,700, Co-principal investigator, 1990.

Keymouse Usability, Key Tronic Corporation, $18,900, Co-principal investigator, 1990.

JETS Summer Workshop, US Department of Energy, $9,000, Principal investigator, 1990.

Mapping Knowledge in Declarative and Procedural Structures, Idaho State Board of Education, $35,000, Co-principal investigator, 1990.

JETS Summer Workshop, US Department of Energy, $22,000, Principal investigator, 1990.

A Program to Test and Evaluate Equipment for the Disabled, University of Idaho Research Office, $7,000, Co-principal investigator, 1989.

Research Experience for Undergraduates, National Science Foundation, $4,000, Co-principal investigator, 1989.

Stressor Interaction Assessment, Boeing Military Aircraft Corporation, $21,600, Co-principal investigator, 1989.

Design and Evaluation of a Vending Machine Retrofit System, The Vendo Company, $20,400, Principal investigator, 1988.

A Structural Technique for Evaluating Design Tools, National Science Foundation, $60,000, Co-author and consultant, 1988.

Formations and Use of Conceptual Structures in Problem Solving Domains, Air Force
**GRANTS AND CONTRACTS: (Continued)**

Office of Scientific Research, $79,200, Co-principal investigator, 1988.

11

Software Interface Design for Asynchronous Computer Conferencing, EG&G of Idaho, $12,800, Co-principal investigator, 1987.

Techniques for Augmenting the Communication of Spatial Information, Boeing Military Aircraft Company, $15,000, Co-principal investigator, 1987.

Evaluation of Warning Label Effectiveness, Arvin Industries, $1,400, principal investigator, 1986.

A Structured Approach for Developing an Effective Teaching Methodology for Problem Solving: A Case Study, American Society for Engineering Education, $1,500, principal investigator, 1986.

The Development of an Innovative Technique for Using Personal Computers to Aid in Teaching Deaf People to Speak, University of Idaho Seed Grant, $3,300, principal investigator, 1986.

The Development of a Steady State EEG Measure of Acceleration Induced Peripheral Light Loss, United States Air Force Aerospace Medical Research Laboratory, Human Engineering Division, $7,100, principal investigator, 1985.

The Feasibility of Using Electroencephalograms to Measure Acceleration Stress, United States Air Force Aerospace Medical Research Laboratory, Human Engineering Division, $14,000, principal investigator, 1984.

The Effects of Acceleration Stress on Cognitive Workload, United States Air Force Aerospace Medical Research Laboratory, Biomechanics Division, $35,000, principal investigator, 1984.



**Applied Cognitive Sciences**
Human Factors
Engineering

A CONSULTING GROUP

## Sworn Testimony for Richard Gill, Ph.D., CHFP, CXLT
### As of May 22, 2007

**2007:**
Trials:

1. Demello vs. State of Hawaii; Honolulu, Hawaii (State)
   Via Preservation Deposition
2. Herbert vs. State of Hawaii; Honolulu, Hawaii (State)
   Via Preservation Deposition
3. Findlay vs. Anderson Cattle Company Restaurant; Vancouver, Washington (State)
   Via Preservation Deposition
4. Jones vs. State of Hawaii; Honolulu, Hawaii (State)
5. Dickman vs. Budget Rental, et al.; Spokane, Washington (State)
6. Clark vs. Sharley-Hubbard; Spokane, Washington (State)
7. Stamey et al, vs. Big Mountain Resort, et al.; Kalispell, Montana (Federal)
   Via Preservation Deposition
8. Salvini vs. Ski Lifts, Inc.; Seattle, Washington (State)
9. Pearl vs. Fred Meyer Stores; Seattle, Washington
10. Herbert vs. State of Hawaii; Honolulu, Hawaii (State; Live Testimony)
11. Megison vs. GM, et al.; Santa Cruz, California (State)
12. Demello vs. State of Hawaii; Honolulu, Hawaii (State)

