# EXHIBIT D



May 21, 2007

David Ledger
c/o Carlsmith Ball LLP
Bank of Hawaii Building, Suite 401
134 West Soledad Avenue
Hagåtña, Guam 96932

**Fejeran vs. Aviation Services (CNMI), Ltd.**

Dear Mr. Ledger:

I have reviewed the file material provided by your office pertaining to the above referenced matter. In addition, my Associate Engineer, Ms. Joellen Gill, inspected the subject aircraft and its associated ladder wherein she took a variety of measurements and photographs, as well as digital videos. The purpose of this letter is to summarize my opinions, as well as provide a brief discussion of their underlying foundation.

I base my findings and opinions: on my training, experience, and expertise in the field of Human Factors Engineering; the photographs, videos, observations, and measurements made at the time of Ms. Gill's site inspection; and the various file material pertaining to this case that your office provided. The material I reviewed that was specific to the facts of this case included:

1. Dr. Perez's Report;
2. Defendant's Second Supplemental Responses to Plaintiff's First Discovery Requests;
3. Defendant's Third Supplemental Rule 26 Disclosures;
4. Miscellaneous Shorts SD3-60 Maintenance Protocols;
5. Miscellaneous Communications with your office.

This report is based on the information that is available to date. It is my understanding that discovery is continuing in this matter, thus I reserve the right to further expand and/or amend my opinions and their bases if additional information relevant to my area of expertise becomes available.

Attached as an exhibit to this report is a copy of my CV that highlights my training, experience, and expertise as it pertains to safety and risk management, along with a list of my publications. Also attached is a listing of my sworn testimony for the past 5 years. Please note that my fees for work on this matter, including trial, is $300/hour plus expenses; deposition fees are $350/hour, unless paid in advance, with a minimum charge of $1,000. Commercial travel time is billed at half-rate.

I have a Ph.D. in Mechanical Engineering – Human Factors Option; I have 30 years of experience in Human Factors with my emphasis being in safety and risk management. I have done theoretical work in the area of safety, as well as provided consulting services to private industry and businesses in the field of safety and risk management. As noted in my CV, I am board certified in Human Factors and I am a certified Tribometrist.

## OPINIONS

1. Inadequate or defective maintenance was not a contributing factor to Mr. Fejeran's alleged stairway fall accident.

   There is no evidence to support any allegation that the subject stairway and its associated appurtenances were not maintained consistent with the requirements as set forth by the aircraft manufacturer (i.e. Shorts). It is noted that Mr. Fejeran has alleged that the handrail somehow "wobbled" as he was descending the stairway. However, it is noted that Mr. Fejeran's expert Dr. Perez measured a total deflection of only ½ inch (i.e. only a ¼ inch deviation on either side of the center line of the handrail). First and foremost, such an alleged deviation does not violate Shorts maintenance specifications. In addition, such a deviation is inconsequential and not likely to induce a loss of balance. Lastly, with all due respect to Mr. Fejeran, it is questionable how such a deviation could occur when other passenger(s) that were disembarking the plane were likely holding onto the handrail at the same time this alleged deflection occurred.

2. Improper deployment of the subject stairway was not a contributing factor to Mr. Fejeran's alleged stairway fall accident.

   There is no evidence to support any allegation that the subject stairway was not deployed in a manner consistent with the manufacturer's specifications. In fact, no such allegation has been made by Mr. Fejeran, nor his expert Dr. Perez.

3. The manner in which Aviation Services was utilizing the subject stairway was not a contributing factor to Mr. Fejeran's alleged stairway fall accident.

   There is no evidence to support any allegation that the subject stairway was not utilized in a manner consistent with the manufacturer's intention for the routine disembarkation from the aircraft. In fact, no such allegation has been made by Mr. Fejeran, nor his expert Dr. Perez.

4. The design of the subject stairway is typical for built-in or fixed stairways in commuter aircraft.

   There is no evidence to support any allegation that the general design characteristics of the subject stairway somehow contributed to Mr. Fejeran's alleged stairway fall accident. The general design configuration is common to that of most commuter aircraft with built-in fixed stairways.

It is noted that Dr. Perez is critical of the variation in the elevation between the last actual stair tread and the tarmac, opining that this increased variation was "a substantial factor" in Mr. Fejeran's alleged fall. However, the variation between the last tread and the tarmac is not proximate to Mr. Fejeran's alleged fall in that in his answers to interrogatories Mr. Fejeran claims that he was about halfway down the stairway when the handrail allegedly wobbled thereby causing him to lose his balance and fall. In other words, according to Mr. Fejeran, his loss of balance allegedly occurred before this variation and it was induced by the handrail.

5.   In his report Dr. Perez claims that the 1985 Uniform Building Code (UBC) "requires" or "mandates" certain design parameters for stairways; however, Dr. Perez's claims are misleading and/or factually erroneous.

For example, Dr. Perez claims that the 1985 UBC "requires" riser heights to be no more than 7 inches. However, for many years both pre 1985, as well as post 1985, the UBC had permitted riser heights up to 8 inches (i.e. see section 3306.(c)1). Dr. Perez also claims that the 1985 UBC "requires" tread depths "to be greater than 11 inches". To be more precise, the 1985 UBC, as well as those for many years before and after, specifically permit tread depths of 11 inches under all circumstances (i.e. see Section 3306.(c)); in fact, in some circumstances the UBC has routinely, over the years, permitted tread depths as shallow as 9 inches (i.e. see Section 3306.(c)1).

Dr. Perez also falsely claims that the 1985 UBC "mandates" handrails on both sides of a stairway **and** a 12 horizontal extension of such handrails. However, the 1985 UBC, as well as the UBC for numerous years before and after 1985, permits either no handrail or a handrail on a single side under a variety of conditions. It should be noted that given the setting for the subject stairway (i.e. embarkation/disembarkation of a commercial aircraft) there is no reason to expect "two-way" traffic on the subject stairway; as such, a handrail on one side only is not unreasonable or unsafe. Of course, it is noted that there is a handrail on both sides on the upper portion of the stairway. It is also noted that the 1985 UBC requires horizontal extensions to be only 6 inches, not 12 inches as alleged by Dr. Perez; in addition, such extensions are not universally required (i.e. see Section 3306.(j)). Lastly, the lack of any such horizontal extension is not proximate to the alleged falling accident in that Mr. Fejeran claims that he was only **partway** down the stairway and he was **holding the handrail** when he allegedly lost his balance and fell.

6.   Mr. Fejeran's alleged stairway fall accident was a result of his own interaction with the design of the subject stairway and not due to any atypical design/condition of the subject stairway, nor due to any unexpected or unusual condition or event.

Mr. Fejeran's alleged falling accident occurred as he was descending the stairway on the subject aircraft. As discussed above: (1) the overall condition of the

3

subject stairway was in compliance with the manufacturer's maintenance specifications; (2) the deployment of the subject stairway was in compliance with the manufacturer's specifications; (3) the subject stairway was deployed in a manner consistent with the manufacturer's recommendations; and (4) there was nothing atypical associated with the design/configuration of the subject stairway.

In short, the subject stairway that Mr. Fejeran encountered at the time of his alleged fall was neither unusual nor unexpected. Rather, the design, condition, operational protocol, and so forth were all consistent with the normal operation of any comparable such aircraft. Any abnormality in Mr. Fejeran's interaction with the subject stairway was due to his own personal interaction with the subject stairway and not due to any abnormality in the design, condition, or method of use of the subject stairway.

Please let me know if you have any questions or if I can be of any further assistance. I look forward to continuing to work with you in this matter.

Sincerely,

Richard Gill, Ph.D., CHFP, CXLT
President and Chief Scientist

Richard Thomas Gill
2104 West Riverside
Spokane, WA 99201
Phone/Fax: (509) 624-3714
Email: RickGill.ACS@Verizon.Net

**LICENSE:**

Certified Human Factors Professional, 1994-present
    By the Board of Certification in Professional Ergonomics
    License Number  0526, 1994

Certified XL Tribometrist, 2002-present
    By the International Safety Academy
    License Number  A2002-0272

**EDUCATION:**

University of Illinois
    Ph.D. in Mechanical Engineering, 1982
    Area of Specialization: Human Factors

Wright State University, 1978
    M.S. in Systems Engineering
    Area of Specialization: Human Factors

Massachusetts Institute of Technology
    1 year Graduate Study in Electrical Engineering, 1973

Wright State University
    B.S. in Systems Engineering, 1972

**ACADEMIC EXPERIENCE:**

*Professor of Mechanical Engineering at the University of Idaho (1995-2002):* Teaching responsibilities include human factors, math modeling, mechanics, and statistics. Additional responsibilities include appointment as an adjunct professor in the Department of Psychology and Director of Idaho Space Grant Consortium.

*Associate Professor of Mechanical Engineering at the University of Idaho (1990-1995):* Teaching responsibilities include human factors, math modeling, mechanics, and statistics. Additional responsibilities include appointment as an adjunct professor in the Department of Psychology and Director of Idaho Space Grant Consortium.

**ACADEMIC EXPERIENCE: (Continued)**

*Assistant Dean for the College of Engineering at the University of Idaho (1989-1990):* Administrative responsibilities included the overall administration of the Engineering Science curriculum, coordinating statewide off-campus programs, managing engineering cooperative education programs, and recruiting new students. Position also included teaching and research responsibilities.

