CARLSMITH BALL LLP

DAVID LEDGER (CNMI BAR NO. F0195)
ELYZE J. MCDONALD (CNMI BAR NO. F0358)
Carlsmith Ball LLP Building
Capitol Hill
Post Office Box 5241
Saipan, MP 96950-5241
Tel No. 670.322.3455

Attorneys for Defendant
Aviation Services (CNMI), Ltd. dba Freedom Air

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN MARIANA ISLANDS

| | |
|---|---|
| MOSES T. FEJERAN and QIANYAN S. FEJERAN,<br><br>Plaintiffs,<br><br>vs.<br><br>AVIATION SERVICES (CNMI), LTD. dba FREEDOM AIR,<br><br>Defendant. | CIVIL ACTION NO. 05-0033<br><br>**DEFENDANT'S MOTION IN LIMINE TO PRECLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT FRANK PEREZ; DECLARATION OF ELYZE J. MCDONALD; EXHIBIT A; CERTIFICATE OF SERVICE** |

## I.     INTRODUCTION

Defendant Aviation Services (CNMI), Ltd. dba Freedom Air moves to preclude the testimony of Plaintiff's expert, Frank Perez.  The Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) impose certain standards of relevance and reliability upon expert opinions.  Mr. Perez's opinion, however, fails to meet those standards.  His opinion about the safety of Defendant's aircraft stairs is based on his references to the irrelevant subject of building codes.  His opinion also fails to take into account any of the particularities surrounding aircraft, such as FAA standards for aircraft safety and design,

manufacturer standards for aircraft safety and design, and aircraft weight, size, and material limitations. Mr. Perez's opinion about stairs on buildings is irrelevant to the issue of aircraft stairs, and his methodology in relying on building codes is also unreliable. As he offers no reliable or relevant opinion, he should be precluded from testifying at trial.

## II.    **MR. PEREZ'S OPINION**

In formulating his opinion, Mr. Perez exclusively and heavily relied on various building codes. Ex. A at 6:25 - 7:4. He offers the opinion that the aircraft could be made safer if they were compliant with such building codes. Ex. A at 74:7-8, 77:1-3, 92:14 - 93:14, 96:9-14, 116:15-16. Yet, Mr. Perez acknowledged that the building codes do not apply to aircraft:

> Q.    Is there anything in the Code that you've referred to, or the interpretation of the Code that is specific to aircraft?
>
> A.    No.    This is building.    And -- and the preface to the [Uniform Building Code] is that it's meant for buildings.    An aircraft is not a building, so . . . if Saipan mandates the Uniform Building Code, it applies to buildings.    And so, we don't have -- **it doesn't apply**.    It's not mandated.    As it stands it's only a standard in relation to aircrafts.    It's not a Code requirement.

Ex. A at 9:19-10:4 (emphasis added). He also acknowledged that the building codes themselves do not indicate that they apply to aircraft. Ex. A at 94:21- 95:2. Moreover, he stated he had no knowledge of any particular requirements over aircraft stairs issued by the FAA. Ex. A at 28:22-25, 29:5-10.

Mr. Perez has degrees in mechanical engineering, but has no experience in stair design, or aircraft stair design. Ex. A at 85:15 - 86:4. Nevertheless, he offers an opinion on how the stairs could have been safer and how much it would have cost to make the stairs safer. *See* Ex. A at 112:13 - 115:24.

Mr. Perez also failed to use, in formulating his opinion, any design criteria specifically for the aircraft in question, the Shorts 360. Ex. A at 116:25 - 117:21.

1

2    **III.    THE STANDARDS OF FRE 702 AND *DAUBERT*.**

3        The Federal Rules of Evidence provide that

4

5                [i]f scientific, technical, or other specialized knowledge will assist
                 the trier of fact to understand the evidence or to determine a fact in
6                issue, a witness qualified as an expert by knowledge, skill,
                 experience, training, or education, may testify thereto in the form
7                of an opinion or otherwise.

8    Fed. R. Evid. 702. *Daubert* holds that Rule 702 imposes a "gatekeeping" obligation on the trial

9    judge to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." 509

10   U.S. at 589.    Maintaining *Daubert's* standards is particularly important considering the aura of

11   authority experts often exude, which can influence juries to give more weight to an expert's

12   testimony.

13

14       While holding that the trial court has substantial discretion in discharging its gatekeeping

15   obligation, *Daubert* suggested a number of factors that the court might consider: 1) whether a

16   theory or technique can be tested; 2) whether it has been subjected to peer review and

17   publication; 3) the known or potential error rate of the theory or technique; and 4) whether the

18   theory or technique enjoys general acceptance within the relevant scientific community. *Id.* at

19   592-94.    *See also United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (expert opinion

20   testimony generally turns on, among other factors, whether the expert's opinion would assist the

21   trier of fact in understanding the evidence or determining a fact in issue; whether the expert has

22   appropriate qualifications - i.e., some special knowledge, skill, experience, training or education

23   on that subject matter; whether the testimony is relevant and reliable; and whether its probative

24   value is substantially outweighed by the risk of unfair prejudice, confusion of issues, or undue

25   consumption of time).

26

27   **IV.    PEREZ'S TESTIMONY IS NEITHER RELEVANT NOR RELIABLE**

28

4852-6923-3409.1.059303-00001                                    3.

It is without question that planes differ from buildings. Planes are built to fly and to carry passengers and cargo in the air. They are subject to weight, size, and materials limitations that allow them to stay airborne. They are also subject to FAA requirements and regulations. Buildings, on the other hand, do not share the same concerns because of the simple fact that they are not airplanes and are not required to carry persons in the air.

Mr. Perez ignores these important distinctions and offers an opinion about the safety of aircraft stairs using his knowledge of building codes. To this extent, his opinion offers no helpful information to the trier of fact. The trier of fact will only be confused as to how to apply building codes to airplanes.

Mr. Perez's opinion also lacks reliability. He is an engineer in things land-based with no experience in the design or construction of airplanes, stairs, or aircraft stairs. He has based his opinion on his studies of building codes and other materials, none of which have any direct application to airplanes, or to the Shorts 360. Mr. Perez acknowledges that aircraft stairs must comply with certain FAA requirements, but has no knowledge of what those requirements are, or how they impact his opinion. He fails to have any "scientific, technical, or other specialized knowledge" that is pertinent to aircraft stairs, and thus, pertinent to this case. *See* Fed. R. Evid. 702. He simply believes that "stairs are stairs," but that is simply not the case. The aircraft is subject to certain size, weight, and materials limitations in order to allow the plane to fly safely. These limitations do not apply to buildings that are on the ground, which is Mr. Perez's area of knowledge.

Mr. Perez also neglected to review any of the design criteria for the Shorts 360 aircraft in particular. How that aircraft works and safely carries passengers and cargo from island to island would be relevant to whether or not the stairs themselves are safe. However, Mr. Perez, who has never studied stair design, attempts to offer an opinion without even referencing an aircraft

manual. Certainly, if this case was about a fall on stairs of a building, building codes would be relevant. Why not the same for aircraft? Why did Mr. Perez not use any FAA standards or manufacturer standards in evaluating a fall on aircraft stairs? His use of building codes demonstrates that the proper scientific method in evaluating the safety of a stair is to reference a manual or a guideline. However, he failed to reference the proper manual, and therefore, fails to use reliable principles or methods, making his testimony insufficient under Rule 702 and *Daubert*.

Another court has rejected an expert opinion on facts strikingly similar to this case. In *Neville v. Great Lakes Aviation Ltd.*, 1998 WL 830632 (unpublished), the Fourth Circuit afforded no weight to an expert's opinion on aircraft stair design, where the expert relied primarily on building codes and an examination of the aircraft. It found that building codes have no direct application to airplanes. *Id.* at *3. It also found that the investigation of building staircase simply has nothing to do with defects in the design of aircraft stairs. *Id.*

Mr. Perez's testimony fares no better than the expert in *Neville*. Both relied on building codes and an examination of the aircraft as part of their evaluation. Just as in *Neville*, this Court should reject Mr. Perez's insufficient, unreliable, and irrelevant opinion.