Depositions/Arbitrations:
1. Pearl vs. Fred Meyer Stores; Seattle, Washington
2. LeMaster et al. vs. Arrow Metal, et al.; Seattle, Washington
3. Sanders vs. Fairmont Orchid; Kona, Hawaii
4. Holler vs. Hilton; Honolulu, Hawaii
5. Tani vs. Healy Tibbits, et al.; Honolulu, Hawaii (Arbitration)
6. Perez vs. Sack N' Save; Honolulu, Hawaii
7. Sampio vs. State of Hawaii; Honolulu, Hawaii (Arbitration)
8. Peters vs. Smith Construction; Helena, Montana
9. Powell, et al. vs. City and County of Honolulu; Honolulu, Hawaii
10. Sanders vs. Fairmont Orchid; Kona, Hawaii (Volume 2)
11. Mabrey vs. Wizard Fisheries; Seattle, Washington
12. Chapman vs. Killinger; Twin Falls, Idaho
13. Tarlton vs. Ryobi et al.; Seattle, Washington
14. Waite vs. Brodhead et al.; Spokane, Washington
15. Speed vs. ICRR; New Orleans, Louisiana
16. Ladner vs. Goggin, et al.; Coeur d'Alene, Idaho

2006:
Trials:
1.  Hokland vs. City and County of Honolulu; Honolulu, Hawaii,
        Via Preservation Deposition (State)
2.  Papadopoulos vs. Fred Meyer Stores; Seattle, Washington,
        Via Preservation Deposition (Federal)
3.  Thornton vs. Spooner Farms; Seattle, Washington,
        Via Preservation Deposition (State)
4.  Camanse vs. Padre; Honolulu Hawaii
        Via Preservation Deposition (State)
5.  State vs. Elder; Honolulu, Hawaii (State)
6.  Steigman vs. Outrigger Properties; Honolulu, Hawaii
        Via Preservation Deposition (State)
7.  Kelly vs. Foodland; Honolulu, Hawaii (State)
        Via Preservation Deposition (State)
8.  Birdwell, et al. vs. AMTRAC, et al.; Philadelphia, Pennsylvania (Federal)
9.  Robins vs. PACCAR, et al.; Lexington, Kentucky
10. Nelson vs. Stellar Sea, et al.; Seattle, Washington
        Via Preservation Deposition (Federal)
11. Harouff vs. Life Church; Dallas, Oregon (State)
12. Clark vs. Harding; Spokane, Washington (State)

Depositions/Arbitrations:
1.  Romero vs. Lowe, et al; Kailua, Hawaii
2.  Sanchez vs. Tsunami's; Waianae, Hawaii
3.  Sisneros vs. UPRR; Hana, Wyoming
4.  Pelzel vs. Pacific County et al.; Gray's Harbor, Washington
5.  Bocatija vs. Cabras Marine; Hagåtña, Guam
6.  Boos et al. vs. Chicago Pneumatic; Seattle, Washington
7.  Lee vs. Royal Orchid et al.; Hagåtña, Guam
8.  Lindall vs. Hawaiian Waters Adventure Park; Honolulu, Hawaii
9.  Stankewich vs. City and County of Honolulu; Honolulu, Hawaii (Arbitration)
10. Remmick vs. Daisy; Billings, Montana
11. Brooks vs. City of Washougal, et al.; Washougal, Washington
12. Boltron vs. St. Francis Medical Center; Honolulu, Hawaii
13. Scrimshaw vs. Stewart; Kona, Hawaii (Arbitration)
14. Nolan vs. Kaanapali Beach Hotel; Kaanapali, Maui (Arbitration)
15. Bright vs. Brown; Spokane, Washington
16. Caldetera vs. Accu-Cut, et al.; Honolulu, Hawaii
17. Teranishi vs. New Casino; Honolulu, Hawaii
18. Heydon vs. City and County of Honolulu; Honolulu, Hawaii
19. Lonczak vs. County of Maui; Wailuku, Maui (Records Deposition)
20. Keehu vs. Players, et al.; Honolulu, Hawaii (Records Deposition)
21. Paglinawan vs. Schuler Homes, et al.; Honolulu, Hawaii
22. Le vs. Kealani, et al.; Wailea, Maui
23. Robins vs. Wayne Engineering, et al.; Lexington, Kentucky