*Assistant Professor of Mechanical Engineering at the University of Idaho (1987-1988):* This tenure track appointment was 65% Mechanical Engineering and 35% Engineering Sciences. Teaching responsibilities included math modeling, mechanics, statistics, and course development in human factors. Additional responsibilities included a position as an adjunct professor in the Department of Psychology to assist in the development of an interdisciplinary research laboratory and graduate program in human factors.

*Assistant Professor of Engineering Science at the University of Idaho (1984-1987):* This tenure track appointment was 50% in the Engineering Science Department and 50% in the Mathematics and Applied Statistics Department. Teaching responsibilities included courses in engineering mechanics, applied probability and statistics, and developing a course in human factors in engineering design. Additional responsibilities included helping staff the Statistical Consulting Center.

*Assistant Professor of Engineering at Wright State University (1980-1984):* Served as Program Director for the Human Factors Engineering Program. Teaching responsibilities included engineering statics, engineering dynamics, human factors engineering, senior seminar, and systems approach to human factors. Also held a joint appointment with the WSU School of Professional Psychology where the primary responsibility was to assist in the development of a Doctor of Psychology degree in Human Factors.

*Tutor for the State of Ohio (1978):* Worked as a personal tutor for individual college students being rehabilitated from mental illnesses.

*Student Tutor (1969-1972):* Worked as a tutor for Wright University, Dean of Students Office. Tutored courses in Mathematics and Physics.

**PROFESSIONAL EXPERIENCE:**

*Engineering Consultant for Applied Cognitive Sciences (1983-Present):* I have worked as an expert witness, for both the plaintiff and defense, on over 1000 legal cases nationwide. I have been qualified as an expert in human factors, accident reconstruction, mechanical engineering, safety engineering, and risk management. Work has also included contracts from U.S. government agencies (USAF Aeromedical Research Laboratory and Idaho National Engineering Laboratory) as well as private industry (Arvin Industries, The Vendo Corporation, Key Tronic Corporation, Port Townsend Paper, Hewlett Packard, Manco Industries, Fun-Kart Association, Anchor Industries, and so forth).

**PROFESSIONAL EXPERIENCE: (Continued)**

*Research Scientist for the USAF Office of Scientific Research (1983):* This was an appointment at the USAF Aeromedical Research Laboratory. The work focused on assessing the relationship between acceleration-stress and pilot workload. In addition, I also worked on a project concerning the effects of high-onset rates of acceleration on pilot performance.

*Graduate Research Assistant at the University of Illinois (1978-1981):* Responsibilities included the conception and formulation of various research projects in the fields of Engineering Psychology and Mechanical Engineering.

*Human Factors Engineer for the United States Air Force Human Resources Laboratory (1976-1978):* Worked concurrently in two major fields: (1) visual simulation and (2) motion and force simulation. This included conducting in-house research as well as serving as program manager for externally conducted research.

*Electronics Engineer for the United States Air Force Foreign Technology Division (1974-1976):* Position required a Top Secret security clearance. The work involved the selection and analysis of intelligence data to predict foreign military trends and capabilities.

*Process Control Engineer for Industrial Nucleonics Corporation (1973-1974):* Worked on the development of an infra-red moisture gauge to allow real-time computer control for tobacco dryers. Responsibilities included the development of a calibration technique and system installation at an operational site.

*Computer Operator for Synergy, Inc. (1970-1972):* Operated a CDC 6600 Computer at Wright Patterson Air Force Base while attending undergraduate school.

**HONORS AND AWARDS:**

University of Idaho College of Engineering Outstanding Academic Advisor, 1998.

University of Idaho College of Engineering Outstanding Senior Faculty, 1996.

University of Idaho Alumni Award for Excellence, 1994.

American Society for Engineering Education Centennial Certificate Awardee, 1993.

Best Paper Award from American Society for Engineering Education Regional Conference, 1991.

ASUI Outstanding Faculty Award, 1991.

University of Idaho Alumni Award for Excellence, 1988.

**HONORS AND AWARDS: (Continued)**

Recipient of the New Engineering Educator Excellence Award from American Society for Engineering Education, 1987.

Recipient of the Dow Outstanding Young Faculty Award from the American Society for Engineering Education, 1986.

Selected as an S.C.E.E.E. fellow for the Air Force Office of Scientific Research Summer Faculty Research Program, 1983.

Graduated first in class at the University of Illinois (GPA 5.0 out of 5.0), 1981.

Member of Tau Beta Pi National Engineering Honor Society, 1979.

Recipient of the "Science and Engineering Career Motivation Award" which is given annually by the Dayton Board of Education, 1978.

Graduated first in class at Wright State University (GPA 4.0 out of 4.0), 1978.

Awarded National Science Foundation Traineeship to Massachusetts Institute of Technology, 1972.

Graduated first in class at Wright State University, summa cum laude (GPA 3.9 out of 4.0), 1972.

W.S.U. Foundation Scholarship, 1972.

W.S.U. Foundation Scholarship, 1971.

Golding Award (Outstanding Junior Engineer) at Wright State University, 1971.


**PUBLICATIONS:**

Gill, R., and Gordon, S.  Cognitive Task Analysis.  In C. Zsambok and G.  Kline (Eds.), <u>Naturalistic Decision Making</u>, pp. 131-140, Lawrence Erlbaum Associates, 1997.

Gill, R.  Towards Protection from Cumulative Trauma Disorder Litigation.  <u>Advances in Industrial Ergonomics and Safety VII</u>, Taylor and Francis, Ltd., 1996.

Gill, R., Gordon, S., McGehee, D., and Dean, S. Integrating Cursor Control into the computer Keyboard. In <u>Human Factors Perspectives on Human-Computer Interaction: Selections from Human Factors and Ergonomics Society Annual Meeting Proceedings, 1983-1994</u>, Human Factors Society, 1995.

Gill, R., Gordon, S., and Babbitt, B.  Embedding Intelligent Tutoring into Real Time Simulation.  <u>Proceedings of the Eighth Symposium on Aviation Psychology</u>, 1995.

## PUBLICATIONS: (Continued)

Babbitt, B., Bell, H., Crane, P., Sorensen, H., Gordon, S., and Gill, R. Intelligent Tutoring System: F-16 Flight Simulation.  <u>Proceedings of the 1994 American Institute of Aeronautics and Astronautics (AIAA) Computing in Aerospace Conference</u>, 1994.

Gill, R.  A Comprehensive Evaluation of Warning Label Design.  In K. Laughery, M. Wogalter, and S. Young (Eds.), <u>Human Factors Perspectives on Warnings</u>, pp. 50-52, Human Factors and Ergonomics Society, 1994.

Gill, R., and Gordon, S. Conceptual Graph Analysis: A Tool for Curriculum Development, Instructional Design, and Trainee Evaluation. <u>Proceedings of the 1993 Interservice/Industry Training Systems and Education Conference</u>, pp. 861-870.

Gordon, S. E., Schmierer, K. A., and Gill, R. T. Conceptual Graph Analysis: Knowledge Acquisition for Instructional System Design. <u>Human Factors</u>, 35, pp. 459-482, 1993.

Gordon, S. E., and Gill, R.T. Knowledge Acquisition with Question Probes and Conceptual Graph Structures. In T. Lauer, E. Peacock, and A. Graesser (Eds.), <u>Questions and Information Systems</u>, pp. 29-46. Hillsdale, N J: Lawrence Erlbaum Associates, 1992.

Gill, R, Gordon, S., McGehee, D., and Dean, S. Integrating Cursor Control into the Computer Keyboard. <u>Proceedings of the Human Factors Society's 35th Annual Meeting</u>, Vol. 1, pp. 256-260, 1991.

Gill, R., Dingus, T. Human Factors and Engineering Design High School Summer Workshop. <u>Proceedings of the Human Factors Society's 34 Annual Meeting</u>, Vol. 1, pp. 522-524, 1990.

Dingus, T., Gordon, S., and Gill, R. A New Program for the Remote Training of Human Factors Professionals. <u>Proceedings of the Human Factors Society's 34 Annual Meeting</u>, Vol. 1, pp. 534-536, 1990.

Gill, R., and Stauffer, L. Developing Appropriate Evaluation Criteria for Assessing the Value Added by Mechanical Engineering Education Programs. <u>Proceedings of the 1989 American Society for Engineering Education Annual Conference</u>, Vol. 3, pp. 1263-1265, 1989.

Gordon, S., and Gill, R. Question Probes: A Structured Method for Eliciting Declarative Knowledge. <u>AI Applications in Natural Resource Management</u>, Vol. 3, pp. 13-20, 1989.

Gill, R. Mail-order Errors: The Role of Human Factors. <u>Dickinson's PSAO,</u> Vol. 3, No. 12, pp. 6-7, Dec. 1988.

Christensen, J., Topmiller, D. and Gill, R. Human Factors Definitions Revisited. <u>Human Factors Bulletin</u>, pp. 7-8, Oct. 1988.

**PUBLICATIONS: (Continued)**

Dingus, T., Hyde, R., Hyde, T., Frame, M. and Gill, R. The Speed and Accuracy of a Spatial Communication Task as a Function of Operator Location. <u>Proceedings of the 21 st Annual Meeting of the Human Factors Association of Canada</u>.

Gill, R., Gordon, S., Moore, J. and Barbera, C. The Role of Knowledge Structures in Problem Solving. <u>Proceedings of the 1988 American Society for Engineering Education Annual Conference</u>, Vol. 2, pp. 583-90, 1988.