## V.    CONCLUSION

At the trial in this case, Plaintiff will seek to introduce the testimony of Frank Perez, whose expert opinion on the safety of aircraft stairs relies exclusively on building codes. His opinion is therefore unreliable and irrelevant, and should be excluded.

1        DATED: Hagåtña, Guam, September 6, 2007.

2  CARLSMITH BALL LLP

3  

4                              DAVID LEDGER
                              ELYZE J. MCDONALD

5                                Attorneys for Defendant
                              Aviation Services (CNMI), Ltd.

6                                dba Freedom Air

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF ELYZE J. McDONALD

I, ELYZE J. McDONALD, pursuant to 28 U.S.C. Section 1746 declare under penalty of perjury that the following statements are true:

1.    I have personal knowledge of the facts stated in this declaration.

2.    I would testify competently as to these facts if called by the Court.

3.    I am licensed to practice law before all courts in the Commonwealth of the Northern Mariana Islands and am admitted to this Court.

4.    I am the attorney for Defendant Freedom Air.

5.    This Declaration is filed in support of Defendant's Motion in Limine to Preclude the Testimony of Plaintiff's Expert Frank Perez.

6.    Attached hereto marked as Exhibit A is a true and correct copy of the pertinent pages of the Deposition Transcripts of Frank A. Perez taken on June 28, 2007.

EXECUTED:  September 6, 2007.

ELYZE J. MCDONALD

7.

# EXHIBIT A

# CONDENSED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS


MOSES T. FEJERAN and
QIANYAN S. FEJERAN,

        Plaintiffs,
vs.      Civil Action No. 05-0033

AVIATION SERVICES (CNMI), LTD.
d.b.a. FREEDOM AIR,

        Defendant.

_____



DEPOSITION OF FRANK A. PEREZ, Ph.D.
Taken on behalf of the Defendants
June 28, 2007

- - -

     BE IT REMEMBERED THAT, pursuant to the Oregon Rules
of Civil Procedure, the deposition of FRANK A. PEREZ, Ph.D.,
was taken before Marta J. Charles, a Professional Court
Reporter and a Notary Public for the State of Oregon, on June
28, 2007, commencing at the hour of 4:12 P.M., the proceedings
being reported at 8235 Northeast Airport Way, Portland,
Oregon.

National (800) 528-3335
www.NaegeliReporting.com

Coeur d'Alene, ID
(208) 667-1163

Spokane, WA
(509) 838-6000

Seattle, WA
(206) 622-3376

Portland, OR
(503) 227-1544

NAEGELI REPORTING
"The Deposition Experts"

Videoconferencing
Trial Presentation
Videography
Court Reporting

Page 5

1  giving depositions. A couple of things to highlight:
2  Make sure you understand my question. If you don't,
3  tell me that you don't understand it, and I'll try to
4  state it in a -- in a -- in a way that is more
5  clear or makes sense to you. Try -- We'll try not
6  to step on each other's speech. Let me finish my
7  question, even if you anticipate what your answer is
8  going to be. Hold your answer back for a second,
9  and then the transcript will be more clear. Mr.
10 Banes may make objections. If he makes an objection,
11 then you should stop doing whatever you're doing and
12 let us resolve that, to the extent it can be resolved
13 today.
14        I -- I think that's all the
15 instructions that are necessary, unless you feel that
16 I'm leaving something out. Or is there some question
17 in your mind as to what I'm doing or what we should
18 be doing?
19 A.  No question at all.
20 Q.  Okay. I didn't think so.
21        The first thing I -- I'd like you
22 to do is -- I notice you -- you brought several
23 items with you.
24 A.  Mm-hm.
25 Q.  Your case file or claim file or whatever -

Page 6

1  - whatever it is that -- you may refer to it. Can
2  - - can you open that and just go through there and
3  tell me what's in there; each -- each individual
4  item? And then, if there's something that I -- that
5  I want to see --
6  A.  Okay.
7  Q.  -- I'll -- I'll make a note of that.
8  A.  Well, I -- First thing is I brought my CV
9  and publications, but you probably already have that.
10 Q.  I do.
11 A.  I'm going to put that aside.
12 Q.  I do.
13 A.  I have -- I have five manila folders and a
14 blue folder. The first manila folder is what I call
15 a "correspondence folder." It contains correspondence,
16 including e-mails and -- intake sheet and a billing
17 sheet -- billing sheets. That's -- that's manila
18 folder one. The second folder is my workup folder.
19 It contains calculations, analyses, also copies of
20 those reports that the -- the preliminary report and
21 my official report and my notes.
22 Q.  Sort of working notes or field notes?
23 A.  Working notes and calculations.
24 Q.  Okay.
25 A.  The third manila folder is entitled

Page 7

1  "Standards," and I have excerpts from various Building
2  Codes, an interpretation of the Codes, various
3  summaries of different Codes, including some
4  information on MIL Standards --
5        THE COURT REPORTER: Mail standards?
6        THE WITNESS: MIL --
7        THE COURT REPORTER: MIL?
8        THE WITNESS: M-I-L -- MIL
9  Standards. And I have an ANSI Standard for workplace
10 floor openings, but that's not relevant to this case.
11 The fourth folder is entitled "Reference," and I -- I
12 think I have, on the Web, researched this particular
13 aircraft; at least it's the specifications and the
14 history of it. I also have in -- in this reference
15 excerpts from a study done by John Templer entitled
16 "The Staircase: Studies of hazards, falls, and safer
17 design." And the last thing, I have a folder -- the
18 last folder I have is the -- Dr. Gill's report.
19 BY MR. LEDGER: (Continuing)
20 Q.  Whose report?
21 A.  Dr. Gill.
22 Q.  Dr. Gill's report? Okay.
23 A.  Yes. And -- and, of course, the -- the
24 blue folder contains -- This is the final thing that
25 I have, is -- is the photographs from my inspection.

Page 8

1  Q.  Okay. Okay. A couple things. As you were
2  going through that list, you said you had some --
3  some materials from -- from ANSI. That's A-N-S- I;
4  that's the acronym. And you commented that whatever
5  it is you have from ANSI is not relevant to this
6  case.
7  A.  Correct.
8  Q.  Can you expand on that? What is it that
9  you're talking about, and why is it not relevant?
10 A.  Well, it -- it's for the workplace, and I
11 didn't really utilize it. It's more of a general
12 standard regarding the workplace and more for
13 preventing falls from heights, I would think. And
14 it's really just a definitional standard, so it
15 doesn't really get to the meat of -- of what is --
16 what is really safe and so forth.
17 Q.  So being not relevant, it wasn't something
18 that you placed any particular reliance on?
19 A.  Correct.
20 Q.  Okay. You also mentioned that you have some
21 inter -- you have various Codes; UBC and others. And
22 then you have something you said that constitutes an
23 interpretation of the Codes?
24 A.  Yes, an explanation. Every now and then I
25 think the society that puts out the Uniform Building

2 (Pages 5 to 8)

NAEGELI
REPORTING
C O R P O R A T I O N

800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR        Seattle, WA        Spokane, WA        Coeur d'Alene, ID
503.227.1544        206.622.3376        509.838.6000        208.667.1163

Court Reporting        Trial Presentation        Videoconferencing        Videography

---

**Page 9**

1  Code publishes a handbook. Actually, the title of
2  this publication was "Handbook to the Uniform Building
3  Code and Illustrative Commentary." So it's -- gets
4  -- it was published by the -- this one is in 1988
5  for the 1985 Building Code published by ICBO;
6  International Conference of Building Officials.
7  Q.  And what -- and what does -- what does that
8  do for you? How does -- how does that -- how does
9  that work in conjunction with the Codes themselves?
10  A.  Well, the Codes, as I've copied them, are
11  very succinct; they're very dry. They just tell you
12  numbers. But -- but this particular document ties it
13  into -- to what's the reason for some of that. It
14  gives a reason why that -- we have a maximum riser
15  height of 7 inches and a minimum height of 4 inches.
16  For example, it goes through the history and explains,
17  you know, how that came about and what -- why it's
18  actually -- it's based on safety research.
19  Q.  Is there anything in the Codes that you've
20  referred to, or the interpretation of the Codes that
21  is specific to aircraft?
22  A.  No. This is building. And -- and the
23  preface to the UBC is that it's meant for buildings.
24  An aircraft is not a building, so -- so as -- if --
25  if Saipan mandates the Uniform Building Code, it