24. Espinoza vs. Risenmay Farms, et al.; Rexburg, Idaho
25. Dickman vs. Budget Rent A Car; Spokane, Washington
26. Sewell vs. Viper Motors; Spokane, Washington
27. Yogi vs. Stearns Airport Equipment, et al.; Honolulu, Hawaii
28. Lewis vs. Mossholders Furniture; Casper, Wyoming
29. Baccus vs. Ameripride; Idaho Falls, Idaho
30. Kelley vs. Foodland; Honolulu, Hawaii
31. Bishop vs. Marriott; Wailuku, Hawaii (Records Deposition)
32. Babayan vs. Wal-Mart; Wailuku, Hawaii (Records Deposition)
33. Bright vs. Brown; Spokane, Washington
34. Maxwell vs. Jerome County; Jerome, Idaho
35. Megison vs. GM, et al.; San Jose, California
36. Carlton vs. BG Consultants, et al.; Hutchinson, Kansas
37. Andrade vs. Flores, et al.; Hilo, Hawaii
38. Warren vs. Kleenco; Honolulu, Hawaii
39. Ringer vs. County of Hawaii; Kona, Hawaii
40. Shimose vs. Apolo, et al.; Honolulu, Hawaii
41. Malott vs. Marriott, Honolulu, Hawaii
42. Pang vs. Yamaha, et al.; Kona, Hawaii
43. Salvini vs. Ski Lifts, Inc.; Seattle, Washington
44. Demello vs. State; Honolulu, Hawaii (Arbitration)
45. Seitz vs. New Holland Equipment, et al.; San Francisco, California
46. Herbert vs. State of Hawaii; Honolulu, Hawaii (Arbitration)
47. Porter vs. Stark; Seattle, Washington

**2005:**
Trials:
1. Juarez vs. Frias; San Francisco, California via Preservation Deposition (State)
2. State of Idaho vs. Marek; Sandpoint, Idaho (State)
3. Dubac-Tyler vs. Hyatt Corp; Kaanapali, Maui (State)
4. Rukavina, et al. vs. Crane Plumbing, et al.; Challis, Idaho (State)
5. Rabissa vs. Costco; Kona, Hawaii (State)
6. Haggard vs. Parma Furniture; Nampa, Idaho (State)

Depositions/Arbitrations:
1. Kim vs. Savard, et al.; St. Johnsbury, Vermont (Volume 1)
2. Cormier vs. Gold's Gym, et al., Boise, Idaho
3. Cross vs. Takenaka Landscaping, et al.; Makakilo, Oahu
4. Li and Wang vs. Sea Life Park; Honolulu, Hawaii
5. Rabissa vs. Costco; Kona, Hawaii (Volume II)
6. Erickson vs. Badger Building Center; Bonners Ferry, Idaho
7. Kim vs. Savard, et al.; St. Johnsbury, Vermont (Volume II)
8. Harris vs. Union Pacific Railroad; Seattle, Washington
9. Juarez vs. Frias; San Francisco, California
10. Horsley vs. Hilton Hotel Corp; Seattle, Washington
11. Dubac-Tyler vs. Hyatt Corp; Kaanapali, Maui
12. Bacani vs. State of Hawaii, et al.; Honolulu, Hawaii

13. Kanei vs. Daiei; Honolulu, Hawaii
14. Stevens vs. Robert Bosch Tool Corporation; Twin Falls, Idaho
15. Young vs. Holiday Inn; Hagåtña, Guam
16. Anthony vs. Alexander & Baldwin, Inc., et al.; Kahalui, Maui (Records)
17. Anthony vs. Alexander & Baldwin, Inc., et al.; Kahalui, Maui
18. Baker vs. Flying J; Casper, Wyoming
19. Abiley vs. State of Hawaii; (Arbitration); Honolulu, Hawaii
20. Sales vs. Self-Help Housing; Honolulu, Hawaii
21. Rukavina, et al. vs. Crane Plumbing, et al.; Challis, Idaho
22. Hart vs. Hoist, et al.; Bonners Ferry, Idaho
23. LeMaster vs. BNSF; Billings, Montana
24. Dunivent vs. UPRR; Cheyenne, Wyoming
25. Glaberson vs. A & B Properties; Kahalui, Hawaii (Records Depo)
26. Newman vs. Milacron, et al.; Bozeman, Montana (Volumes 1 and 2)
27. Glaberson vs. A & B Properties; Kahalui, Hawaii
28. McKay vs. Smith; Spokane, Washington; (Arbitration)
29. Schultz vs. Ellensburg Cement Products, et al.; Seattle, Washington
30. Scholz vs. Zip Truck Lines, et al.; Spokane, Washington
31. Nyquist vs. Farmers, et al.; Great Falls, Montana (Arbitration)
32. Hernadez vs. Lematic; Honolulu, Hawaii
33. Abiley vs. State of Hawaii; Honolulu, Hawaii
34. Dison vs. Vaagen Brothers Lumber; Colville, Washington
35. Harvey vs. Payne Properties; Spokane, Washington
36. Mallot vs. Marriott; Ko'Olina, Oahu (Records Deposition)
37. Stewart vs. Violich, et al.; Kailua, Hawaii
38. Hytrek vs. Albertsons; Casper, Wyoming
39. Hedge vs. Redmond Heavy Hauling; Tacoma, Washington