Junker, A., Levison, B. and Gill, R. A Systems Engineering Based Methodology for Analyzing Human Electrocortical Responses. AFAMRL Technical Report AAMRL-TR-87-030, May 1987.

Gill, R., Barbera, C. and Precht, T. A Comparative Evaluation of Warning Label Designs. <u>Proceedings of the Human Factors Society's 31 st Annual Meeting,</u> Vol. 1, pp. 476-78, 1987.

Gordon, S., Gill, R., and Dingus, T. Designing for the User: The Role of Human Factors in Expert System Development. <u>Artificial Intelligence Applications in Natural Resource Management</u>, Vol. 1, No. 1, pp. 35-46, 1987.

Gill, R. The Need for Human Factors in the Design of Expert Systems. <u>Proceedings of the 1987 Frontiers in Education Conference</u>, 1987.

Gill, R., and Dingus, T. A Structural Approach to Teaching Relative Motion. <u>Proceedings of the 1987 American Society for Engineering Education Annual Conference</u>, Vol. 4, pp. 1806-08, 1987.

Barbera, C. and Gill, R. Human Factors in Warning Label Design. <u>Proceedings of Interface 1987</u>.

Gill, R., Kenner, K. and Junker, A. Steady State EEG as A Measure of Peripheral Light Loss. <u>Proceedings of the Human Factors Society's 30th Annual Meeting</u>, Vol. 2, pp. 1249-52, 1986.

Kenner, K, Junker, A. and Gill, R. Visual Evoked Response in the Periphery, The Beginnings of an Objective Measure of G-Induced PLL. <u>Proceedings of the National Aerospace and Electronics Conference,</u> Vol. 3, pp. 909-12, May 1986.

Gill, R., and Albery, W. The Effects of Acceleration Stress on Human Workload and Manual Control. <u>Proceedings of the 21st Annual NASA Conference on Manual Control</u>, 1985.

Albery, W., Ward, S. and Gill, R. Effects of Acceleration Stress on Human Workload. AFAMRL Technical Report AAMRL-TR-85-039, 1985.

**PUBLICATIONS: (Continued)**

Gill, R., and Gordon, S. The Effectiveness of Group Projects in Teaching Engineering Mechanics. <u>Proceedings of the 1984 American Society for Engineering Education</u>, 5(5), pp. 27-33, 1984.

Gill, R., Obleski, M. Gordon, S. and Albery, W. The Effects of Acceleration on Cognitive Processing. <u>Proceedings of Mid-Central Ergonomics/Human Factors Conference</u>, April 1984.

Gill, R. Pilot Workload and G-Stress: A Potential Interaction? USAF Summer Faculty Research Program - Final Reports. Published by Southeastern Center for Electrical Engineering Education, December 1983.

Pierce, B., Obleski, M. and Gill, R. Human Factors in Aerospace: A Student Chapter Project. <u>Human Factors Bulletin</u>, April 1983.

Gill, R., and Wickens, C. Operator Workload as a Function of the System State. <u>Proceedings of the 18th Annual NASA Conference on Manual Control</u>, 1982.

Gill, R., Wickens, C., Reid, R. and Donchin, E. Pseudo-Quickening: A New Display Technique for Manual Control of Higher Order Systems. <u>Proceedings of the Human Factors Society's 26th Annual Meeting</u>, 1982.

Gill, R., Wickens, C., Donchin, E. and Reid, R. The Internal Model as a Means of Analyzing Human Performance. <u>Proceedings of the 1982 I.EE.E. International Conference on Systems, Man and Cybernetics,</u> 1982.

Hull, J., Gill, R. and Roscoe, S. Locus of Stimulus to Visual Accommodation: Where in the World, or Where in the Eye? <u>Human Factors</u>, 24, pp. 311-19, 1982.

Wickens, D., Gill, R., Kramer, A., Ross, W. and Donchin, E. The Cognitive Demands of Second Order Manual Control: Applications of the Event-Related Brain Potential. <u>Proceedings of the 17th Annual NASA Conference on Manual Control</u>, NASA TM, 1981.

Ritchie, M., Gill, R. and Jankowski, R. The Education and Placement of Human Factors Engineers. <u>Proceedings of the North Central Section, American Society for Engineering Education</u>, Dayton, OH, pp. 82-87, April 1981.

Albery, W., and Gill, R. Development and Validation of Drive Concepts for an Advanced G-Cueing System. <u>Proceedings of the 1978 American Institute of Aeronautics and Astronautics</u>, 1978.

## PRESENTATIONS:

Gill, J. and Gill, R. Human Factors in Litigation. Invited presentation by the Washington State Trial Lawyer's Association, October 2006.

Gill, R. Electronic Billboards: Safety and Social Issues. Invited presentation to the Snohomish City Council Meeting, May 2005.

Gill, R. Human Factors in Accident Reconstruction. Invited address to the 20th Annual Special Problems in Traffic Crash Reconstruction at IPTM, Jacksonville, Florida, April, 2002.

Gill, R. Human Factors Expert Witness. American Board of Trial Advocates Meeting, Waikiki, Hawaii, November 2000.

Gill, R. Industrial Funding Support for K-12 Programs. Panel discussant for the Annual Meeting of Space Grant Directors, April 1997.

Gill, R. Human Factors in Forensic Investigations. Invited address at Society of Forensic Engineers and Scientists Meeting, August 1996.

Barnes, T., Hodge, J., and Gill, R. Design and Fabrication of an Integrated Cystic Fibrosis Treatment System. Presented at the 1996 Idaho Academy of Science Meeting.

Gill, R. Technology and Its Impact on Society. Invited address at the Fourteenth Annual International Exchange Conference, Lewis-Clark State College, October 1994.

Gill, R., and Lewis, V. Towards Improved College Teaching: A Preliminary Report. Presented at the American Society for Engineering Education Pacific Northwest Section Annual Regional Meeting, April 1992.

Elger, D., and Gill, Modeling the Problem Solving Process Used by an Expert. Presented at the American Society for Engineering Education Pacific Northwest Section Annual Regional Meeting, April 1992.

Gill, R. High School Summer Workshops: An Effective Recruitment Technique. Presented at the American Society for Engineering Education Pacific Northwest Section Annual Regional Meeting, April 1991.

Elger, D., and Gill, R. A Goal for Engineering Education: The Ideal Engineer. Presented at the American Society for Engineering Education Pacific Northwest Section Annual Regional Meeting, April 1991.

Carson, B., and Gill, R. The Human Factors Element in Engineering Design. Presented at the 1989 Idaho Academy of Science.

**PRESENTATIONS: (Continued)**

Simon, A., Imthurn, J., Polillo, S. and Gill, R. The Role of Human Factors in Engineering Design: A Case Study of an Industrial Paper Winder. Presented at the 1987 Idaho Academy of Science.

Gill, R. The Role of Human Factors in Operator Workstation Design. Invited Presentation at the 1986 PCAPPA.

Gill, R., and Mau, C. The Feasibility of Using EEG to Measure Peripheral Light Loss. Presented at the Annual Western Psychological Association Meeting, 1986.

Gill, R., Ward, S. and Albery, W. The Comparison of Subjective and Objective Workload Measures for Humans Under Acceleration Stress. Presented at the 1984 National Aerospace and Electronics Conference, May 1984.

Gordon, S., & Gill, R. A New Technique for Assessing Cognitive Processing Capabilities. Presented at the Annual Meeting of the Ohio Academy of Science, April 1984.

Richard, M., Rice, S. and Gill, R. The Improvement of a Ballistics Test Range Control Panel Via Human Factors Engineering. Presented at the Annual Meeting of the Ohio Academy of Science, April 1984.

Peters, R., Gill, D., Pasquini, L. and Gill, R. Human Factors Critique and Redesign of a Jet Engine Control Panel. Presented at the Annual Meeting of the Ohio Academy of Science, April 1984.

Gill, R. Improved Quickened Displays. Presented at the Annual Meeting of the Ohio Academy of Science, April 1983.

Julien, J., Click, A., Sanders, S., Scandura, L. and Gill, R. Human Factors Critique and Design of a Hydraulic Systems Test Stand. Presented at the Annual Meeting of the Ohio Academy of Science, April 1983.

Ingle, D., Dabney, G., Scherty, K. Beckett, T. and Gill, R. A Human Factors Critique of an Industrial Sewer Cleaner. Presented at the Annual Meeting of the Ohio Academy of Science, April 1983.

Gill, R. The Role of Human Factors at Three Mile Island. Invited presentation by the Southern Ohio Chapter of the Human Factors Society, October 1982.

Gill, R. Human Factors in Education. Invited presentation by the Dayton Chapter of the I.E.E.E., October 1980.

Gill, R., Ross, T. and Albery, W. An Advanced Acceleration Simulation Device for the Flight Simulators. Presented at the Dayton-Cincinnati AIAA  Mini-Symposium, 1978.

**PROFESSIONAL ACTIVITIES:**

Member of Human Factors and Ergonomics Society
Member of American Society for Testing and Materials
Member of American Academy of Forensic Sciences

**GRANTS AND CONTRACTS:**

Evaluation and Development of Warning Information for Portable Fire Shelters, Anchor Industries, Co-investigator, 2006.

Safety Analysis of Electronic Billboards, City of Snohomish, Principle Investigator, 2005.

Evaluation of Warning Label Designs, American Fun Kart Association, Principle Investigator 2002.