---

**Page 10**

1  applies to buildings. And so, we don't have -- it
2  doesn't apply. It's not mandated. It's -- it's --
3  As it stands, it's only a standard in relation to
4  aircrafts. It's not a Code requirement.
5  Q.  A standard in relation to aircraft, according
6  to your interpretation?
7  A.  According to interpretation of safety
8  engineering.
9  Q.  Okay.
10  A.  It's -- it's more than that. And I have to
11  not only tie what's written in the Uniform Building
12  Code, but I also am looking at the reference that I
13  -- I mentioned before; the Templer article. He -- he
14  describes what -- what really is safe design for
15  stairways.
16  Q.  In the Templer article, is there anything
17  specific to aircraft?
18  A.  No. No, there is not.
19  Q.  And that's -- that's a little bit too broad.
20  I think your answer's going to be the same, but in
21  the Templer code, or in the -- the other Codes that
22  we've been talking about, is there anything in
23  particular specific to an aircraft stair, such as the
24  one at issue in this case, where it's an integral
25  part of the aircraft and it folds down?

---

**Page 11**

1  A.  Well, the -- Templer's not a Code, but is
2  a publication. No. No. Nowhere in Templer does he
3  say -- I believe he doesn't say "aircraft." And --
4  and also regarding your question --
5       THE WITNESS: I'm sorry, you were
6  going to --
7       MR. BANES: I was just going to
8  put in an objection. I realize I'm a little bit
9  late, but I -- I think that assumes facts not in
10  evidence, i.e., that it's an integral, fixed part of
11  the airplane.
12       MR. LEDGER: Well, let's ask Dr.
13  --
14       THE COURT REPORTER: Fixed part of
15  the...
16       MR. BANES: Airplane.
17  BY MR. LEDGER: (Continuing)
18  Q.  How would you describe the configuration?
19  Would you -- would you say it's an integral part of
20  the airplane?
21  A.  I would ask, Clinton-like, define --
22       MR. BANES: It's water.
23       THE WITNESS: Okay.
24       THE COURT REPORTER: Clinton-like?
25       THE WITNESS: In a Clinton-like

---

**Page 12**

1  manner, define "integral." But -- but my -- You cut
2  to the chase. I know that Gill has described this
3  as a built-in or a fixed stairway, which -- which,
4  integrated, is -- does not seem to be the case here.
5  That stairway -- that particular stairway ladder is
6  removable. It actually can be stowed away; it can be
7  swung into place. So depending how you define that
8  "integrated" part, I would -- I would actually say it
9  isn't integrated; it's actually a removable piece of
10  -- of furniture, basically.
11  BY MR. LEDGER: (Continuing)
12  Q.  Well, wouldn't -- wouldn't that be true of
13  the propellers, of the landing gear, of any component
14  that you could actually remove from the aircraft?
15  It's really not a trick question. It's more --
16  A.  Yeah.
17  Q.  The -- the stair is not a -- the stair is
18  not an add-on by the operator. I mean, it -- it --
19  it comes from the manufacturer in the configuration
20  that we see it?
21  A.  Yes.
22  Q.  That's my definition of "integral."
23  A.  Okay.
24  Q.  The manufacturer installs the air -- the
25  stair --



NAEGELI
REPORTING
C O R P O R A T I O N

800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR          Seattle, WA          Spokane, WA          Coeur d'Alene, ID
503.227.1544         206.622.3376         509.838.6000          208.667.1163

Court Reporting        Trial Presentation        Videoconferencing        Videography

Page 25

1   them. I don't know. Of the 110 that were in
2   airline service, do you know how many of them had a
3   stair similar to what's shown in Exhibit 12?
4   A.  No, I don't.
5   Q.  Okay. If you were given an opportunity to
6   inspect each of the 110 that were in service as of
7   the date, okay --
8   A.  Mm-hm.
9   Q.  -- and as a result of your inspection, you
10  accumulated the same data in terms of measurements
11  that you've accumulated in your inspection of the
12  Freedom Air aircraft, if everything about these stairs
13  were the same as what you've discovered about the
14  Freedom Air aircraft, would your opinion be that each
15  of those aircraft had an unsafe or a defective stair?
16  A.  Yes.
17  Q.  And who's -- I'm not saying I agree with
18  you -- but, again, assuming that your answer would be
19  correct, who's -- who would be responsible for that
20  configuration?
21  A.  Well, initially, one of the parties would be
22  the designer/manufacturer of the stairs --
23  Q.  Okay.
24  A.  -- because they put it into the commerce
25  stream.

Page 26

1   Q.  Into the airplane?
2   A.  Into the airplane, correct.
3   Q.  Okay.
4   A.  At some point, the operators of the airline,
5   I would think, is knowledgeable about -- about these
6   stairs and they would have incidences with it. It's
7   clear to me that -- that -- that this is probably
8   not the only incident of a person coming off these
9   stairs and falling.
10  Q.  That's probably -- You're probably right
11  about that.
12  A.  Mm-hm. I -- I -- I believe I'm right.
13  And -- and just from -- from basic principles, human
14  factors and safety principles, this is not a safe
15  stair.
16  Q.  So at least your -- your answer, so far, is
17  that, initially, what you consider to be an unsafe
18  stair would be the responsibility of the manufacturer
19  --
20  A.  Yes.
21  Q.  -- for putting it into the airplane and
22  selling it in that -- in that way --
23  A.  Correct.
24  Q.  -- correct?
25  A.  Correct.

Page 27

1   Q.  Okay. If the -- if that stair that we're
2   talking about, which the manufacturer installed, it's
3   in the airplane, and in order for this airplane to
4   carry passengers in the United States, the FAA has to
5   certify it. Obviously, the plane has been certified
6   because they are flying in the United States. So
7   would that affect your thinking or your opinion that
8   the stair, as installed, is unsafe or defective?
9        MR. BANES:  I'm just going to
10  object to the extent it may call for a legal
11  conclusion.
12       THE WITNESS:  I come upon that in
13  another field -- in automobile design -- just because
14  GM produced sidesaddle gas tanks for many decades and
15  - - and they considered it acceptable -- it -- it --
16  You know, it wasn't safe.
17  BY MR. LEDGER:  (Continuing)
18  Q.  True. But what you're talking about in that
19  instance is, the manufacturer determining whether or
20  not its own product is safe. This is a different
21  situation where you have a federal agency with
22  oversight --
23  A.  Mm-hm.
24  Q.  -- and they're obviously concerned with
25  safety, among other things. So on that basis, would

Page 28

1   that change your thinking or your opinion about the
2   airworthiness or the -- the safety or unsafety
3   characteristics of the stair?
4   A.  It still doesn't, because --
5        MR. BANES:  Same objection. Sorry.
6        THE WITNESS:  Oh. Yeah. It still
7   doesn't. Because, I believe this is not a safe
8   stair. The FAA, even though they stamp -- rubber-
9   stamped it, the analysis shows that this is not a
10  safe stair.
11  BY MR. LEDGER:  (Continuing)
12  Q.  Yeah. But how do you know what analysis
13  the FAA undertook before certifying the aircraft?
14  A.  That, I don't know.
15  Q.  Okay.
16  A.  And -- and the similar concept applies to
17  Building Codes, too. A lot of times, inspectors --
18  Q.  Okay. Hold -- hold -- hold on one minute,
19  because I think you answered my question. So let me
20  answer -- let me ask another one.
21  A.  Mm-hm.
22  Q.  You don't know whether -- Your answer was,
23  you don't know to what extent the FAA considered the
24  stair, individually --
25  A.  Correct.