**2004:**
Trials:
1. Twenge vs. Fred Meyers, et al.; Portland, Oregon (State)
2. Tyler vs. Petsmart, et al.; Spokane, Washington (State)
3. Lewis vs. Tribune Publishing Company, et al.; Colfax Washington (State)
4. Fowler vs. Fred Meyers; Portland, Oregon (State)
5. Richardson vs. State of Montana; Butte, Montana (State)
6. Wendt vs. USA; Honolulu, Hawaii (Federal)
7. Parris vs. State of Washington, et al.; Spokane, Washington (State)
8. Miller vs. Ostler; Moses Lake, Washington (State)
9. Kelley vs. County of Maui, et al.; Wailuku, Maui (State)

Depositions/Arbitrations:
1. Robinson vs. State of Montana; Butte, Montana
2. Lewis vs. Colfax Masonic Corp.; Colfax, Washington
3. Rabisa vs. Costco; Kona, Hawaii
4. Kitchens vs. Outrigger, et al.; Waikiki, Hawaii
5. Ishii vs. Island Colony Condominiums; Waikiki, Hawaii
6. Cadman vs. City and County of Honolulu; Honolulu, Hawaii

7. Castillo vs. A & A Electric; Honolulu, Hawaii
8. Lyons vs. Smith's Food and Drug; Casper, Wyoming
9. Johnson vs. Manco, et al.; Modesto, California
10. Benoy vs. Jacobson; Coeur d'Alene, Idaho
11. Rabisa vs. Costco; Kona, Hawaii (Arbitration)
12. Lawlor vs. Naeole, et al.; Honolulu, Hawaii
13. Carter vs. City of Spokane; Spokane, Washington
14. Kahikina vs. Hilo Terrace Apartments AOAO, et al.; Hilo, Hawaii
15. Moniz vs. Barland, et al.; Honolulu, Hawaii
16. Zelinski vs. BNSF; Portland, Oregon
17. Hopkin vs. BNSF; Greybull, Wyoming
18. Schroder vs. Arby's; Spokane, Washington
19. Vuittonet vs. Hayes Lemmerz International, et al.; Boise, Idaho
20. Gapero vs. Pacific Shores AOAO, et al.; Kihe, Maui
21. Ibara vs. Aloha Tower Management Company, et al.; Honolulu, Hawaii
22. Baker vs. Totally Titanium Inc.; Waikiki, Hawaii
23. Jenner vs. Bargain Giant; Spokane, Washington
24. Milward vs. Vandervert; Spokane, Washington
25. Baker vs. Totally Titanium Inc.; Waikiki, Hawaii (Arbitration)
26. Frahm vs. Alamo Rental Car; Las Vegas, Nevada
27. Mathews vs. Harrington; Spokane, Washington
28. Cuthbert vs. JB's Family Restaurant; Coeur d'Alene, Idaho
29. Kelley vs. County of Maui, et al.; Wailuku, Maui
30. Kappel vs. Kea Lani, et al.; Wailea, Maui
31. Cross vs. Takanaka Landscaping, et al.; Makakilo, Hawaii (Arbitration)
32. Sharp vs. Best; Cheney, Washington
33. Meador vs. Chipman & Taylor, et al.; Pullman, Washington
34. Miyamoto vs. Hawaiian Electric Company, et al.; Honolulu, Hawaii (Vol 1 & 2)
35. Hayes vs. Union Pacific Railroad, et al.; Rupert, Idaho
36. Reaves vs. Rowe; Kennewick, Washington