Idaho Space Grant Consortium, NASA, $260,000, Assistant Director, 2001.

Idaho Space Grant Consortium, NASA, $260,000, Assistant Director, 2000.

Transforming Engineering Consulting into Engineering Case Studies, University of Idaho, $35,000, Sabbatical, 1999-2000.

Idaho Space Grant Consortium, NASA, $256,500, Director, 1999.

NASA Experimental Program to Stimulate Competitive Research, $225,000, State-wide Director, 1999.

Idaho Space Grant Consortium, NASA, $256,000, Director, 1998.

Idaho Space Grant Consortium, NASA, $255,000, Director, 1998.

Idaho Total Engineering Challenge, Lockheed Martin Aerospace Corporation, $5,000, Principal investigator, 1997.

Idaho Space Grant Consortium, NASA, $255,000, Director, 1997.

Idaho Space Grant Consortium, NASA, $230,000, Director, 1996.

Summer Institute for Engineering Educators on Curriculum Design and Implementation for Interactive Teaching/Learning, University of Idaho Office of Teaching Enhancement, $2,500, Co-principal investigator, 1995.

Idaho Space Grant Consortium, NASA, $230,000, Director, 1995.

Evaluation of an F-16 Intelligent Tutoring System, Northrop Corporation, $37,600, Co-principal investigator, 1994.

**GRANTS AND CONTRACTS: (Continued)**

JETS Workshop, US Department of Energy, $1,400, Co-principal investigator, 1993.

Workstation and Hand Tool Design for Disk Drive Assembly, Hewlett Packard, $5,000, Co-principal investigator, 1993.

Analysis of a Disk Drive Arm Assembly Line Process, Hewlett Packard, $2,000, Co-principal investigator, 1992.

Multimedia for Enhanced Undergraduate Education, University of Idaho Office of Academic Affairs and IBM, $81,000, Co-principal investigator, 1991.

JETS Summer Workshop, US Department of Energy, $9,000, Co-investigator, 1991.

Analysis of a Paper Winder Safety Gate, Port Townsend Paper, $2,500, Co-principal investigator, 1991.

Keymouse Configuration and Design, Key Tronic Corporation, $6,700, Co-principal investigator, 1990.

Keymouse Usability, Key Tronic Corporation, $18,900, Co-principal investigator, 1990.

JETS Summer Workshop, US Department of Energy, $9,000, Principal investigator, 1990.

Mapping Knowledge in Declarative and Procedural Structures, Idaho State Board of Education, $35,000, Co-principal investigator, 1990.

JETS Summer Workshop, US Department of Energy, $22,000, Principal investigator, 1990.

A Program to Test and Evaluate Equipment for the Disabled, University of Idaho Research Office, $7,000, Co-principal investigator, 1989.

Research Experience for Undergraduates, National Science Foundation, $4,000, Co-principal investigator, 1989.

Stressor Interaction Assessment, Boeing Military Aircraft Corporation, $21,600, Co-principal investigator, 1989.

Design and Evaluation of a Vending Machine Retrofit System, The Vendo Company, $20,400, Principal investigator, 1988.

A Structural Technique for Evaluating Design Tools, National Science Foundation, $60,000, Co-author and consultant, 1988.

Formations and Use of Conceptual Structures in Problem Solving Domains, Air Force
**GRANTS AND CONTRACTS: (Continued)**

Office of Scientific Research, $79,200, Co-principal investigator, 1988.

Software Interface Design for Asynchronous Computer Conferencing, EG&G of Idaho, $12,800, Co-principal investigator, 1987.

Techniques for Augmenting the Communication of Spatial Information, Boeing Military Aircraft Company, $15,000, Co-principal investigator, 1987.

Evaluation of Warning Label Effectiveness, Arvin Industries, $1,400, principal investigator, 1986.

A Structured Approach for Developing an Effective Teaching Methodology for Problem Solving: A Case Study, American Society for Engineering Education, $1,500, principal investigator, 1986.

The Development of an Innovative Technique for Using Personal Computers to Aid in Teaching Deaf People to Speak, University of Idaho Seed Grant, $3,300, principal investigator, 1986.

The Development of a Steady State EEG Measure of Acceleration Induced Peripheral Light Loss, United States Air Force Aerospace Medical Research Laboratory, Human Engineering Division, $7,100, principal investigator, 1985.

The Feasibility of Using Electroencephalograms to Measure Acceleration Stress, United States Air Force Aerospace Medical Research Laboratory, Human Engineering Division, $14,000, principal investigator, 1984.

The Effects of Acceleration Stress on Cognitive Workload, United States Air Force Aerospace Medical Research Laboratory, Biomechanics Division, $35,000, principal investigator, 1984.



**Applied Cognitive Sciences**

Human Factors
Engineering

A CONSULTING GROUP

**Sworn Testimony for Richard Gill, Ph.D., CHFP, CXLT**
**As of May 22, 2007**

**2007:**
Trials:

1. Demello vs. State of Hawaii; Honolulu, Hawaii (State)
   Via Preservation Deposition
2. Herbert vs. State of Hawaii; Honolulu, Hawaii (State)
   Via Preservation Deposition
3. Findlay vs. Anderson Cattle Company Restaurant; Vancouver, Washington (State)
   Via Preservation Deposition
4. Jones vs. State of Hawaii; Honolulu, Hawaii (State)
5. Dickman vs. Budget Rental, et al.; Spokane, Washington (State)
6. Clark vs. Sharley-Hubbard; Spokane, Washington (State)
7. Stamey et al, vs. Big Mountain Resort, et al.; Kalispell, Montana (Federal)
   Via Preservation Deposition
8. Salvini vs. Ski Lifts, Inc.; Seattle, Washington (State)
9. Pearl vs. Fred Meyer Stores; Seattle, Washington
10. Herbert vs. State of Hawaii; Honolulu, Hawaii (State; Live Testimony)
11. Megison vs. GM, et al.; Santa Cruz, California (State)
12. Demello vs. State of Hawaii; Honolulu, Hawaii (State)

Depositions/Arbitrations:
1. Pearl vs. Fred Meyer Stores; Seattle, Washington
2. LeMaster et al. vs. Arrow Metal, et al.; Seattle, Washington
3. Sanders vs. Fairmont Orchid; Kona, Hawaii
4. Holler vs. Hilton; Honolulu, Hawaii
5. Tani vs. Healy Tibbits, et al.; Honolulu, Hawaii (Arbitration)
6. Perez vs. Sack N' Save; Honolulu, Hawaii
7. Sampio vs. State of Hawaii; Honolulu, Hawaii (Arbitration)
8. Peters vs. Smith Construction; Helena, Montana
9. Powell, et al. vs. City and County of Honolulu; Honolulu, Hawaii
10. Sanders vs. Fairmont Orchid; Kona, Hawaii (Volume 2)
11. Mabrey vs. Wizard Fisheries; Seattle, Washington
12. Chapman vs. Killinger; Twin Falls, Idaho
13. Tarlton vs. Ryobi et al.; Seattle, Washington
14. Waite vs. Brodhead et al.; Spokane, Washington
15. Speed vs. ICRR; New Orleans, Louisiana
16. Ladner vs. Goggin, et al.; Coeur d'Alene, Idaho

**2006:**

Trials:

1. Hokland vs. City and County of Honolulu; Honolulu, Hawaii,
   Via Preservation Deposition (State)
2. Papadopoulos vs. Fred Meyer Stores; Seattle, Washington,
   Via Preservation Deposition (Federal)
3. Thornton vs. Spooner Farms; Seattle, Washington,
   Via Preservation Deposition (State)
4. Camanse vs. Padre; Honolulu Hawaii
   Via Preservation Deposition (State)
5. State vs. Elder; Honolulu, Hawaii (State)
6. Steigman vs. Outrigger Properties; Honolulu, Hawaii
   Via Preservation Deposition (State)
7. Kelly vs. Foodland; Honolulu, Hawaii (State)
   Via Preservation Deposition (State)
8. Birdwell, et al. vs. AMTRAC, et al.; Philadelphia, Pennsylvania (Federal)
9. Robins vs. PACCAR, et al.; Lexington, Kentucky
10. Nelson vs. Stellar Sea, et al.; Seattle, Washington
    Via Preservation Deposition (Federal)
11. Harouff vs. Life Church; Dallas, Oregon (State)
12. Clark vs. Harding; Spokane, Washington (State)

Depositions/Arbitrations:

1. Romero vs. Lowe, et al; Kailua, Hawaii
2. Sanchez vs. Tsunami's; Waianae, Hawaii
3. Sisneros vs. UPRR; Hana, Wyoming
4. Pelzel vs. Pacific County et al.; Gray's Harbor, Washington
5. Bocatija vs. Cabras Marine; Hagåtña, Guam
6. Boos et al. vs. Chicago Pneumatic; Seattle, Washington
7. Lee vs. Royal Orchid et al.; Hagåtña, Guam
8. Lindall vs. Hawaiian Waters Adventure Park; Honolulu, Hawaii
9. Stankewich vs. City and County of Honolulu; Honolulu, Hawaii (Arbitration)
10. Remmick vs. Daisy; Billings, Montana
11. Brooks vs. City of Washougal, et al.; Washougal, Washington
12. Boltron vs. St. Francis Medical Center; Honolulu, Hawaii
13. Scrimshaw vs. Stewart; Kona, Hawaii (Arbitration)
14. Nolan vs. Kaanapali Beach Hotel; Kaanapali, Maui (Arbitration)
15. Bright vs. Brown; Spokane, Washington
16. Caldetera vs. Accu-Cut, et al.; Honolulu, Hawaii
17. Teranishi vs. New Casino; Honolulu, Hawaii
18. Heydon vs. City and County of Honolulu; Honolulu, Hawaii
19. Lonczak vs. County of Maui; Wailuku, Maui (Records Deposition)
20. Keehu vs. Players, et al.; Honolulu, Hawaii (Records Deposition)
21. Paglinawan vs. Schuler Homes, et al.; Honolulu, Hawaii
22. Le vs. Kealani, et al.; Wailea, Maui
23. Robins vs. Wayne Engineering, et al.; Lexington, Kentucky