7 (Pages 25 to 28)



NAEGELI
REPORTING
C O R P O R A T I O N

800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR          Seattle, WA       Spokane, WA      Coeur d'Alene, ID
503.227.1544        206.622.3376      509.838.6000      208.667.1163

Court Reporting      Trial Presentation    Videoconferencing      Videography

Frank A. Perez, Ph.D.                                                    June 28, 2007

Page 29

1   Q.  -- correct?
2   A.  Correct.
3   Q.  All right. But you agree that the aircraft,
4   in a delivered state, has to be certified safe?
5   A.  I don't know that, either. It has to be -
6   - There's -- there's -- The process that it has to
7   go through, and I don't know that whole process.
8   Q.  I agree with that. You don't know the
9   whole process. But you agree there is a process?
10  A.  I believe there is a process, yes.
11  Q.  Okay. Then, I'll get back my -- my chain
12  of thought was, then -- then you said that, at some
13  point, the -- Assuming the correctness of your answer
14  that there's something wrong with the stair, then
15  according to what I heard you say, at some point in
16  time it, in your opinion, becomes an obligation on
17  the part of the operator --
18  A.  Yes.
19  Q.  -- to make changes?
20  A.  Correct.
21  Q.  Okay. And what if the operator was
22  prohibited from making a change to the stairway?
23  A.  Hypothetically, if the operator was -- had
24  to keep the aircraft in the same situa -- state that
25  it was, then -- then I think his hands are tied.

Page 30

1        If, hypothetically, he had to keep
2   it as is, no modifications at all.
3   Q.  Okay. When you were -- when you were doing
4   your research, did you -- did you come upon any
5   information concerning why production ceased in 1991?
6   A.  No. I didn't go that far.
7   Q.  Okay. And for the 110 that were still in
8   service in late 1998, did you -- did you come upon
9   any research to give you any sort of distribution;
10  how many were in the U.S., how many were in Europe,
11  anything like that?
12  A.  No.
13  Q.  Okay.
14  A.  No.
15  Q.  That's 14. 15. 15 is the airstair of Wiki
16  -- Wikipedia?
17  A.  Mm-hm.
18  Q.  Okay. And if you need me to hand this back
19  to you at any time I ask you a question, just tell
20  me and I'll give it to you.
21       There's -- there's one section
22  called "airstair," and there's another section called
23  "airstair design." Is -- is this -- is this two-
24  page -- Exhibit 15, is this about airstair design
25  generally, as opposed to airstair design for the

Page 31

1   Short's 360?
2   A.  Generally.
3   Q.  Generally? Okay. And what -- what was the
4   significance to you? Why did -- why did you download
5   and print Exhibit 15 for your file?
6   A.  I -- When -- This is a -- I was looking
7   for the word "stairs" and "airplane" and I just
8   stumbled upon this word, "airstair." But in the
9   context that it's used, it's actually an integrated --
10  what I would call "integrated" part of the aircraft.
11  It's -- it's a physical stair that -- that swings out
12  from the aircraft. And the important thing that I've
13  noticed when I've looked at such airstairs in bigger,
14  wide-body aircraft is that they do have handrails on
15  both sides. I mean, we're -- we're not in that
16  category here. We have a foldable, stowable stairway
17  that -- that can be moved by hand. In that
18  particular case, it's more of a -- it's not quite the
19  same. It's a physical stair that -- that swings out
20  of the aircraft.
21  Q.  That's your interpretation of Exhibit 15?
22  A.  Yes.
23  Q.  Okay. Let -- let me offer another one and
24  see if you accept it or reject it. In the second
25  paragraph under the section "Airstair Design," it

Page 32

1   says, "The most common type of airstair is found in
2   most business aircraft" --
3   A.  Mm-hm.
4   Q.  -- "regional jets and other small airliners,
5   which is a stair built into the side of a door" --
6   A.  Yes, it is.
7   Q.  -- "which is lowered to the outside"?
8   A.  Correct.
9   Q.  Okay.
10  A.  Correct.
11  Q.  Now, would you consider the Short's 360 to
12  be -- It's not a regional jet --
13  A.  Mm-hm.
14  Q.  -- right? Could it be a small airliner?
15  A.  It could be, yes.
16  Q.  Could it be a business aircraft?
17  A.  Could be.
18  Q.  Okay. And the stair on the Short 360 is
19  built into the inside of the door?
20  A.  It's actually not built into the inside of a
21  door. It is separated, but it could be stowed inside
22  -- on the side of the door. It's not built into the
23  door.
24  Q.  Okay.
25  A.  It is -- it is a separate item.



**NAEGELI REPORTING CORPORATION**

**800.528.3335**
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR        Seattle, WA        Spokane, WA        Coeur d'Alene, ID
503.227.1544        206.622.3376        509.838.6000        208.667.1163

Court Reporting        Trial Presentation        Videoconferencing        Videography

Page 73

1   Q.  How do you -- how do you do that?
2   A.  Based on this number -- and this is, of
3   course, Templer looking at normal stairs; not -- not
4   deep stairs, I believe.  But -- but -- For example,
5   in our -- in our little scenario, the horizontal
6   distance from -- from the top -- the ground -- or
7   the floor level of this -- the aircraft, you know,
8   the base level, down to the last step is just the
9   addition of the -- the treads that I talked about.
10  Q.  Right.
11  A.  The 7 and a half, 8 and a quarter, 8 and a
12  quarter.  I get 24 inches, which is 2 feet.  So 2
13  feet -- if this were normal stairs, and it isn't, it
14  -- it should take 1.3 seconds to traverse that.
15  Q.  Okay.  Given its configuration -- Did you
16  say "1.3"?
17  A.  Yes.
18  Q.  1.3.
19  A.  So -- so I'm saying you take 2 feet and you
20  divide by 1 and a half --
21  Q.  Okay.
22  A.  -- and you get -- you get 1.3 seconds.
23  Q.  Okay.  But was your -- is the 1.3 seconds
24  for this stair, or in general?
25  A.  In general.

Page 74

1   Q.  Okay.
2   A.  In general.
3   Q.  What about for this stair?
4   A.  That, I don't know.
5   Q.  Okay.
6   A.  I -- I would have to do some studies,
7   because it -- it is a difficult stair.  It's not --
8   it's not your normal Building Code stair.  It's deep.
9   Q.  Do you -- Can you say it would be 3 seconds
10  or less?
11  A.  I would look at your video and make a
12  comment.  But I -- I don't know.  I -- I don't know
13  what -- what it would be.
14  Q.  You mean if I played it again, you would -
15  -
16  A.  Yeah.
17  Q.  -- be able to comment?
18  A.  Yeah, just by looking at the other people.
19  Q.  Okay.
20  A.  If that's running real-time.
21  Q.  The video?
22  A.  The video.
23  Q.  Yeah.  So that's what you need?
24  A.  Yeah.  And probably, I would want to use
25  what I would consider more able-bodied people.

Page 75

1   Because, for example, the --
2   Q.  Actually, I can find that for you --
3   A.  Mm-hm.
4   Q.  -- because there's more than one clip.
5   A.  Okay.
6   Q.  Actually, it's -- it's a group of passengers
7   exiting the aircraft.  And for some reason, the
8   J-pegs are split up.
9   A.  Now -- now, that 1.3 seconds is to get to
10  the bottom step.  But to get to the ground, I would
11  estimate that -- that it's more like two seconds.
12  Q.  Not for the stair?  For, like --
13  A.  For --
14  Q.  -- for, like, a building stair?
15  A.  Right.
16  Q.  Okay
17  A.  That's right.
18      MR. LEDGER:  Okay.  Why don't you
19  go off the record for 60 seconds or whatever this
20  takes me.
21      (Whereupon, a discussion was held
22  off the record.)
23  BY MR. LEDGER:  (Continuing)
24  Q.  Okay.  How about this one?
25      THE COURT REPORTER:  Are we on the

Page 76

1   record?
2       MR. LEDGER:  Yeah.  Go back on the
3   record.
4   BY MR. LEDGER:  (Continuing)
5   Q.  Want to just leave it small screen?
6   A.  Yeah.  That's -- that's good.
7   Q.  Okay.
8       (Played video.)
9   A.  I need it to be stopped.  Oops.  I need to
10  -- he stopped.
11  Q.  Okay.  Hold on.  You want me to start it
12  over?
13  A.  Start it over.
14  Q.  Okay.
15  A.  There was a hesitation.
16  Q.  Okay.  So you're trying to get it when he
17  first steps off?
18  A.  Right.
19  Q.  Okay.  Ready?
20  A.  Ready.
21  Q.  Okay.
22      (Played video.)
23      THE WITNESS:  It's -- it's, like,
24  2 -- 2.4 seconds for that particular run.
25  BY MR. LEDGER:  (Continuing)