**2003:**
Trials:
1. George vs. Diamond Parking, Inc., et al.; Honolulu Hawaii (State)
2. Slack vs. Kelleher; Caldwell, Idaho (State)
3. Sinclair vs. BNSF; Great Falls, Montana (State)
4. Barnedo vs. Dominguez; Honolulu, Hawaii (State)
5. Lewis vs. State of Hawaii; Honolulu, Hawaii (State)
6. Gouveia vs. 24 Hour Fitness; Honolulu, Hawaii (State)
7. Fenwick vs. Watabe, et al.; Hagåtña, Guam
8. Gipson vs. Yoke's Pac & Save; Spokane, Washington (State)
9. England vs. Swinerton; San Francisco, California (State)

Depositions/Arbitrations:
1. Vuillemot vs. Wailuna Recreation Association; Honolulu, Hawaii (Arbitration)
2. King vs. Cottrell; Spokane, Washington

3. Lewis vs. State of Hawaii; Honolulu, Hawaii
4. Easterday vs. Leeward Auto Recycling; Honolulu, Hawaii
5. Weathers vs. 24 Hour Fitness; Boise, Idaho
6. Prior vs. Columbus McKinnon Corporation; Lewiston, Idaho
7. Pettit, et al. vs. Friendly Ford, et al.; Las Vegas, Nevada
8. Sinclair vs. BNSF; Billings, Montana
9. Burkey vs. Premier Chemicals, et al; Pocatello, Idaho
10. Figaroa vs. State of Hawaii; Lihue, Hawaii
11. Sherwood, et al. vs. Williams & Associates, et al.; Honolulu, Hawaii (Vol 1-2)
12. Borges vs. County of Hawaii; Hilo, Hawaii (Arbitration)
13. Johnson vs. K.C. Charles, et al.; Spokane, Washington (Volume 1-2)
14. Bishop vs. Union Pacific Railroad; Cheyenne, Wyoming (Volume 1-2)
15. Van Dinter vs. Nason; Spokane, Washington
16. Olson vs. Johnson; Post Falls, Idaho
17. Schmit vs. Vandouris; Spokane, Washington
18. Martin vs. State of Hawaii, et al.; Waimanalo, Hawaii
19. Himmelmann vs. Taroc; Honolulu, Hawaii
20. Olson vs. BNSF; Cheyenne, Wyoming
21. Gomez, et al. vs. IBM, et al.; San Jose, California (Volumes 1-6)
22. Kubinski vs. UPRR; Salt Lake City, Utah (Volume 1-2)
23. Broadfoot vs. Watco; Colfax, Washington
24. Berry vs. Hotel of Marianas; Hagåtña, Guam 96910
25. Ganley vs. Harbor Square; Honolulu, Hawaii (Deposition)
26. Ganley vs. Harbor Square; Honolulu, Hawaii (Arbitration)
27. Ferger vs. Spokane Valley Four Square Church; Spokane, Washington
28. Tyler vs. Petsmart, et al.; Spokane, Washington
29. Paulson vs. Ru-mar Club; Twin Falls, Idaho
30. O'Donnell vs. Taylor Construction; Bozeman, Montana
31. England vs. Swinerton , et al.; San Francisco, California
32. Fenwick vs. Watabe, et al.; Hagåtña, Guam
33. Pinkley vs. BNSF; Spokane, Washington
34. Harrison vs. Hilton Hawaii Village; Waikiki, Hawaii
35. Clark vs. BNSF; Gillette, Wyoming
36. Zygutis vs. Beech; Waipio Valley, Hawaii
37. Retford vs. Snow King, et al.; Jackson Hole, Wyoming
38. Westlake vs. Ryobi, et al.; Pocatello, Idaho
39. Mecurio vs. Brownlee, et al.; Missoula, Montana
40. Nordstrom vs. Bodkin Enterprises; Hayden Lake, Idaho
41. Houser vs. Resort Quest, et al.; Lahaina, Maui
42. Benson vs. Magic Valley Partners, et al.; Twin Falls, Idaho

## 2002:
Trials:
1. Wright vs. Chanel; Honolulu, Hawaii (State)
2. Dexheimer vs. Guthrie; Spokane, Washington (State)
3. Becker vs. Oliver Family Limited Partnership; Coeur d'Alene, Idaho (State)
4. Weissinger vs. Lewis & Clark College; Portland, Oregon (State)

Depositions/Arbitrations:

1. Hotel Corporation of the Pacific vs. Group 70; Kauai, Hawaii
2. Eades vs. Lisandra, Inc.; Kihei, Hawaii (Volume 2)
3. Requelman vs. Pacific Transportation Services; Hilo, Hawaii
4. Eades vs. Lisandra, Inc.; Kihei, Hawaii (Arbitration)
5. Parlin vs. Miller; Spokane, Washington
6. Gaspero vs. Pacific Shores; Kihei, Hawaii (Records Deposition)
7. Bowkett vs. Texton; Boise, Idaho
8. Guerrero vs. Cabjaun, et al.; Honolulu, Hawaii
9. Fenzke vs. Naniloa Hotel; Hilo, Hawaii (Arbitration)
10. Harshmans vs. Jackson Hole Mountain Resort, et al.; Jackson, Wyoming
11. Gibson vs. BNSF; Albuquerque, New Mexico
12. Colburn vs. Amtrack; Salt Lake City, Utah
13. Wells vs. Wolf Lodge; Coeur d'Alene, Idaho
14. Ley vs. Stockman Financial Corporation; Billings, Montana
15. Becker vs. Oliver Family Limited Partnership; Coeur d'Alene, Idaho
16. Britton vs. Shearer; Spokane, Washington
17. Keller, et al. vs. Jones, et al.; New Orleans, Louisiana
18. Kinery vs. Mathieu; Jackson Hole, Wyoming
19. Zalopany vs. Keller; Honolulu, Hawaii
20. Williams vs. LRG Real Estate LP, et al.; Kona, Hawaii
21. Rehkopf vs. Kahana Falls, et al.; Lahaina, Maui
22. Evans vs. England; Springdale, Washington
23. Idaho Department of Labor vs. Sunset Marts, et al.; Orofino, Idaho
24. Karlsson, et al. vs. Savage, et al.; Los Angeles, California
25. O'Neil vs. Ho; Honolulu, Hawaii (Records Deposition)
26. Ng vs. Hwa, et al.; San Francisco, California
27. Tracy vs. Bock, et al.; Spokane, Washington
28. Hart Machine vs. Clapp; Minneapolis, Minnesota
29. Parrish et al. vs. Minidoka County Highway Department; Pocatello, Idaho
30. Radke vs. Pacific Hawaiian Holidays, et al.; Honolulu, Hawaii (Arbitration)
31. Oie vs. Himuro; Waikiki, Hawaii
32. Kailieha vs. PRN 'Ekolu dba Scoozies'; Waikiki, Hawaii
33. Keating vs. Fox and Hound; Waikiki, Hawaii
34. Hirukawa vs. Structures International; Honolulu, Hawaii
35. Firestone vs. Milford; Spokane, Washington
36. Oschner vs. BNSF; Laramie, Wyoming
37. Hippler vs. Dittman; Elk, Washington
38. Collins vs. Union Pacific Railroad; Laramie, Wyoming
39. Milford vs. Firestone; Spokane, Washington (Mediation)
40. Zygutis vs. Beech; Waipio Valley, Hawaii (Arbitration)
41. Nazar vs. Amsbury; Spokane, Washington (Mediation)
42. Ejercito vs. Baywatch Production, et al.; Honolulu, Hawaii (Arbitration)
43. Jackson vs. Larson; Moscow, Idaho
44. Bumgraber vs. Safeway; Spokane, Washington
45. George vs. Diamond Parking; Waikiki, Hawaii

46. Koenig vs. Riemer, et al.; Kihei, Maui
47. Piggee vs. Chrysler, et al.; San Francisco, California

1

## CERTIFICATE OF SERVICE

2          The undersigned hereby certifies that on the 26th day of July 2007, I will cause to be

3    served, via electronic filing, a true and correct copy of **DEFENDANT'S OPPOSITION TO**

4    **PLAINTIFFS MOTION TO AMEND COMPLAINT AND TO ALLOW DEPOSITION**

5
     **OF DEFENDANT; DECLARATION OF RICHARD BROWN; DECLARATION OF**
6
     **DAVID LEDGER; EXHIBIT A; CERTIFICATE OF SERVICE** to the following Counsel
7
8    of record.

9              George L. Hasselback, Esq.
               O'Connor Berman Dotts & Banes
10             Second Floor, Nauru Building
               Post Office Box 501969
11             Saipan, MP 96950

12        DATED: July 26, 2007.

13

14

15                                                    _____
                                                      DAVID LEDGER
16                                                    ELYZE J. MCDONALD

17

18

19

20

21

22

23

24

25

26

27

28