24. Espinoza vs. Risenmay Farms, et al.; Rexburg, Idaho
25. Dickman vs. Budget Rent A Car; Spokane, Washington
26. Sewell vs. Viper Motors; Spokane, Washington
27. Yogi vs. Stearns Airport Equipment, et al.; Honolulu, Hawaii
28. Lewis vs. Mossholders Furniture; Casper, Wyoming
29. Baccus vs. Ameripride; Idaho Falls, Idaho
30. Kelley vs. Foodland; Honolulu, Hawaii
31. Bishop vs. Marriott; Wailuku, Hawaii (Records Deposition)
32. Babayan vs. Wal-Mart; Wailuku, Hawaii (Records Deposition)
33. Bright vs. Brown; Spokane, Washington
34. Maxwell vs. Jerome County; Jerome, Idaho
35. Megison vs. GM, et al.; San Jose, California
36. Carlton vs. BG Consultants, et al.; Hutchinson, Kansas
37. Andrade vs. Flores, et al.; Hilo, Hawaii
38. Warren vs. Kleenco; Honolulu, Hawaii
39. Ringer vs. County of Hawaii; Kona, Hawaii
40. Shimose vs. Apolo, et al.; Honolulu, Hawaii
41. Malott vs. Marriott, Honolulu, Hawaii
42. Pang vs. Yamaha, et al.; Kona, Hawaii
43. Salvini vs. Ski Lifts, Inc.; Seattle, Washington
44. Demello vs. State; Honolulu, Hawaii (Arbitration)
45. Seitz vs. New Holland Equipment, et al.; San Francisco, California
46. Herbert vs. State of Hawaii; Honolulu, Hawaii (Arbitration)
47. Porter vs. Stark; Seattle, Washington

**2005:**
Trials:
1. Juarez vs. Frias; San Francisco, California via Preservation Deposition (State)
2. State of Idaho vs. Marek; Sandpoint, Idaho (State)
3. Dubac-Tyler vs. Hyatt Corp; Kaanapali, Maui (State)
4. Rukavina, et al. vs. Crane Plumbing, et al.; Challis, Idaho (State)
5. Rabissa vs. Costco; Kona, Hawaii (State)
6. Haggard vs. Parma Furniture; Nampa, Idaho (State)

Depositions/Arbitrations:
1. Kim vs. Savard, et al.; St. Johnsbury, Vermont (Volume 1)
2. Cormier vs. Gold's Gym, et al., Boise, Idaho
3. Cross vs. Takenaka Landscaping, et al.; Makakilo, Oahu
4. Li and Wang vs. Sea Life Park; Honolulu, Hawaii
5. Rabissa vs. Costco; Kona, Hawaii (Volume II)
6. Erickson vs. Badger Building Center; Bonners Ferry, Idaho
7. Kim vs. Savard, et al.; St. Johnsbury, Vermont (Volume II)
8. Harris vs. Union Pacific Railroad; Seattle, Washington
9. Juarez vs. Frias; San Francisco, California
10. Horsley vs. Hilton Hotel Corp; Seattle, Washington
11. Dubac-Tyler vs. Hyatt Corp; Kaanapali, Maui
12. Bacani vs. State of Hawaii, et al.; Honolulu, Hawaii

13. Kanei vs. Daiei; Honolulu, Hawaii
14. Stevens vs. Robert Bosch Tool Corporation; Twin Falls, Idaho
15. Young vs. Holiday Inn; Hagåtña, Guam
16. Anthony vs. Alexander & Baldwin, Inc., et al.; Kahalui, Maui (Records)
17. Anthony vs. Alexander & Baldwin, Inc., et al.; Kahalui, Maui
18. Baker vs. Flying J; Casper, Wyoming
19. Abiley vs. State of Hawaii; (Arbitration); Honolulu, Hawaii
20. Sales vs. Self-Help Housing; Honolulu, Hawaii
21. Rukavina, et al. vs. Crane Plumbing, et al.; Challis, Idaho
22. Hart vs. Hoist, et al.; Bonners Ferry, Idaho
23. LeMaster vs. BNSF; Billings, Montana
24. Dunivent vs. UPRR; Cheyenne, Wyoming
25. Glaberson vs. A & B Properties; Kahalui, Hawaii (Records Depo)
26. Newman vs. Milacron, et al.; Bozeman, Montana (Volumes 1 and 2)
27. Glaberson vs. A & B Properties; Kahalui, Hawaii
28. McKay vs. Smith; Spokane, Washington; (Arbitration)
29. Schultz vs. Ellensburg Cement Products, et al.; Seattle, Washington
30. Scholz vs. Zip Truck Lines, et al.; Spokane, Washington
31. Nyquist vs. Farmers, et al.; Great Falls, Montana (Arbitration)
32. Hernadez vs. Lematic; Honolulu, Hawaii
33. Abiley vs. State of Hawaii; Honolulu, Hawaii
34. Dison vs. Vaagen Brothers Lumber; Colville, Washington
35. Harvey vs. Payne Properties; Spokane, Washington
36. Mallot vs. Marriott; Ko'Olina, Oahu (Records Deposition)
37. Stewart vs. Violich, et al.; Kailua, Hawaii
38. Hytrek vs. Albertsons; Casper, Wyoming
39. Hedge vs. Redmond Heavy Hauling; Tacoma, Washington

**2004:**
Trials:
1. Twenge vs. Fred Meyers, et al.; Portland, Oregon (State)
2. Tyler vs. Petsmart, et al.; Spokane, Washington (State)
3. Lewis vs. Tribune Publishing Company, et al.; Colfax Washington (State)
4. Fowler vs. Fred Meyers; Portland, Oregon (State)
5. Richardson vs. State of Montana; Butte, Montana (State)
6. Wendt vs. USA; Honolulu, Hawaii (Federal)
7. Parris vs. State of Washington, et al.; Spokane, Washington (State)
8. Miller vs. Ostler; Moses Lake, Washington (State)
9. Kelley vs. County of Maui, et al.; Wailuku, Maui (State)

Depositions/Arbitrations:
1. Robinson vs. State of Montana; Butte, Montana
2. Lewis vs. Colfax Masonic Corp.; Colfax, Washington
3. Rabisa vs. Costco; Kona, Hawaii
4. Kitchens vs. Outrigger, et al.; Waikiki, Hawaii
5. Ishii vs. Island Colony Condominiums; Waikiki, Hawaii
6. Cadman vs. City and County of Honolulu; Honolulu, Hawaii

7. Castillo vs. A & A Electric; Honolulu, Hawaii
8. Lyons vs. Smith's Food and Drug; Casper, Wyoming
9. Johnson vs. Manco, et al.; Modesto, California
10. Benoy vs. Jacobson; Coeur d'Alene, Idaho
11. Rabisa vs. Costco; Kona, Hawaii (Arbitration)
12. Lawlor vs. Naeole, et al.; Honolulu, Hawaii
13. Carter vs. City of Spokane; Spokane, Washington
14. Kahikina vs. Hilo Terrace Apartments AOAO, et al.; Hilo, Hawaii
15. Moniz vs. Barland, et al.; Honolulu, Hawaii
16. Zelinski vs. BNSF; Portland, Oregon
17. Hopkin vs. BNSF; Greybull, Wyoming
18. Schroder vs. Arby's; Spokane, Washington
19. Vuittonet vs. Hayes Lemmerz International, et al.; Boise, Idaho
20. Gapero vs. Pacific Shores AOAO, et al.; Kihe, Maui
21. Ibara vs. Aloha Tower Management Company, et al.; Honolulu, Hawaii
22. Baker vs. Totally Titanium Inc.; Waikiki, Hawaii
23. Jenner vs. Bargain Giant; Spokane, Washington
24. Milward vs. Vandervert; Spokane, Washington
25. Baker vs. Totally Titanium Inc.; Waikiki, Hawaii (Arbitration)
26. Frahm vs. Alamo Rental Car; Las Vegas, Nevada
27. Mathews vs. Harrington; Spokane, Washington
28. Cuthbert vs. JB's Family Restaurant; Coeur d'Alene, Idaho
29. Kelley vs. County of Maui, et al.; Wailuku, Maui
30. Kappel vs. Kea Lani, et al.; Wailea, Maui
31. Cross vs. Takanaka Landscaping, et al.; Makakilo, Hawaii (Arbitration)
32. Sharp vs. Best; Cheney, Washington
33. Meador vs. Chipman & Taylor, et al.; Pullman, Washington
34. Miyamoto vs. Hawaiian Electric Company, et al.; Honolulu, Hawaii (Vol 1 & 2)
35. Hayes vs. Union Pacific Railroad, et al.; Rupert, Idaho
36. Reaves vs. Rowe; Kennewick, Washington