NAEGELI
REPORTING
CORPORATION

800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR        Seattle, WA        Spokane, WA        Coeur d'Alene, ID
503.227.1544        206.622.3376        509.838.6000        208.667.1163

Court Reporting        Trial Presentation        Videoconferencing        Videography

Page 77

1  Q.  Okay.  So about a half second longer than
2  if it were a building stair?
3  A.  Stair.  Right.  Right.
4  Q.  Okay.
5  A.  Correct.
6  Q.  Okay.  All right.
7  A.  But -- but it's -- This is just based on
8  one data point, and -- and the number that Templer
9  quoted.  So I wouldn't -- I would need more
10  information, more data points to give you a better
11  answer.
12  Q.  Why don't you try the same thing with --
13        MR. BANES:  Let me go to your
14  side.
15  BY MR. LEDGER:  (Continuing)
16  Q.  This is the one we looked at before?
17  A.  Mm-hm.
18  Q.  But you may as well just use it for another
19  point of reference.
20  A.  Okay.
21  Q.  It's the lady coming down.
22  A.  All right.
23  Q.  Okay.  So you tell me when.
24  A.  Start.
25        (Played video.)

Page 78

1        THE WITNESS:  Oh.  Actually, I got
2  distracted.
3        MR. BANES:  She wasn't that good
4  looking.  Come on, Frank.
5  BY MR. LEDGER:  (Continuing)
6  Q.  Okay.  Hold on.  Wait.  I've got to back
7  it up.  Okay.  You say when.
8  A.  Go.
9  Q.  Can you see it okay?
10  A.  I can see.  Go.
11  Q.  Okay.  Go.
12        (Played video.)
13        THE WITNESS:  It's more like 2.4.
14  So --
15  BY MR. LEDGER:  (Continuing)
16  Q.  About the same as the --
17  A.  -- about the same.
18  Q.  About the same as the other gal?
19  A.  But she has a -- She pauses at the step,
20  and then she kind of falls down, and it runs down
21  the rest of the way.
22  Q.  Here.  Actually, there's -- there's a --
23  A.  There's more.
24  Q.  -- there's a whole bunch of people that come
25  out of the airplane.  Hold on a minute.  Okay.

Page 79

1  Wait.
2  A.  I'm just pen watching -- pen stopping this.
3  This is -- frame analysis is more -- would be more
4  accurate, but this is just rough.
5  Q.  Okay.
6  A.  Go.  I won't do her.  I'll do the --
7  Q.  Right.
8  A.  -- next person.
9  Q.  Right.
10        (Played video.)
11        THE WITNESS:  That's 2.3.  Oh,
12  there's still more.  2.3.  It's all about 2.4, 2.5,
13  2. --
14  BY MR. LEDGER:  (Continuing)
15  Q.  Okay.  2.4, 2.5?
16  A.  Yeah.
17  Q.  All right.  Okay.  Thank you.
18  A.  2.3 is the low end, and that's rough.
19  Q.  Okay.  I understand that.  Well, then we're
20  going to -- we're going -- we're going to do that
21  right now.  What we've done is, we've -- we've run a
22  video of -- of disembarkation of the aircraft footage
23  taken by Cognitive -- Applied Cognitive Science.  And
24  by using a stopwatch function on your wristwatch --
25  A.  Yes.

Page 80

1  Q.  -- you've estimated the time it takes the
2  passenger to get from the top to the bottom of the
3  step --
4  A.  Correct.
5  Q.  -- to the tarmac?
6  A.  Correct.
7  Q.  And -- and using that method, it ranged from
8  2.3 seconds to 2.5 seconds?
9  A.  2.2 to 2.5, correct.
10  Q.  2.2 to 2.5?
11  A.  Yes.
12  Q.  Okay.
13  A.  I -- I -- I also have to comment.  I
14  notice an interesting thing -- thing about all those.
15  A lot of people that are walking down the stairs,
16  they're -- they're not walking normally as you would
17  forward.  There were -- Many people were turning --
18  they were walking -- sidestepping down the stairs.
19  Q.  Probably because the stair is narrow?
20  A.  Correct.  Correct.
21  Q.  Including the guy carrying the baby?
22  A.  Yes.
23  Q.  Did it -- did it appear to you that any of
24  those people had any difficulty negotiating the stair?
25  A.  Not in the -- that video.

20 (Pages 77 to 80)

NAEGELI
REPORTING
C O R P O R A T I O N

**800.528.3335**
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR        Seattle, WA        Spokane, WA        Coeur d'Alene, ID
503.227.1544      206.622.3376      509.838.6000      208.667.1163

Court Reporting      Trial Presentation      Videoconferencing      Videography

Frank A. Perez, Ph.D.                                                    June 28, 2007

## Page 85

1  a passenger?
2  A.  I would -- I would consider grab bar A
3  being of some use to a passenger.  And B would be
4  some, but lesser use, to a passenger.
5  Q.  Less than A?
6  A.  Correct.
7  Q.  Okay.  Okay.  Go to your Exhibit 17, I
8  believe.  That should be your report, March 25th --
9  A.  Yes.
10  Q.  -- 2007.
11  A.  Yes.
12  Q.  Okay.  In the second paragraph on Page 1 of
13  the exhibit, which is three pages, I just have a
14  curiosity about your background.  You say,
15  "Additionally, I have over 10 years of direct
16  engineering experience."  What was -- what was that
17  work that you did?
18  A.  Mostly, I've worked in aerospace at Hughes
19  Aircraft.
20  Q.  Was that the work on the fluid mechanics
21  that you talked about earlier?
22  A.  Well, I was talking about my graduate work
23  on that.  But I would think that the work I was
24  doing at Hughes Aircraft -- Actually, you're -- Yeah,
25  I must add this to my aerospace background.  I forgot

## Page 86

1  I did some work on avionics at some point, and also
2  on satellites for 10 years.
3  Q.  For 10 years?  Okay.  But no stair design?
4  A.  Correct.
5  Q.  All right.  Okay.  On the very bottom, we
6  need to clarify some things.  Under the heading "CASE
7  BACKGROUND," and on the last sentence it says, "At
8  the time and place, Mr. Moses Fejeran was walking
9  down the rear gangway stairs of the aircraft when he
10  slipped and fell, thus injuring himself."  Okay.  The
11  words "slip and fall" --
12  A.  Yes.
13  Q.  -- did you use that sort of in the generic
14  sense?
15  A.  Absolutely.
16  Q.  Okay.
17  A.  And it's -- it's also mirrored in the -- in
18  Templer many times.  That's how an accident is
19  codified, when in fact, that's not what happened.
20  Q.  Okay.  But it's kind of a label?
21  A.  Yes.
22  Q.  All right.  Let's see.  Okay.  On the
23  second page of -- of Exhibit 17, the basis for your
24  opinions, you've -- we know that you inspected --
25  took pictures.  Then paragraphs numbered 1 and 2, are

## Page 87

1  you listing items that you reviewed, at least in part
2  as a basis for forming your opinions --
3  A.  Yes.
4  Q.  -- in -- in this -- Freedom Air's incident
5  report --
6  A.  Yes.
7  Q.  -- of the subject in the original
8  handwriting and the transcription from Doll Boddy?
9  A.  Yes.  Yes.
10  Q.  What -- what else did you -- what other
11  paperwork or documentation did you review as a basis
12  for your opinions?
13  A.  Just what's listed here.
14  Q.  Just what's listed here?
15  A.  Yes.
16  Q.  All right.  And the -- the 6 black-and-
17  white faxed photographs dated January 25th, 2006 --
18  A.  Yes.
19  Q.  -- where did they come from?  Did they come
20  from my office?  Mr. Banes?  Got them from me?  Or
21  --
22  A.  You know, I don't know.
23  Q.  Do you -- do you have them?
24  A.  I have them.
25  Q.  Can we just see them just to make sure it's