**2003:**
Trials:
1. George vs. Diamond Parking, Inc., et al.; Honolulu Hawaii (State)
2. Slack vs. Kelleher; Caldwell, Idaho (State)
3. Sinclair vs. BNSF; Great Falls, Montana (State)
4. Barnedo vs. Dominguez; Honolulu, Hawaii (State)
5. Lewis vs. State of Hawaii; Honolulu, Hawaii (State)
6. Gouveia vs. 24 Hour Fitness; Honolulu, Hawaii (State)
7. Fenwick vs. Watabe, et al.; Hagåtña, Guam
8. Gipson vs. Yoke's Pac & Save; Spokane, Washington (State)
9. England vs. Swinerton; San Francisco, California (State)

Depositions/Arbitrations:
1. Vuillemot vs. Wailuna Recreation Association; Honolulu, Hawaii (Arbitration)
2. King vs. Cottrell; Spokane, Washington

3.  Lewis vs. State of Hawaii; Honolulu, Hawaii
4.  Easterday vs. Leeward Auto Recycling; Honolulu, Hawaii
5.  Weathers vs. 24 Hour Fitness; Boise, Idaho
6.  Prior vs. Columbus McKinnon Corporation; Lewiston, Idaho
7.  Pettit, et al. vs. Friendly Ford, et al.; Las Vegas, Nevada
8.  Sinclair vs. BNSF; Billings, Montana
9.  Burkey vs. Premier Chemicals, et al; Pocatello, Idaho
10. Figaroa vs. State of Hawaii; Lihue, Hawaii
11. Sherwood, et al. vs. Williams & Associates, et al.; Honolulu, Hawaii (Vol 1-2)
12. Borges vs. County of Hawaii; Hilo, Hawaii (Arbitration)
13. Johnson vs. K.C. Charles, et al.; Spokane, Washington (Volume 1-2)
14. Bishop vs. Union Pacific Railroad; Cheyenne, Wyoming (Volume 1-2)
15. Van Dinter vs. Nason; Spokane, Washington
16. Olson vs. Johnson; Post Falls, Idaho
17. Schmit vs. Vandouris; Spokane, Washington
18. Martin vs. State of Hawaii, et al.; Waimanalo, Hawaii
19. Himmelmann vs. Taroc; Honolulu, Hawaii
20. Olson vs. BNSF; Cheyenne, Wyoming
21. Gomez, et al. vs. IBM, et al.; San Jose, California (Volumes 1-6)
22. Kubinski vs. UPRR; Salt Lake City, Utah (Volume 1-2)
23. Broadfoot vs. Watco; Colfax, Washington
24. Berry vs. Hotel of Marianas; Hagåtña, Guam  96910
25. Ganley vs. Harbor Square; Honolulu, Hawaii (Deposition)
26. Ganley vs. Harbor Square; Honolulu, Hawaii (Arbitration)
27. Ferger vs. Spokane Valley Four Square Church; Spokane, Washington
28. Tyler vs. Petsmart, et al.; Spokane, Washington
29. Paulson vs. Ru-mar Club; Twin Falls, Idaho
30. O'Donnell vs. Taylor Construction; Bozeman, Montana
31. England vs. Swinerton , et al.; San Francisco, California
32. Fenwick vs. Watabe, et al.; Hagåtña, Guam
33. Pinkley vs. BNSF; Spokane, Washington
34. Harrison vs. Hilton Hawaii Village; Waikiki, Hawaii
35. Clark vs. BNSF; Gillette, Wyoming
36. Zygutis vs. Beech; Waipio Valley, Hawaii
37. Retford vs. Snow King, et al.; Jackson Hole, Wyoming
38. Westlake vs. Ryobi, et al.; Pocatello, Idaho
39. Mecurio vs. Brownlee, et al.; Missoula, Montana
40. Nordstrom vs. Bodkin Enterprises; Hayden Lake, Idaho
41. Houser vs. Resort Quest, et al.; Lahaina, Maui
42. Benson vs. Magic Valley Partners, et al.; Twin Falls, Idaho

**2002:**
Trials:
1.  Wright vs. Chanel; Honolulu, Hawaii (State)
2.  Dexheimer vs. Guthrie; Spokane, Washington (State)
3.  Becker vs. Oliver Family Limited Partnership; Coeur d'Alene, Idaho (State)
4.  Weissinger vs. Lewis & Clark College; Portland, Oregon (State)

Depositions/Arbitrations:

1. Hotel Corporation of the Pacific vs. Group 70; Kauai, Hawaii
2. Eades vs. Lisandra, Inc.; Kihei, Hawaii (Volume 2)
3. Requelman vs. Pacific Transportation Services; Hilo, Hawaii
4. Eades vs. Lisandra, Inc.; Kihei, Hawaii (Arbitration)
5. Parlin vs. Miller; Spokane, Washington
6. Gaspero vs. Pacific Shores; Kihei, Hawaii (Records Deposition)
7. Bowkett vs. Texton; Boise, Idaho
8. Guerrero vs. Cabjaun, et al.; Honolulu, Hawaii
9. Fenzke vs. Naniloa Hotel; Hilo, Hawaii (Arbitration)
10. Harshmans vs. Jackson Hole Mountain Resort, et al.; Jackson, Wyoming
11. Gibson vs. BNSF; Albuquerque, New Mexico
12. Colburn vs. Amtrack; Salt Lake City, Utah
13. Wells vs. Wolf Lodge; Coeur d'Alene, Idaho
14. Ley vs. Stockman Financial Corporation; Billings, Montana
15. Becker vs. Oliver Family Limited Partnership; Coeur d'Alene, Idaho
16. Britton vs. Shearer; Spokane, Washington
17. Keller, et al. vs. Jones, et al.; New Orleans, Louisiana
18. Kinery vs. Mathieu; Jackson Hole, Wyoming
19. Zalopany vs. Keller; Honolulu, Hawaii
20. Williams vs. LRG Real Estate LP, et al.; Kona, Hawaii
21. Rehkopf vs. Kahana Falls, et al.; Lahaina, Maui
22. Evans vs. England; Springdale, Washington
23. Idaho Department of Labor vs. Sunset Marts, et al.; Orofino, Idaho
24. Karlsson, et al. vs. Savage, et al.; Los Angeles, California
25. O'Neil vs. Ho; Honolulu, Hawaii (Records Deposition)
26. Ng vs. Hwa, et al.; San Francisco, California
27. Tracy vs. Bock, et al.; Spokane, Washington
28. Hart Machine vs. Clapp; Minneapolis, Minnesota
29. Parrish et al. vs. Minidoka County Highway Department; Pocatello, Idaho
30. Radke vs. Pacific Hawaiian Holidays, et al.; Honolulu, Hawaii (Arbitration)
31. Oie vs. Himuro; Waikiki, Hawaii
32. Kailieha vs. PRN 'Ekolu dba Scoozies'; Waikiki, Hawaii
33. Keating vs. Fox and Hound; Waikiki, Hawaii
34. Hirukawa vs. Structures International; Honolulu, Hawaii
35. Firestone vs. Milford; Spokane, Washington
36. Oschner vs. BNSF; Laramie, Wyoming
37. Hippler vs. Dittman; Elk, Washington
38. Collins vs. Union Pacific Railroad; Laramie, Wyoming
39. Milford vs. Firestone; Spokane, Washington (Mediation)
40. Zygutis vs. Beech; Waipio Valley, Hawaii (Arbitration)
41. Nazar vs. Amsbury; Spokane, Washington (Mediation)
42. Ejercito vs. Baywatch Production, et al.; Honolulu, Hawaii (Arbitration)
43. Jackson vs. Larson; Moscow, Idaho
44. Bumgraber vs. Safeway; Spokane, Washington
45. George vs. Diamond Parking; Waikiki, Hawaii

46. Koenig vs. Riemer, et al.; Kihei, Maui
47. Piggee vs. Chrysler, et al.; San Francisco, California

# EXHIBIT E

# CONDENSED

Coeur d'Alene, ID
(208) 667-1163

Spokane, WA
(509) 838-6000

Seattle, WA
(206) 622-3376

Portland, OR
(503) 227-1544

Videoconferencing

Trial Presentation

Videography

Court Reporting

National (800) 528-3335
www.NaegeliReporting.com

Naegeli Reporting
"The Deposition Experts"

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS


MOSES T. FEJERAN and
QIANYAN S. FEJERAN,

        Plaintiffs,

vs.       Civil Action No. 05-0033

AVIATION SERVICES (CNMI), LTD.
d.b.a. FREEDOM AIR,

        Defendant.

_____



DEPOSITION OF RICHARD T. GILL, Ph.D.
Taken on behalf of the Plaintiffs
June 28, 2007

- - -

       BE IT REMEMBERED THAT, pursuant to the Oregon Rules
of Civil Procedure, the deposition of RICHARD T. GILL, Ph.D.,
was taken before Marta J. Charles, a Professional Court
Reporter and a Notary Public for the State of Oregon, on June
28, 2007, commencing at the hour of 11:59 A.M., the
proceedings being reported at 8235 Northeast Airport Way,
Portland, Oregon.