## Page 88

1  not something we haven't seen before?
2  A.  Let me find it.
3  Q.  Okay.
4     MR. LEDGER:  I think I gave these
5  to you.
6     MR. BANES:  Yeah, you did.  You
7  used them during Boddy's deposition.
8     MR. LEDGER:  Okay.
9  BY MR. LEDGER:  (Continuing)
10  Q.  Okay.  So it's nothing we haven't seen
11  before.  That's all I wanted to confirm with you.
12  Okay.
13     And then, in the "OPINION" section
14  -- okay.  Excuse me.  I need to back up.  The last
15  -- the last item under "BASIS FOR OPINION," it says,
16  "In addition, it is my understanding that Mr. Fejeran
17  indicates he stumbled and fell while he was
18  transitioning from the gangway stairs onto the
19  ground."  What's the source of your information?
20  A.  Mr. -- Mr. Banes' office.
21  Q.  Did you interview or speak with Mr. Fejeran?
22  A.  No.
23  Q.  Okay.  All right.  And dropping down into
24  the "OPINION" section, then, "Based on a review of
25  the above materials" -- and we're referring to the

# NAEGELI REPORTING CORPORATION

**800.528.3335**
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR         Seattle, WA         Spokane, WA         Coeur d'Alene, ID
503.227.1544         206.622.3376         509.838.6000         208.667.1163

Court Reporting      Trial Presentation      Videoconferencing      Videography

Page 89

1   information that Mr. Banes gave you.
2   A.  Yes.
3   Q.  All right -- about Mr. Fejeran stumbling - -
4   and then, all of the -- the ANSI -- Strike that.
5        The information that Mr. Banes gave
6   you, and then in the paragraph above where you've
7   listed some codes --
8   A.  Yes.
9   Q.  -- that's information that you relied on - -
10   A.  Yes.
11   Q.  -- correct?
12   A.  Yes.
13   Q.  All right.  And then the six black-and-
14   white photographs?
15   A.  Yes.
16   Q.  And then, item 1, Freedom Air's incident
17   report from Ms. Boddy and from Mr. Muna and from Mr.
18   Suzuki?
19   A.  That's correct.
20   Q.  Okay.  Now, is that -- is -- so is this a
21   -- is this a -- "Based on a review of the above
22   material, I have reached the following opinions"?
23   A.  Both, including --
24   Q.  Including --
25   A.  -- including things that are not mentioned,

Page 90

1   such as the Templer article.
2   Q.  Okay.
3   A.  Such as the -- We've already discussed some
4   of these, that -- the UBC commentary.
5   Q.  Okay.
6   A.  And just -- Yeah.  And -- and the materials
7   that are in my file; standards and so forth, which I
8   mention here.
9   Q.  Including what we've marked as Exhibits 12,
10   13, 14, 15?  That's the two pictures and the
11   Wikipedia and the -- the --
12   A.  Yes.
13   Q.  Right?
14   A.  Yes.
15   Q.  You know what I'm talking about?  12, 13,
16   14, 15?
17   A.  Correct.
18   Q.  Okay.  So my question for those items is:
19   Did you review them and rely on them in forming your
20   opinions, or did you review them after you formed
21   your opinions?
22   A.  Yes and no.  The 12, 13, 14, 15 are just
23   recently.  And it's after I reviewed, also, Dr.
24   Gill's report.  So that's another thing that's also
25   folded into this.  So that's after this report was

Page 91

1   published.  The Templer article, I forgot to reference
2   it in this paper, but I have -- I've always had that
3   in the back of my mind, always.  And -- and that's
4   -- wasn't put down as one of the basis of my
5   opinions.
6   Q.  Okay.  So chronologically, you reviewed
7   certain items and then formed the opinions expressed
8   in Exhibit 17?
9   A.  Yes.
10   Q.  And then, chronologically, you -- you looked
11   at some additional materials?
12   A.  Yes.
13   Q.  Now, did looking at the additional materials
14   give you any reason to change the opinions that you
15   reached prior to looking at those items?
16   A.  No, it didn't change any opinions; it just
17   bolstered it.
18   Q.  Okay.  Okay.  That's good.  Because I don't
19   have any -- if you don't have any others that aren't
20   here, then I don't have to ask you about them.
21   A.  I do have -- I probably have other opinions
22   that are not expressed in this list.  But that's --
23   Q.  Let's go through the ones on the list first.
24   A.  All right.
25   Q.  And then you get a chance to talk about the

Page 92

1   additional ones.  Okay.  Item 1: "The subject
2   stairway is unsafe, in that it lock -- it lacks
3   proper handrail/guardrail on the right side of the
4   stairs for disembarking passengers."  Okay.  What does
5   it lack?  What's wrong with the handrail, in your
6   opinion?
7   A.  There isn't any.  There's -- there's --
8   Q.  I'm sorry.  It lacks one of them.  I
9   thought you were talking about the one on the -- I'm
10   getting my orientation mixed up.  We're not talking
11   about the one on the left, going down.  Your
12   reference in item 1 is --
13   A.  Going down.
14   Q.  -- going down.  There's -- there's not a
15   handrail on the -- on the right side similar to the
16   handrail that's on the left side?
17   A.  Correct.
18   Q.  Okay.  So in your opinion, it lacks the
19   handrail entirely on the right side going down?
20   A.  It lacks a handrail.  It also lacks a
21   proper handrail, which is --
22   Q.  I was going to ask you that.  What's the -
23   - what's -- what did you mean when you used the word
24   "proper" in this context?
25   A.  Well, in this context -- and this is --



NAEGELI
REPORTING
C O R P O R A T I O N

800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR    Seattle, WA    Spokane, WA    Coeur d'Alene, ID
503.227.1544    206.622.3376    509.838.6000    208.667.1163

Court Reporting    Trial Presentation    Videoconferencing    Videography

Page 93

1  this is back, again, to the -- Dr. Gill's criticism
2  about the handrails and so forth. A proper handrail
3  spans the whole stairway with an extension. Now, he
4  is right, that in '85, it's a 6-inch extension. But
5  in '91, it becomes a 12-inch extension. So we're
6  nitpicking each other. I -- I say that it -- it
7  should be a 12-inch handrail in my discussion -- 12
8  -- it should extend 12 inches beyond the bottom
9  riser, for example, and -- and it -- that -- that
10  actually occurs in 1991.
11  Q. But that requirement is specific to stairs
12  inside buildings?
13  A. Stairs inside buildings, and also exiting
14  buildings to the public way.
15  Q. Okay. And so, it's your -- you're
16  extrapolating that in your opinion to apply to the
17  aircraft stair that we're looking at?
18  A. I'm not doing anything as far as saying that
19  this is a Code violation. No, I'm not doing that.
20  I'm -- I'm utilizing safe design principles to -- to
21  say that the proper stairway should have such a
22  handrail.
23  Q. Okay. But the design principles that you're
24  referring to are design principles applicable to
25  stairs inside buildings and stairs that are exiting

Page 94

1  buildings; is that correct?
2  MR. BANES: Objection; asked and
3  answered.
4  THE WITNESS: They're applicable to
5  stairs, period. And it's --
6  BY MR. LEDGER: (Continuing)
7  Q. Okay. It's --
8  A. -- it's just that they're not mandated.
9  Q. Okay. Are they applicable specifically to
10  aircraft stairs; the design criteria that you've
11  referred to? Is there anything in the information
12  that you've read giving you the -- that criteria that
13  makes the criteria apply specifically to aircraft?
14  A. The way the literature has published -- and
15  this is a long-about way to answer that -- that
16  handrails, quotes, "probably are the most important,
17  single safety device that can be provided in
18  connection with stairs." That's -- unquotes. In one
19  of the --
20  Q. Let me ask a more simple question.
21  A. Okay.
22  Q. In the material that you're relying on for
23  your opinion that it lacks a proper handrail, okay,
24  in the written material, is there is a specific
25  reference anywhere in the written material that