## Page 21

1　regulation that you can point me to, or is there just
2　kind of -- yeah -- is there any specific FAA
3　regulation you can say, "Look. Here's the regulation.
4　They cannot make this change"?
5　A.　No. I didn't -- have not gone to the
6　literature and looked.
7　　　　THE WITNESS:　And if we can just
8　take a brief break here, I notice the court reporter
9　had dropped her writing utensil.
10　　　　(Whereupon, a short break was
11　taken.)
12　　　　MR. BANES:　We're back on record.
13　BY MR. BANES:　(Continuing)
14　Q.　Is there any part of your testimony -- I
15　know that you had a chance to meet with Freedom Air's
16　lawyer. Is there any part of your testimony you'd
17　like to change, correct, or modify?
18　A.　Just to expand, I think would be the proper
19　word. And that is, in our discussions this morning,
20　the name Richard Brown had come up. And I believe
21　he's director of operations and safety at Freedom Air.
22　And through discussions that Mr. Ledger has had with
23　Mr. Brown, Mr. Brown's communication to Mr. Ledger are
24　consistent with my understanding, and that is that the
25　FAA would not allow them to go through and design,

## Page 22

1　modify, or install a new set of stairways. But I
2　can't cite you to a specific FAA regulation statute.
3　Q.　Okay. So you're relying on a statement by
4　an employee of Defendant Freedom Air -- communicated
5　through their lawyer to you?
6　A.　I would say that corroborates my prior
7　understanding.
8　Q.　Going back to this case in which you gave a
9　general opinion of the design of the stairway was not
10　safe, what was not safe about the stairway -- that
11　particular stairway?
12　A.　There were a number of issues. But the one
13　that was most prevalent was it had aluminum
14　slip-resistant tread nosings with an abrasive grip
15　coating on them, and that had not been maintained in
16　a safe condition. And the -- Based on the frequency
17　in which it was alleged to be replaced was either a
18　design or a manufacturing defect, because it was only
19　lasting a matter of a few days before large pieces
20　were coming off. And then, it was a number of
21　issues pertaining to general stairway geometry, again.
22　Q.　Like what?
23　A.　Rise run ratios, rise run heights and riser
24　heights, tread depths. There was an issue of the
25　handrail allowing somebody to fall through the center

## Page 23

1　of it because there was allegations of falling through
2　the handrail.
3　Q.　Well, how could -- how could there be a
4　design defect if -- if the airline could then say,
5　"Well, look, we can't make any change because we are
6　FAA regulated, and so, we can have an unsafe
7　stairway, and there's nothing you can do about it"?
8　A.　I don't understand your question.
9　Q.　Well, you gave an opinion in the other case
10　that the stairway was unsafe, in part because of a
11　coding problem, but also issues related to variations
12　in riser and treads, if I understood you correctly.
13　A.　Correct.
14　Q.　So how is that -- how is that situation
15　different than the present situation?
16　A.　Well, I think there are similarities. But,
17　again, the issue at hand is that it's a manufacturing
18　design issue. It's not the air carrier issue. In
19　other words, the issue that I had in that case and
20　is an issue, I believe in part in this case, is that
21　these stairways, in either case, could have been
22　designed safer. Now, obviously, there are constraints
23　that have to be dealt with, but they could've been
24　designed safer. So the point of contention that I
25　have is more with the manufacturer than something to

## Page 24

1　do with the manner in which the -- the aircraft is
2　being operated.
3　Q.　Was the carrier also a party to the design
4　defect stairway case that we were talking about?
5　A.　They were the original party, is my
6　recollection. And when I looked at the aircraft and
7　the steps and gave my preliminary opinions back to
8　the attorney, they then brought in -- the plaintiff
9　brought in the airframe manufacturer.
10　Q.　Is there anywhere in your report in which
11　you state that -- in effect, that these stairways
12　cannot be changed pursuant to FAA regulation?
13　A.　I don't believe I went into that level of
14　detail. No, sir.
15　Q.　Did -- During Applied Cognitive Science's
16　inspection of Freedom Air's stairway, did it consider
17　the feasibility of making any changes to make the
18　stairway safer?
19　A.　No. That was really beyond the scope of
20　anything that we were asked to do.
21　Q.　What was the ultimate resolution of the case
22　in which you -- you gave an opinion saying the
23　stairway in the aircraft was unsafe? Was it settled?
24　Did it go to trial?
25　A.　I think it's still an open-case file.

NAEGELI REPORTING CORPORATION

800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR          Seattle, WA          Spokane, WA          Coeur d'Alene, ID
503.227.1544          206.622.3376          509.838.6000          208.667.1163

Court Reporting     Trial Presentation     Videoconferencing     Videography

Page 13

1  down.  And it's also referred to in Dr. Perez'
2  report.
3     A.   And your question would be?
4     Q.   Does that change your opinions in your
5  report any?
6     A.   Let me see just skim real quick what they
7  are.  I don't believe so.  No.  In terms of the six
8  opinions that I've had listed, I don't see how that
9  would change any of those.
10    Q.   So the two persons that you've talked with
11 about this matter are Joellen Gill and David Ledger,
12 your attorney for Freedom Air; is that correct?
13    A.   Yes, sir, that's correct.
14    Q.   All right.  And did Applied Cognitive
15 Sciences -- Well, let me ask you this:  In your
16 report, you refer to miscellaneous Short's SD3-60
17 maintenance protocols.  Can you please explain to me
18 what those are?
19    A.   They appear to be excerpts from Short's
20 manuals, the manufacturer of the aircraft in
21 particular, as it explains to maintenance and
22 procedural operations for the use of the stairway.
23    Q.   Why was maintenance an issue in your report?
24    A.   For the sake of completeness of my report,
25 would be one, because maintenance is always a

Page 14

1  potential issue when it comes to this type of
2  incident.
3         Secondly, I think in terms of the
4  things that Freedom Air has control over, which is
5  not the design of the airframe but the manner in
6  which they use the airframe and the manner in which
7  they maintain the airframe, I felt it was important
8  to make sure that they were using it in the manner
9  that it was intended and maintaining consistent with
10 the OEM specifications.
11    Q.   And was that something you were asked to do,
12 or is it just something that you did as part of your
13 analysis?
14    A.   The latter; it's just something I would
15 always do in a case like this.
16    Q.   Since the date of your report, which is May
17 21, 2007, have you looked at any other materials?
18    A.   That one, I might be able to do a better
19 job of answering for you.  It appears that I have
20 also reviewed the Complaint, the Plaintiffs' Response
21 to First Set of Interrogatories, the Defendants'
22 Initial Disclosure, and there may be some additional
23 -- No, I think that's the same ones -- the
24 maintenance manual and the station manual are the same
25 ones.  So I think that's the same information.  That

Page 15

1  would be it.
2     Q.   What materials did you review for your
3  deposition today?
4     A.   I just would've read over my report again,
5  read over my summary notes that I generated as I read
6  the material that I described in my report, and then
7  I just indicated it was new material.
8     Q.   And you met with Mr. Ledger?
9     A.   I did.
10    Q.   Was anybody else present -- anybody else
11 present?
12    A.   No, sir, not until you joined us.
13    Q.   Okay.
14        (Coughing.)
15        THE WITNESS:  Bless you.
16 BY MR. BANES:  (Continuing)
17    Q.   And besides the one case that you talked
18 about earlier where you were asked to give an opinion
19 about the design of a stairway of an aircraft, have
20 you ever given an opinion about any other stairway in
21 any other kind of -- besides a building?
22    A.   I've encountered stairways in a large range
23 of settings, from commercial maritime cases to
24 recreational maritime cases, I guess you might call
25 it, heavy equipment, like railroad equipment or heavy

Page 16

1  earthmoving equipment, industrial settings where it's
2  part of equipment, itself.  Sometimes it's a stairway,
3  sometimes it's a stair ladder.  Those would be the
4  kinds of things I can think of off the top of my
5  head.
6     Q.   And when you gave the opinion about the
7  design for the aircraft, when was that -- when was
8  that opinion given?
9     A.   I think it was -- I was first retained on
10 that case three years ago, maybe.
11    Q.   Okay.  If, during a break, you reviewed your
12 report in which you list cases you've testified in or
13 given opinions in -- I think the last five years or
14 perhaps longer -- do you think you would be able to
15 recognize the case that you talked about?
16    A.   Are you referring to my Federal Rule 26?
17    Q.   Yeah, that's right.
18    A.   I could -- Yeah.  I don't know if it's in
19 there, because I don't know what -- if I for sure
20 gave a deposition and what year it was.
21    Q.   Okay.
22    A.   It seems to me it was relatively recent, but
23 I can't tell you a certain...
24    Q.   And what standards did you use in assessing
25 whether the stairway was designed safely or not?

NAEGELI
REPORTING
C O R P O R A T I O N

800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR          Seattle, WA          Spokane, WA          Coeur d'Alene, ID
503.227.1544          206.622.3376         509.838.6000         208.667.1163

Court Reporting       Trial Presentation   Videoconferencing    Videography

# EXHIBIT F

Videoconferencing

Trial Presentation

Videography

Court Reporting

NAEGELI REPORTING
"The Deposition Experts"

National (800) 528-3335
www.NaegeliReporting.com

Coeur d'Alene, ID
(208) 667-1163

Spokane, WA
(509) 838-6000

Seattle, WA
(206) 622-3376

Portland, OR
(503) 227-1544

# CONDENSED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS


MOSES T. FEJERAN and
QIANYAN S. FEJERAN,

        Plaintiffs,
vs.        Civil Action No. 05-0033

AVIATION SERVICES (CNMI), LTD.
d.b.a. FREEDOM AIR,

        Defendant.