Page 95

1  indicates that the criteria applies to aircraft?
2  A. No.
3  Q. Okay. Back to "proper." I guess the
4  question is: Do you have anything to add to that
5  answer as to why you feel that the handrail -- Well,
6  I guess I need to put it in context. Are you saying
7  that it lacks a proper handrail on the right side
8  because, in your opinion, the handrail on the left
9  side is improper? In other words, if there were
10  another -- if there were two handrails identical to
11  the one that exists, would your opinion be that the
12  second one is improper?
13  A. From -- from an interpretation of the
14  Building Code, yes.
15  Q. Okay.
16  A. -- that's absolutely true.
17  Q. Okay.
18  A. And it's a little bit more. Because if you
19  look at that opinion, I'm actually saying "proper
20  handrail/guardrail." And -- and deep down - - I've
21  already alluded to this -- that the guardrail should
22  be there, because there's a danger of -- of people
23  falling from a height. And -- and this height is
24  also above what's needed for guardrails, that the
25  height -- to align from the stair from the jet plane

Page 96

1  is -- is above 30 inches.
2  Q. Okay. I see that. That's your reference
3  here of "guardrail"?
4  A. Yes.
5  Q. Okay. So what it lacks is a piece of
6  equipment, a bar, that serves two functions; handrail
7  and guardrail?
8  A. Yes.
9  Q. Okay. Would the same item -- could it
10  serve both purposes? Or are you saying it has to
11  have two different things there?
12  A. Well, the -- It'd be safer if they were
13  identical. It'd even be safer and proper, according
14  to the Building Code, to -- to have an extension to
15  the ground; one of them.
16  Q. Okay.
17  A. And we're just focusing on handrail/guardrail.
18  We're not talking about risers and treads --
19  Q. Right.
20  A. -- or anything of that sort.
21  Q. That's right. I agree. Okay. Okay.
22  Number 2, "The subject stairway is unsafe, in that
23  tread and risers variation is too great for safe
24  passage when exiting the aircraft." Okay. Obviously,
25  you focus in on the two words, "riser variation."

24 (Pages 93 to 96)

NAEGELI REPORTING CORPORATION

800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR          Seattle, WA          Spokane, WA          Coeur d'Alene, ID
503.227.1544          206.622.3376         509.838.6000         208.667.1163

Court Reporting        Trial Presentation      Videoconferencing        Videography

Page 109

1    MR. LEDGER: 19.
2        (Whereupon, a document titled "Frank
3    Perez Depositions/Trials/Arbitration/Mediation" was
4    marked as Exhibit-19 for identification.)
5    BY MR. LEDGER: (Continuing)
6    Q. It's a list of deposition trial testimonies.
7    A. Yes. Not -- not the latest, but it's up to
8    a certain point; I think in February.
9    Q. So since February 2007?
10   A. Yes.
11   Q. Since February 2007, you haven't given a
12   deposition or testified in an aviation case -- an
13   aircraft staircase?
14   A. I have given depositions; it's just not been
15   updated. But I have not given aviation deposition
16   testimony.
17   Q. About an aircraft stair?
18   A. About an aircraft stair.
19   Q. This is the first; the one and only? This
20   case?
21   A. Yes.
22   Q. Okay. All right.
23   A. I will remove this yellow sticky. There's
24   no reason to --
25   Q. You can take that sticky.

Page 110

1        Okay. When you did your aircraft
2    inspection, did you take any video or did you take
3    only still pictures?
4    A. Only still pictures.
5    Q. Okay. That's -- I've got that. There was
6    a -- there was a person with you that day?
7    A. Yes.
8    Q. Who was that?
9    A. I think he was a law student who was doing
10   a summer intern.
11   Q. Oh, that's right, with Dan Berman's office?
12   A. Yes.
13   Q. Okay. So he wasn't -- he's not an
14   associate or colleague of yours --
15   A. No.
16   Q. -- in your current position?
17   A. Correct.
18   Q. Okay. Did he have any input at all into
19   any of the workup?
20   A. No.
21   Q. He was just there to hold the tape measurer
22   and --
23   A. Yes. Yes.
24   Q. -- and carry your briefcase?
25   A. Right, my -- my equipment.

Page 111

1    Q. Your equipment. Okay. The -- You had --
2    we had -- we went over the four enumerated opinions
3    in Exhibit --
4    A. 17.
5    Q. -- 17. And then you -- you verbalized one;
6    the additional one?
7    A. Yes.
8    Q. Are there any others -- any other opinions
9    that you wanted to -- to give before we adjourn or
10   before --
11   A. Yes, I do. I think I kind of hinted at --
12   that the stairway should've been a 6-riser stairway to
13   be safe, according to --
14   Q. That's the one -- that's the configuration
15   that would've made it 21 inches longer?
16   A. Yes. Yes.
17   Q. Okay.
18   A. It would actually be a little bit longer, 31
19   inches longer, to make it safe and comfortable,
20   according to -- from human factors perspective. But
21   to make it safe, 21 inches is the minimum required.
22   Q. Okay.
23   A. That means that the -- the -- the rise is
24   6.4 inches for this configuration, and that the run
25   is 9 inches.

Page 112

1    Q. Okay.
2    A. The other thing that we didn't discuss was
3    that --
4    Q. Can I ask a question before you go to the
5    other thing?
6    A. Mm-hm.
7    Q. Because it just flows a little better.
8    A. Okay.
9    Q. So hold your thought on the other thing.
10       Okay. The stairway that you just
11   described, okay, this is Exhibit 10 -- we'll use
12   Exhibit 9 and 10 to the Gill deposition. In the
13   stairway that you just described would not fit in the
14   opening that exists in the fuselage of the airplane;
15   is that correct?
16   A. It can fit through the opening in the
17   fuselage in the airplane. It will not stow in the
18   door.
19   Q. In the manner that the present stair does --
20   A. Correct.
21   Q. -- correct? Okay. So what you're saying
22   is, you could take it off and you could slide it in
23   the airplane through the door?
24   A. Yes.
25   Q. But to operate it like this one operates, if

28 (Pages 109 to 112)

NAEGELI
REPORTING
CORPORATION

800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR          Seattle, WA          Spokane, WA          Coeur d'Alene, ID
503.227.1544          206.622.3376         509.838.6000         208.667.1163

Court Reporting       Trial Presentation   Videoconferencing    Videography

Page 113

1  you folded it up, unless it was articulated and had
2  an elbow in the middle, it wouldn't fit in the hole
3  that is in the fuselage of the airplane --
4   A.  Correct.
5   Q.  -- correct?
6   A.  Correct.
7   Q.  Okay.  So it would have to articulate in
8  the middle and sort of collapse on itself --
9   A.  Yes.
10   Q.  -- and then fold it up?
11   A.  That's correct.
12   Q.  All right.  Okay.  Now, the additional point
13  that I asked you to hold; what's that?
14   A.  Well, that the -- the cost of such a thing
15  should -- should not be that great.  I mean, it's
16  essentially a piece of metal that's 21 inches longer
17  than the current stair.  It -- it really does -- the
18  -- the effect of the cost should be $1,000,
19  approximately, for such a stair.
20   Q.  How can you testify to that, when you said
21  you have no experience in aircraft stair design?
22   A.  Just -- just the materials and the metal.
23  It's -- it's not -- it's not that expensive to -- to
24  produce this kind of thing.  I didn't talk about the
25  design cost, which is -- is a lot more, but that's a

Page 114

1  nonrecurring thing.  It's -- You know, in aerospace,
2  we -- we spend -- we spend a lot of government money
3  to make -- to make a battery that's -- that's --
4   Q.  Well, what's your -- what's -- When you say
5  it would cost -- in your opinion, it would cost
6  $1,000 more per stair in materials -- and what else
7  did you say?
8   A.  That's -- that's roughly what it would cost
9  to manufacture that, if you had to build up stamping
10  operations and stuff like that.  You know, that --
11  that's probably what the reasonable cost of selling
12  such a stairway, after -- you want to recoup that, as
13  a manufacturer of a stair.
14   Q.  But how would you -- how would you -- how
15  would you know that given your lack of any experience
16  in design or manufacture of aircraft stair?
17   A.  Well, this is just based on -- on
18  engineering design of product, which is, as I --
19  You're right.  It's not based on aircraft component
20  manufacturing, so I don't -- I'm not talking from
21  that standpoint.
22   Q.  You're talking about a nonaircraft stair?
23   A.  Producing metal of -- of this configuration,
24  that that would be a safe stairway.  That's all I'm
25  saying.