_____



DEPOSITION OF FRANK A. PEREZ, Ph.D.
Taken on behalf of the Defendants
June 28, 2007

- - -

     BE IT REMEMBERED THAT, pursuant to the Oregon Rules
of Civil Procedure, the deposition of FRANK A. PEREZ, Ph.D.,
was taken before Marta J. Charles, a Professional Court
Reporter and a Notary Public for the State of Oregon, on June
28, 2007, commencing at the hour of 4:12 P.M., the proceedings
being reported at 8235 Northeast Airport Way, Portland,
Oregon.

Page 25

1  them. I don't know. Of the 110 that were in
2  airline service, do you know how many of them had a
3  stair similar to what's shown in Exhibit 12?
4  A. No, I don't.
5  Q. Okay. If you were given an opportunity to
6  inspect each of the 110 that were in service as of
7  the date, okay --
8  A. Mm-hm.
9  Q. -- and as a result of your inspection, you
10  accumulated the same data in terms of measurements
11  that you've accumulated in your inspection of the
12  Freedom Air aircraft, if everything about these stairs
13  were the same as what you've discovered about the
14  Freedom Air aircraft, would your opinion be that each
15  of those aircraft had an unsafe or a defective stair?
16  A. Yes.
17  Q. And who's -- I'm not saying I agree with
18  you -- but, again, assuming that your answer would be
19  correct, who's -- who would be responsible for that
20  configuration?
21  A. Well, initially, one of the parties would be
22  the designer/manufacturer of the stairs --
23  Q. Okay.
24  A. -- because they put it into the commerce
25  stream.

Page 26

1  Q. Into the airplane?
2  A. Into the airplane, correct.
3  Q. Okay.
4  A. At some point, the operators of the airline,
5  I would think, is knowledgeable about -- about these
6  stairs and they would have incidences with it. It's
7  clear to me that -- that -- that this is probably
8  not the first incident of a person coming off these
9  stairs and falling.
10  Q. That's probably -- You're probably right
11  about that.
12  A. Mm-hm. I -- I -- I believe I'm right.
13  And -- and just from -- from basic principles, human
14  factors and safety principles, this is not a safe
15  stair.
16  Q. So at least your -- your answer, so far, is
17  that, initially, what you consider to be an unsafe
18  stair would be the responsibility of the manufacturer
19  --
20  A. Yes.
21  Q. -- for putting it into the airplane and
22  selling it in that -- in that way --
23  A. Correct.
24  Q. -- correct?
25  A. Correct.

Page 27

1  Q. Okay. If the -- if that stair that we're
2  talking about, which the manufacturer installed, it's
3  in the airplane, and in order for this airplane to
4  carry passengers in the United States, the FAA has to
5  certify it. Obviously, the plane has been certified
6  because they are flying in the United States. So
7  would that affect your thinking or your opinion that
8  the stair, as installed, is unsafe or defective?
9        MR. BANES: I'm just going to
10  object to the extent it may call for a legal
11  conclusion.
12        THE WITNESS: I come upon that in
13  another field -- in automobile design -- just because
14  GM produced sidesaddle gas tanks for many decades and
15  - - and they considered it acceptable -- it -- it --
16  You know, it wasn't safe.
17  BY MR. LEDGER: (Continuing)
18  Q. True. But what you're talking about in that
19  instance is, the manufacturer determining whether or
20  not its own product is safe. This is a different
21  situation where you have a federal agency with
22  oversight --
23  A. Mm-hm.
24  Q. -- and they're obviously concerned with
25  safety, among other things. So on that basis, would

Page 28

1  that change your thinking or your opinion about the
2  airworthiness or the -- the safety or unsafety
3  characteristics of the stair?
4  A. It still doesn't, because --
5        MR. BANES: Same objection. Sorry.
6        THE WITNESS: Oh. Yeah. It still
7  doesn't. Because, I believe this is not a safe
8  stair. The FAA, even though they stamp -- rubber-
9  stamped it, the analysis shows that this is not a
10  safe stair.
11  BY MR. LEDGER: (Continuing)
12  Q. Yeah. But how do you know what analysis
13  the FAA undertook before certifying the aircraft?
14  A. That, I don't know.
15  Q. Okay.
16  A. And -- and the similar concept applies to
17  Building Codes, too. A lot of times, inspectors --
18  Q. Okay. Hold -- hold -- hold on one minute,
19  because I think you answered my question. So let me
20  answer -- let me ask another one.
21  A. Mm-hm.
22  Q. You don't know whether -- Your answer was,
23  you don't know to what extent the FAA considered the
24  stair, individually --
25  A. Correct.

7 (Pages 25 to 28)

NAEGELI
REPORTING
CORPORATION

800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR        Seattle, WA        Spokane, WA        Coeur d'Alene, ID
503.227.1544        206.622.3376       509.838.6000       208.667.1163

Court Reporting     Trial Presentation    Videoconferencing    Videography

# EXHIBIT G

1    CARLSMITH BALL LLP

2    DAVID LEDGER (CNMI BAR NO. F0195)
     Carlsmith Ball LLP Building
3    Capitol Hill
     Post Office Box 5241
4    Saipan, MP 96950-5241
     Tel No. 670.322.3455
5
     Attorneys for Defendant
6    Aviation Services (CNMI), Ltd. dba Freedom Air

7

8

9                    UNITED STATES DISTRICT COURT

10                            FOR THE

11                   NORTHERN MARIANA ISLANDS

12

13   MOSES T. FEJERAN and                    CIVIL ACTION NO. 05-0033
     QIANYAN S. FEJERAN,
14
                     Plaintiffs,
15
            vs.                              **DECLARATION OF RICHARD
16                                           BROWN**
     AVIATION SERVICES (CNMI), LTD.
17   dba FREEDOM AIR,

18                   Defendant.

19
           I, RICHARD BROWN, declare under penalty of perjury that the following statements are
20
     true and correct:
21
           1.      I have personal knowledge of the facts stated in this declaration except as
22
     otherwise indicated.
23
           2.      I would testify competently to these facts if called by the Court to do so.
24
           3.      At present, I am employed by Freedom Air as Director of  Safety. In January
25
     2005 when Mr. Fejeran was a passenger on Freedom Air and was involved in a disembarkation
26
     irregularity on a flight from Saipan to Rota my position was Director of Operations.  That flight
27

28

     4833-7267-9681.1.059303-00001

1  was one leg of an international flight Freedom Air operated between Guam and the Northern

2  Mariana Islands.  The ticket Mr. Fejeran traveled on was the same ticket issued to all passengers

3  on that flight.

4      4.    Previous to my employment with Freedom Air, I was employed for thirty seven

5  (37) years in the aviation industry as a commercial airline transport pilot and held a transport

6  pilot license issued by the FAA.  I retired from commercial transport flying upon reaching

7  mandatory retirement age of 60.

8

9      5.    My present position at Freedom Air requires me to ensure that Freedom Air is in

10  compliance with FAA and U.S. Dept. of Transportation ("DoT") rules and regulations applicable

11  to international air travel.  My present position at Freedom Air also requires me to be familiar

12  with how the Warsaw Convention applies to international air travel such as the flight Mr. Fejeran

13  was on, and in particular how the Convention applies to passengers traveling on such flights with

14  regard to liability for claims against Freedom Air.

15

16      6.    Freedom Air operates and did operate in January 2005 a flight with the following

17  itinerary:  Guam-Rota-Saipan-Rota-Guam.  Freedom Air operates the entire flight and each

18  separate leg of this flight as an international flight in full compliance with FAA and DoT  rules

19  and regulations for international air travel. Though the Saipan-Rota leg could be mislabeled by

20  an uninformed person as a so-called domestic flight because it takes off and lands in the CNMI,

21  since the flight traverses approximately forty (40) miles of international airspace FAA and DoT

22  rules and regulations for international air travel apply and the flight is officially classified as

23  international air travel.

24

25      7.    In addition, Freedom Air operates Guam-Rota-Saipan-Rota-Guam, including the

26  Saipan-Rota leg, as a Flag Carrier authorized by FAR Part 121 to conduct international air

27  transportation (see 14 CFR Part 119.3).

28

4833-7267-9681.1.059303-00001                         2.

8.    Previous to my employment with Freedom Air I was employed by Pacific Island Aviation in the position of Director of Operations for nearly three years.  PIA also flew Guam-Rota-Saipan-Rota-Guam.  At one time the FAA wanted PIA to operate the Saipan-Rota leg as a domestic flight and Guam-Saipan and Rota-Guam as international flights.  This was not possible as different flight rules applied, for example, as concerns fuel loads and payloads.  After being reminded that the Saipan-Rota leg operated in international airspace, the FAA concluded that even that leg was to be deemed an international flight.

9.    The Transportation Security Administration likewise classifies the Saipan-Rota leg of the Guam-Rota-Saipan-Rota-Guam flight as international air travel. All commercial aircraft operating internationally are required to carry on board a transponder which identifies the aircraft to aviation authorities.   Freedom Air's Guam-Rota-Saipan-Rota-Guam flight is required to carry such a transponder, and have it turned on for all legs of the flight because FAA classifies the flight, including Saipan-Rota, as international air travel.

I declare under penalty of perjury that the foregoing is true, correct and complete.

DATED: Hagåtña, Guam, July 25th, 2007.

RICHARD BROWN