Page 115

1   Q.  So in aircraft context, to --
2   A.  I don't have any basis to -- to testify to
3  that.
4   Q.  So it could be $5,000?
5   A.  Could be, yes.
6   Q.  Okay.
7   A.  And -- and seeing that this is a low
8  quantity item, you know, that's -- that may very well
9  be the case.
10   Q.  I see your point.  The fewer you make, the
11  more expensive each one is?
12   A.  Correct.
13   Q.  Okay.  Sort of like an incremental cost?
14   A.  Recapture development costs is really a --
15   Q.  Okay.
16   A.  -- a factor that's not folded into that.
17   Q.  All right.  Okay.  I think we got that.
18  Given the existing opening in the airplane, a stair
19  designed the way you would like to design it would
20  have to articulate and fold in on itself, and then it
21  --
22   A.  Yes.
23   Q.  -- it could be closed in the same manner?
24   A.  Correct.
25   Q.  Okay.

Page 116

1   A.  Correct.
2   Q.  That's it?  A.  Others?  No.
3   Q.  No more opinions?
4   A.  No.  Oh, no, there's a -- there's one more.
5  It's just a -- several critiques on Dr. Gill's
6  report.  I mean, I'm just not --
7   Q.  Not happy with what he said?
8   A.  No.  No, it's not that.  I think what we're
9  doing is we're nitpicking each other in total,
10  especially about Building Code analyses.  I think he's
11  actually -- In his report, he actually says that the
12  UBC permits riser heights up to 8 inches.  So, yeah,
13  that's -- Looking closely at that, that's for
14  exceptions.  And the exception is for an occupant
15  load less than ten.  But if one were to apply the
16  Building Codes to this particular airplane, the
17  occupancy load is more than ten, so -- so this
18  permitted riser height doesn't apply.  You go back to
19  the 4 and 7 inches and you go back to the safety
20  standards that -- that are promulgated by -- by
21  Templer, which is something less than 7.2 inches and
22  riser -- and treads that are greater than 9 inches.
23  That's -- that's the minimum that -- that he has
24  published.
25   Q.  When you were doing your Web research on the

29 (Pages 113 to 116)

NAEGELI
REPORTING
CORPORATION

800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR        Seattle, WA        Spokane, WA        Coeur d'Alene, ID
503.227.1544        206.622.3376       509.838.6000       208.667.1163

Court Reporting     Trial Presentation     Videoconferencing     Videography

---

Page 117

1  Short's 360, were you looking for published design
2  criteria? Were you hoping to find that so that you
3  would have something to compare this aircraft stair
4  to?
5  A.  No. I -- I believe that kind of -- I
6  mean, I know from doing this for many years that
7  you're not going to find that information on the Web;
8  the specifications or the engineering detail. That's
9  not -- that's hidden from the world.
10  Q.  That's not -- so that's not what you were
11  looking for?
12  A.  That's not what I'm looking for.
13  Q.  Okay. So you -- And it's more -- you --
14  in your -- you -- it would be proprietary and it
15  wouldn't be out there --
16  A.  Correct.
17  Q.  -- for people to --
18  A.  To download.
19  Q.  -- to download?
20  A.  Absolutely.
21  Q.  Okay.
22       MR. LEDGER:  Mr. Banes, why don't
23  you take over.
24       THE WITNESS:  No. I have -- I
25  still have --

Page 118

1  BY MR. LEDGER:  (Continuing)
2  Q.  Oh.
3  A.  -- another criticism of Gill's.
4  Q.  Oh, okay. I'm sorry.
5  A.  The one final --
6  Q.  I'm sorry.
7  A.  I'm just going to gloss -- I mean,
8  basically, we can nitpick and talk about the stuff in
9  the Building Codes. But I have to go there. It's
10  just -- it's just unsafe.
11       But he did say a curious thing, I
12  understand, in today's deposition; that he believes
13  that Mr. Fejeran fell, not from the last step, but
14  higher than that. And his -- I believe his reason
15  that he utilized was that the timing -- you know, the
16  -- Doll Boddy -- Ms. Boddy couldn't have gotten to
17  him that fast.
18  Q.  Yeah. He said something like that.
19  A.  Right. But I -- I did a simple analysis
20  before I came to this deposition: What does -- what
21  does it take to drop that height, you know, from that
22  -- that particular height. And we're looking at --
23  Just the body dropping would take .3 seconds. So now
24  -- I mean, this is just a simple gravity fall, but
25  there's going to be a little bit more to that, if

Page 119

1  you have to pivot over the steps involved. So I
2  don't think -- I think there's not enough time for
3  anybody to react, and I think -- So there's really --
4  You can't use that justification to say that he had
5  to be at a higher step.
6  Q.  Actually, it sounded as -- From what you
7  just said, it sounds like you agree with Mr. Gill
8  instead of disagreeing.
9  A.  Well --
10  Q.  I think what Mr. Gill said -- my
11  interpretation -- was that if -- in order for --
12  assuming Ms. Boddy's statement is correct, that she
13  was able to grab Mr. Fejeran under the arm and
14  prevent him from falling facedown on the pavement --
15  A.  Right.
16  Q.  -- I think what Mr. Gill said was, in order
17  -- in order for her to have the awareness and the
18  time to do that, that in Mr. Gill's view, the
19  precipitating event would've had to occurred somewhere
20  prior to the last riser.
21  A.  No. What I'm saying is that, even if you
22  were up higher, the time involved is so short that
23  even -- anybody couldn't perceive and react with that.
24  Q.  So are you saying that she didn't catch him?
25  A.  No. No. I'm not saying that that's not a

Page 120

1  reason for -- for explaining why he's up higher,
2  because there's not enough time --
3  Q.  Oh, okay. Okay.
4  A.  -- there's not even enough time even to do
5  something with that at the next step up.
6  Q.  But assuming her account of things -- and
7  there is some difference in Mr. Fejeran's statements
8  to various people and Ms. Boddy's.
9  A.  Okay.
10  Q.  But as far as it goes, assuming that she
11  did assist him, or break his fall in some manner by
12  grabbing him under the arm, if that's true, doesn't
13  that necessarily mean that she had time to do that?
14  A.  Assuming that, yes. That means she -- if
15  she was completely unaware and away from it, then,
16  yes, she needed to rush up and -- Well, first she
17  needs to perceive and do something, decide, and then
18  move and so on. So that takes a lot of time.
19  Q.  I think what she -- she said that she
20  didn't -- she didn't have to change her position.
21  A.  Okay.
22  Q.  She was at -- she was at her post at the
23  bottom of the steps doing her normal, you know,
24  "Welcome to Rota. Have a nice day. Watch your
25  step." I think -- She didn't have to run and catch

30 (Pages 117 to 120)

**NAEGELI
REPORTING**
C O R P O R A T I O N

**800.528.3335**
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR          Seattle, WA          Spokane, WA          Coeur d'Alene, ID
503.227.1544          206.622.3376          509.838.6000          208.667.1163

Court Reporting          Trial Presentation          Videoconferencing          Videography

1

**CERTIFICATE OF SERVICE**

2          The undersigned hereby certifies that on the 6th day of September 2007, I will cause to

3   be served, via electronic filing/service, a true and correct copy of **DEFENDANT'S MOTION**

4   **IN LIMINE TO PRECLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT FRANK**

5   **PEREZ; DECLARATION OF ELYZE J. McDONALD; EXHIBIT A; CERTIFICATE OF**

6   **SERVICE** to the following Counsel of record.

7

8                    David G. Banes, Esq.
                     O'Connor Berman Dotts & Banes
9                    Second Floor, Nauru Building
                     Post Office Box 501969
10                   Saipan, MP 96950

11   and             Victorino DLG. Torres, Esq.
                     Torres Brothers, LLC
12                   Second Floor, Nauru Building
13                   Saipan, MP 96950

14          DATED:  September 6, 2007.

15

16                                         _____
17                                         ELYZE J. MCDONALD

18

19

20

21

22

23

24

25

26

27

28